**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Nathan A. Saunders, II

    3224 Wheeler Road, SE

    Washington, D.C.  20032

    202 563 2363.

    Plaintiff,

v.

                  )  CASE NUMBER:_____

George Parker

    490 L'Enfant Plaza, SW, Suite 7200

    Washington, D.C.  20024

Case: 1:08-cv-00715
Assigned To : Collyer, Rosemary M.
Assign. Date : 4/25/2008
Description: Pro Se General Civil

Michelle Rhee

    825 North Capitol Street, NE

    Washington, D.C.  20002

Adrian Fenty

    441-4th Street, NW

    Washington, D.C.  20004

Al Squires

    555 New Jersey Avenue, NW

    Washington, D.C.  20013

American Federation of Teachers

Edward J. McElroy

    555 New Jersey Avenue, NW

    Washington, D.C.  20013

JURY TRIAL DEMANDED

Charles Henry "Clay" White, II

    490 L'Enfant Plaza, SW, Suite 7200

1

| | | |
|---|---|---|
| 1 | Washington, D.C.   20024 | ) |
| 2 | | ) |
| 3 | Lorraine Smith | ) |
| 4 | 490 L'Enfant Plaza, SW | ) |
| 5 | Suite 7200 | ) |
| 6 | Washington, D.C.   20024 | ) |
| 7 | | ) |
| 8 | John Tatum | ) |
| 9 | 490 L'Enfant Plaza, SW | ) |
| 10 | Suite 7200 | ) |
| 11 | Washington, D.C.   20024 | ) |
| 12 | | ) |
| 13 | Erich Martel | ) |
| 14 | 490 L'Enfant Plaza, SW | ) |
| 15 | Suite 7200 | ) |
| 16 | Washington, D.C.   20024 | ) |
| 17 | | ) |
| 18 | Joseph M. Carrillo | ) |
| 19 | 6816 32nd Street, NW | ) |
| 20 | Washington, D.C.  20015 | ) |
| 21 | | ) |
| 22 | Jane Doe | ) |
| 23 | | ) |
| 24 | Jane Doe | ) |
| 25 | | ) |
| 26 | John Doe | ) |
| 27 | | |
| 28 | | |
| 29 | | |
| 30 | | |
| 31 | | |
| 32 | | |

1

2

3

# I. INTRODUCTION

4    Because Plaintiff Nathan A. Saunders, General Vice President of the Washington

5  Teachers' Union (WTU), engaged in Freedom of Speech and Assembly activities, he was

6  systemically punished and retaliated against for those actions.  His duties are found in the

7  WTU constitution.

8      **Section 2.**  *The General Vice-President shall:*

> *A. Perform other duties as delegated by the President or assigned by the Executive Board.*
> *B. Oversee and assist the building representatives in their duties.*
> *C. Supervise the field representatives and other employees as designated by the t.*
> *D. Co-sign checks and other financial documents in the absence of the President or the Treasurer and serve as a fiduciary of the Union. The General Vice-President shall be bonded and such expense shall be borne by the Union.*
> *E. Perform all the duties of the President in the absence of the President.*
> *F. Complete the un-expired term of the president should the office become vacant.*
> *G. Convene the Elections Committee.*

9      In 2004, the position of the General Vice President was expanded in the WTU

10  Constitution, by the national affiliate organization, American Federation of Teachers

11  (AFT), while WTU was under an AFT imposed Trusteeship.  Part of the expanded

12  General Vice President's authority includes the requirement that General Vice President

3

1    serve as a fiduciary agent, become a full time executive of the WTU with compensation

2    determined by the Executive Board.  Legislative history shows the desire and intent to

3    allow the General Vice President independence and not require acquiesce to the President.

4    WTU members are also able to vote for the General Vice President separate and apart

5    from the President.

6          Between 1995 and July 2002, Barbara Bullock served as elected President of the

7    Washington Teachers' Union ("WTU"), Defendant Gwendolyn Hemphill served as

8    Bullock's Special Assistant, and Defendant James Baxter served as the WTU's elected

9    Treasurer, and in these capacities, all three were legally obligated and duty-bound to

10   serve and protect the interests of the WTU and its approximately 5,000 members. Instead,

11   Bullock, Hemphill, and Baxter, acting in concert with and/or due to the failed oversight

12   of other Defendants, plundered and depleted the WTU treasury by illegally

13   misappropriating more than Five Million Dollars ($5,000,000.00) for substantial personal

14   gain and for the benefit of their families and friends. These officers and union insiders

15   used the WTU treasury, funded almost entirely from union dues paid by active and

16   retired teachers for the District of Columbia Public Schools ("DCPS"), as a personal bank

17   account to pay for, on information and belief, such luxury items as: multiple fur coats and

18   fur accessories; antiques; a million-dollar wardrobe of designer and custom clothing;

1    multiple designer handbags; a $10,000 plasma television and other electronic and stereo

2    equipment; a personal chauffeur; travel to the Bahamas; a $57,000 Tiffany tea set; bone

3    china; home computers; custom hair wigs; season tickets for professional sports events;

4    jewels and pearl necklaces; artwork; a $6,800 ice bucket; partial payment towards a new

5    Cadillac; and home furnishings, including a dining table and a burled wood desk.

6          Plaintiff carries a special crucifix in that it was his initial action through Saunders

7    v. Hankerson et.al., written as a pro se complainant, which established important case law

8    and impacted labor law and regulations for all unions in the United States.  Esther

9    Hankerson, the former General Vice President during Bullock term, was the chief

10   defendant in that Lawsuit.  The Plaintiff, a classroom teacher at the time, held Hankerson

11   legally responsible for breaching her fiduciary responsibilities to the members of the

12   WTU.

13         In that regard, Plaintiff presents himself before the honorable court fully

14   understanding the seriousness of the issues embodied herein and fully exhausting all

15   reasonable intra-union remedies.  It is the result of a multiple "last straws" which this

16   court is formally requested to act on violations of law.  Plaintiff was exposed to direct

17   intimidation and retaliation impacting employment benefits, rights and privileges.  Seeing

18   the elected official constructively removed from his post by management through

1   Defendant Parker has a chilling effect on the members. The WTU members have been

2   denied the services of the elected representative of their choice or the Plaintiff. Such

3   actions are violations of federal and local law and the constitutions of both AFT and

4   WTU.   Actions against Plaintiff and others similarly situated were designed to quell

5   individual and joint dissent within the Washington Teachers' Union and the District of

6   Columbia Public Schools against current view of the "Political Education Policy" of

7   Defendant Adrian Fenty, Mayor of the District of Columbia and Defendant Michelle

8   Rhee, Chancellor of DCPS. These actions were carried out in a collusive fashion by

9   multiple parties acting jointly and independently. All defendants are members of the

10  District of Columbia Public Schools (DCPS), The Washington Teachers' Union (WTU),

11  The American Federation of Teachers (AFT), or their families, friends, and acquaintances.

12  Defendants orchestrated walls of obstruction so that Plaintiff could not perform his

13  fiduciary duty. In doing so, those who are elected officials of WTU breach their

14  fiduciary responsibilities.   This court action is initiated in adherence to the Plaintiff's

15  Fiduciary Standard and his rights as a union member. Plaintiff –union officer- sues the

16  Defendants including its President claiming violations of the Labor Management

17  Reporting and Disclosure Act's Bill of Rights 29 U. S. C.S. § 411(a)(1), (2), and (4) by

18  trying to suppress dissent within the union and further their own political, economic and

1   educational interest. Defendants violated the union constitution, in contravention of the

2   Labor Management Relations Act, §303, 29 U. S. C. S. §185.   Congress considered the

3   protection afforded by Title I to free speech and assembly in the union context necessary

4   to bring an end to abuses by union leadership that had curtailed union democracy.  It

5   adopted the freedom of speech and assembly provision in order to promote union

6   democracy and recognized that democracy would be assured only if union members are

7   free to discuss union policies and criticize the leadership without fear of reprisal.  This

8   right is crucial to the independence of the membership and the effective and fair

9   operation of the union as the representative thereby also serving a public good.   The

10  Labor Management Reporting and Disclosure Act of 1959, 29 U. S. C. S. § 412, provides

11  in part:  Any person whose rights secured by the provisions of this title have been

12  infringed by an violation of this title my bring a civil action in a district court of the

13  United States for such relief (including injunctions) as may be appropriate.

14      Disappointingly, Plaintiff's performance of these fiduciary duties has been

15  portrayed as insider politics.  Plaintiff vehemently rejects this portrayal. The next WTU

16  officers' election  is more than 2 years away scheduled for May, 2010.  The matters at

17  hand and the current affairs of the WTU have consequential bearing on the next two

18  school years—all prior to the scheduled WTU election of officers.

## II. JURISDICTION AND VENUE

1

2 This action arises under provisions of the Labor-Management Reporting and Disclosure

3 Act (LMRDA), 29 U.S.C. §401 et seq., the Labor-Management Relations Act (LMRA),

4 29 U.S.C. §141 et seq., the Racketeer Influenced and Corrupt Organizations Act (RICO),

5 18 U.S.C: §1961 et seq., and District of Columbia law. This Court has jurisdiction over

6 the case pursuant to 28 U.S.C. §1331 because this complaint arises under the laws of the

7 United States, and 28 U.S.C. §1367 because supplemental claims arising under the laws

8 of the District of Columbia are so related to the Federal claims in this action that they

9 form part of the same case or controversy.

10 Venue is proper in the United States District Court for the District of Columbia pursuant

11 to 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving

12 rise to the claims occurred in the District, the WTU is located in the District, the AFT is

13 located in the District, and all other defendants and Plaintiff's either reside or work in the

14 District.

15 All of the Defendants are subject to the exercise of personal jurisdiction by this Court.

16 There exists now between the parties an actual, justifiable controversy in which Plaintiff

17 is entitled to relief because of the facts and circumstances set forth below.

# III. PARTIES

2   Plaintiff, Nathan A. Saunders II, is an individual who resides at 3224 Wheeler Road.,
3   S.E., Washington, D.C. 20032.  Plaintiff, in addition to being an elected officer of the
4   WTU, is a WTU member in good standing, a voting member of the WTU Executive
5   Board, the Union's highest ranking officer who resides in Washington DC and the second
6   highest WTU officer overall.

7   Defendant George Parker is the President of the Washington Teachers' Union.  He
8   resides in Upper Marlboro, Maryland.
9
10  Defendant Adrian Fenty is the Mayor of the District of Columbia.  He resides in
11  Washington, DC.
12
13  Defendant Michelle Rhee is the Chancellor of the District of Columbia Public Schools.
14  She resides in Washington DC.

15  Defendant Al Squires is the Southern Region Director of the AFT.  He is sued in that
16  capacity and personally.

17  Defendant, Edward McElroy, is the President of the American Federation of Teachers,
18  AFL-CIO, a non-profit labor union, having its principal place of business at 555 New
19  Jersey Avenue, N.W., Washington, D.C. 20001.

20  Defendant Charles Henry "Clay" White, II is the Chief of Staff of the Washington
21  Teachers Union.  He is a member of the WTU contract negotiations team appointed by
22  Defendant Parker.  He is not an elected officer of the WTU.  He is sued personally.  He
23  resides in Washington DC.
24
25  Defendant Lorraine Smith is an elected member of the WTU Executive Board.  She is
26  also the Chairperson of the WTU personnel committee.  She is sued personally.  She
27  resides in Washington DC.
28
29  Defendant John Tatum is the Parliamentarian of the Washington Teachers' Union, a
30  position appointed by Defendant George Parker.  This position is paid for out of the
31  membership dues of the WTU.
32

9

1   Defendant Erich Martel is an elected member of the WTU executive board.  He is a
2   member of the WTU contract negotiations team appointed by Defendant Parker.  He
3   resides in Washington DC.

4

5   Defendant Joseph Carrillo is a member of the WTU contract negotiations team appointed
6   by Defendant Parker.

7

8   Jane Doe

9

10  Jane Doe

11

12  John Doe

13                    **IV. Freedom of Speech and Assembly**

14  Plaintiff incorporates by reference the allegations set forth in all earlier paragraphs.

15  Plaintiff opposed Mayor Fenty's and Defendant Chancellor Rhee's At-Will legislation

16  officially titled "District of Columbia Public Education Personnel Reform Amendment

17  Act of 2007", based on ethical, educational and economic reasons.  Plaintiff's logic

18  behind the opposition fits within a traditional labor union viewpoint.  Plaintiff notified

19  Defendant Parker and the Executive Board of the position the WTU should consider

20  taking as it relates to At-Will Legislation.  **(SEE THE LETTER TO PARKER AND**

21  **THE EXECUTIVE BOARD, Exhibit 1) AND THE WASHINGTON POST**

22  **ARTICLE, Exhibit 2)**

23      Defendant Parker, who was personally supportive of the Mayor Fenty's and

24  Defendant Rhee's At-Will legislation, urged Plaintiff to be silent.  When Plaintiff sought

1    support from the WTU's Executive Board to oppose the At-Will Legislation, Defendant

2    Parker intentionally misrepresented the official position of the Metropolitan Washington

3    Council (MWC) when the matter was presented to the WTU Executive Board for

4    consideration. Defendant Parker intentionally misinformed the WTU Executive Board

5    that the MWC had no position on the legislation.  This crude act prompted a

6    representative from the MWC to attend the next WTU Delegate Assembly meeting to

7    seek this body's endorsement of the MWC's stated position which was opposition to the

8    At-Will Legislation.  At that meeting, WTU Delegate Assembly passed a strong motion

9    that obligated WTU to oppose the At-Will Legislation.  The motion further directed

10   President Parker and the WTU leadership to actively work, on behalf of WTU members,

11   to defeat the legislation using all forms of media formats and by working collaboratively

12   with other organizations seeking the same outcome.  Defendant Parker took only minor

13   superficial actions against the legislation.  Behind the scenes he reneged on fully

14   supporting radio campaigns aimed at defeating the At-Will legislation and strongly

15   dissuaded other unions from holding Press conferences to collectively speak against the

16   legislation.  Defendant Parker acted as if he had higher responsibilities other than the

17   interest of the membership.  According to the WTU Constitution, the Delegate Assembly

18   is the highest rule making body outside of the general membership.  Its decisions override

1  the views of the WTU General Vice President's, WTU President's and the WTU

2  Executive Board.  Following the directive of Delegate Assembly, Plaintiff aggressively

3  spoke out against the At-will legislation, participated in community rallies, community

4  meetings and town hall education forums—all aimed at speaking against the At-Will

5  legislation, per the directive of the Delegate Assembly.  Because of my Plaintiff's

6  activities, Defendant Parker threatened Plaintiff for taking a position contrary to his

7  personal point of view albeit not WTU's.  Plaintiff, based on knowledge, believes

8  Defendant Parker already pledged his quietness and the quieting of all voices inside of

9  the Washington Teachers' Union.  Evidence will show that members in DCPS and the

10  Washington Teachers' Union, who spoke out against the At-Will legislation were

11  retaliated against and intimidated by Defendants Parker and Rhee.  In yet another

12  incidence, which immediately followed the aforementioned, Plaintiff was invited to

13  appear on WPFW's Gloria Minot show to discuss the impact of At-Will Legislation on

14  the workforce.  When Defendant Parker discovered Plaintiff Saunders was going to

15  appear on the show, Defendant Parker ordered Plaintiff not to speak on the show .

16  Plaintiff refused and told Defendant Parker so in a written email sent to him and the

17  Executive Board concerning the threats.  (SEE LETTER TO THE EXECUTIVE

18  BOARD NOTIFYING THEM OF THREATS, Exhibit 3).

1    Within one week after this event, Defendant Lorraine Smith, presumably acting on

2    behalf of Defendant Parker telephoned select Executive Board Members stating, "Please

3    come to this upcoming meeting.  George needs your vote against Nathan."    In an effort

4    to deliver on his earlier threat, Defendant Parker tried to ambush Plaintiff by introducing

5    a letter, written by a member, intended to assassinate Plaintiff's character. **(See Carillo**

6    **Letter, Exhibit 4)**. The letter admonished the Plaintiff's actions of speaking out against

7    the At-Will Legislation, participating in community rallies, and generally not helping

8    Defendants Rhee and Fenty think kindly of the WTU as a cooperative-collaborative agent.

9    This letter, referred to as the "Carrillo" letter, was presented to the Executive Board

10   without Plaintiff's or the WTU's Executive Board prior knowledge of its contents and

11   with Defendant Al Squire receiving a copy earlier than the decision making entities of the

12   WTU.  The Defendant's conspirators knew that the Plaintiff did not know of its existence

13   or that it would be on the agenda.  Defendant Joe Carrillo, author of the "Carrillo" letter

14   was allowed to present his letter of accusations against Plaintiff, which were technically

15   and legally absurd, to the WTU Executive Board.  During the presentation of the

16   "Carrillo" Letter, Defendant Erich Martel, a board member and another appointee of

17   Defendant Parker's contract negotiating team, immediately began disseminating a one

18   and a half page typewritten resolution which we will call "The Martel Resolution" during

13

1    the meeting. **(See Exhibit 5).** The "Martel Resolution" is a document designed to restrict

2    the public speech of the WTU General Vice-President. It restricts the speech of all

3    members and punishes them without due process or equal protection of the law.  A 2.5

4    hour debate ensued about free speech in a labor organization, the WTU constitution,

5    individual rights of members, censorship, punitive clauses, due process and the members

6    Labor's Bill of Rights, as well as the other aspects of the "Martel Resolution".  Plaintiff

7    mentioned numerous times again he believed the Martel Resolution to be unlawful.

8    Despite Plaintiff's objections, Defendant Martel made the motion to enact the Martel

9    Resolution.  Defendants Martel and Parker voted in favor of the motion; Saunders and

10   four other board members voted against it and five Board members abstained.   The

11   Executive Board officially struck down the Martel Resolution.

12        Between January and February 2008, Plaintiff was away from the WTU, on approved

13   educational leave, as part of the 97th Class of the Harvard Trade Union Program at the

14   Harvard Law School.  During Plaintiff's time of educational leave, Defendant Parker

15   created and instituted a new Media Policy.  This new policy, which was not presented to

16   or approved by the Executive Board or the WTU Delegate Assembly, is essentially the

17   same policy previously voted down by the WTU Executive Board in the form of the

18   Martel Resolution.  This new policy was distributed to all media outlets, all WTU

1    members and other external D.C. Government Agents including the management tier of

2    the D.C. Public Schools. **(SEE THE NEW WTU MEDIA POLICY, Exhibit 6).** In

3    addition, Defendant Parker with the help of Defendant Smith, who is not the elected

4    WTU secretary, and Defendant John Tatum, the appointed WTU Parliamentarian,

5    changed the Board minutes to reflect that the Martel Resolution was approved by the

6    Executive Board—when in actuality, it was disapproved. **(SEE THE BOARD**

7    **MINUTES WHICH SHOW THE TANGIBLE PORTIONS OF THE MARTEL**

8    **RESOLUTION AS PASSING, EXHIBIT 7).**

9    Since returning from educational leave, Plaintiff has been repeatedly obstructed from the

10   completion of his constitutional duties. Defendant Parker eliminated some of the

11   Plaintiff's duties and attempted to exercise significant limiting capacity to insure failure

12   in other projects. These barriers included but were not limited to loss of meaningful

13   involvement with delegate assembly. For example, for the past 3 years Plaintiff was

14   delegated the responsibility, by the President, to serve in the capacity of the presiding

15   officer. This duty was removed for punitive reasons described herein. Control of field

16   service operations including assisting the building representatives, also constitutionally

17   mandated to the General Vice President under the WTU Constitution, and was also

18   obstructed, for punitive reasons described herein. For example, Plaintiff's scheduled

1  meeting with field staff was cancelled by Defendant Parker indicating that no more

2  meetings were to be held until supervisory authority was established. **(See Emails,**

3  **Exhibit 8 & 9).** Plaintiff's constitutionally given duties were subsequently reassigned to

4  Defendant White. Defendant Squire provided a document, at the request of Defendant

5  Parker, to suggest the appropriateness of these actions. During the Monday, April 14

6  staff meeting conducted by Defendant White, due to the absence of the President,

7  Plaintiff noted that the assignments of critical functions were being diverted around

8  Plaintiff. When confronted with this belief by Plaintiff, Defendant Parker, on the

9  speakerphone at the time, stated in the presence of the field staff "that is correct."

10  Plaintiff's involvement in significant school projects has been interrupted.  Plaintiff has

11  been kept out of the WTU contract negotiations, which is unusual for this union, and a

12  violation of the constitution in and of itself. For example, if something happened to

13  Defendant Parker while in contract negotiations, the organization would be jeopardized

14  as the officer elected to complete the negotiations, in his absence, has had no prior

15  involvement.

16  Plaintiff has fought hard to keep the WTU clean from graft, fraud and conspiracy

17  with management. Plaintiff's concerns predate Defendants Fenty and Rhee's "Political

18  Education Policy." Plaintiff's demand for basic employment and hiring procedures are

16

1    the result of the excessive amount of sexual harassment complaints by female employees

2    of the WTU, special employment relationships enjoyed by select staff, and the high staff

3    turnover rate resulting from this work environment. Within the last 45 days alone, two

4    female staff members have quit their employment at the WTU. The alleged perpetrators

5    were the direct hires of Defendant Parker who secured special employment relationships.

6    Plaintiff had detailed and explicit conversations with Defendant Parker on this issue. The

7    basic employment and hiring procedures demanded by the Plaintiff include but are not

8    limited to advertising vacant job position, developing job descriptions, allowing the WTU

9    personnel committee to properly manage the process, and using a fundamental

10    organization structure based on the WTU Constitution.

11        The last straw for the media policy occurred on April 10, 2008. Plaintiff attended

12    a press conference, purely by happenstance, whereby Defendants Fenty and Rhee

13    released the details of the Teacher Transition Award program. Plaintiff saw Defendant

14    White and inquired where Defendant Parker was? Defendant White stated Defendant

15    Parker was sick. Plaintiff told him that Plaintiff was not aware of this, although Plaintiff

16    had been in the office all morning. Plaintiff called Defendant Parker on his home and

17    mobile telephone number and showed Defendant White my attempts. Defendant White

18    acknowledged them. At my request, Defendant gave me a copy of the statement of

1    WTU's support of TTA program.  After reading the prepared media advisory, Plaintiff

2    determined WTU's statement was a farce. It was misleading and evasive and contrary to

3    the best interest of our members.  The statement, which takes a position on the TTA

4    Program on behalf of the WTU, had not been presented to or approved by the Executive

5    Board before Defendant Parker made an endorsement. The TTA Program Defendant

6    Parker was endorsing, on behalf of the WTU, was a thinly cancelled sale back of current

7    union members jobs. **(SEE THE MEDIA REPORTS ON THE TTA, EXHIBITS 10,**

8    **& 11 ).**

9        Because of this, Plaintiff requested Defendant White "to stand down" 3 times as

10    Plaintiff would handle the press conference in the absence of the President.  Further,

11    Defendant White has had not media experience or training.  Defendant White said he

12    would not as "George put him in charge."   Plaintiff then reminded him of Plaintiff's

13    constitutional role as General Vice President and Defendant White's role as a paid and

14    non-elected staff member.  Again, Defendant White refused to stand down.  At that point,

15    Plaintiff stepped aside, in protest, to avoid a confrontation and determined a legal

16    challenge was the only route to enforce Plaintiff's constitutional duties on behalf of the

17    WTU.  Defendant Parker's media policy can not supersede the WTU constitution.

18    Disappointingly, Defendant White, who is also employed, part-time, as a security guard

1    for another agency, engaged in a strong arm tactic, which left unchecked, could be the

2    downfall of objective involvement. These strong arm tactics have been employed before

3    and are becoming more frequent.  Plaintiff had to previously voice support for the elected

4    WTU Treasurer when she received undo pressure to sign checks with Defendant Parker.

5    Defendant White has no job description or duties other than being the personal assistant

6    to Defendant Parker.

7        News reports after the press conference indicated mass disappointment with the

8    TTA Program and that it was negotiated with Defendant Parker.  Defendant Parker later

9    refers to it as "unattractive."  **(SEE NEWS ARTICLES, EXHIBITS 12, 13 14 & 15).**

10   Additionally, Plaintiff's demand for a vendor bidding and selection policy was

11   requested due to the awarding of WTU vendor contracts and special employment

12   provisions to certain defendants "friends and family" whereby the work product and

13   compensations amounts have been questionable and uncontrollable.  Recently, Defendant

14   Parker informed Plaintiff he was allegedly "tricked" by Defendant White into diversion

15   of WTU funds, through an out of state company, to a family member over a protracted

16   period of time.  Plaintiff had a detailed face to face meeting with Defendants Parker and

17   White, and with the family member over the speakerphone, and made it clear Plaintiff

18   was not implicating himself.  Plaintiff refused to sign any checks to vendors not properly

1   authorized by the WTU Executive Board. Defendant Parker was also instructed, by

2   Plaintiff, to inform the executive board of this matter. In yet another instance,

3   Defendants Parker and White produced a last minute rental lease agreement for WTU to

4   execute for a questionable facility, parties, and fees including an undecipherable $10,000

5   finder's fee designated as a special commission. The lease, facility, and transaction were

6   wholly inappropriate and challenged from the onset by the Plaintiff. Plaintiff informed

7   the WTU staff, the executive board and AFT the transaction was bad for the WTU.

8   While Defendants Parker and White tried to convince executive board members

9   otherwise, valuable time was lost and because of this, WTU's mission and finances were

10  placed at risk. The organization paid dearly for defendants' last minute deviation. The

11  resulting impact to the union members was the WTU was sued in DC Superior Court for

12  failing to vacant its former office space - 1717 K St. NW Suite 902- on time. One year

13  worth of legitimate work between Plaintiff, Grubb and Ellis Realty, and AFT was cast in

14  the winds. The WTU lost its security deposit – approximately $17,000- which was

15  completely unnecessary, incurred an additional $20,000 in moving expenses, forced to

16  acquire a short-term lease, amassed unnecessary legal fees, and significantly interrupted

17  service to members for more than 8 weeks.   The present office space, which was

18  secured within 35 days, is a short-term lease. This situation will require WTU to spend

1    another $30,000 or more in order to move again shortly.  These same types of situations

2    started in early 2005 and Plaintiff has sought to resolve issues quietly and behind the

3    scenes.  Plaintiff developed a practice of verbal conversations, written letters to

4    Defendant Parker, if necessary, and correspondence being sent to the Executive Board.

5    This process was used oftentimes on major issues.  Recently, Plaintiff started

6    communicating directly with the AFT as the waste and mismanagement was beyond

7    Plaintiff's ability to counterbalance.  The ideals of the organization were being corrupted

8    as well as its basic ideals of union democracy.  As the union's treasury has grown, more

9    and more pressure has been put accessing it in a personal and dictatorial manner by

10   Defendants.  **(SHOW THE WTU FINANCIAL STATEMENTS PARTICULARLY**

11   **THE BALANCE SHEET, EXHIBIT 16).**  Plaintiff has lobbied the executive board

12   concerning the misuse of the union funds, contracting improprieties, executive loans,

13   check challenges and the use of personal credit card expenditures on behalf of the WTU .

14   Over the years, Plaintiff has stopped the acquisition of WTU credit cards and the ability

15   of Defendant Parker being able to write checks to himself, etc.    By quieting the

16   Plaintiff's free speech and assembly or any member's for that matter, the ability to

17   protect the union's treasury, union democracy, its values and ideals and perform other

18   fiduciary duties are also diminished.

21

1

2

3
## V.  THE PARKER-SQUIRE SPEAKERPHONE CONVERSATION

4

5      AFT, through its own experiences in dealing with Defendant's projects and

6   activities and appeals from the Plaintiff, has recognized the current shortcomings.

7   Plaintiff complaints and Executive Board request for assistance has led to the

8   development of the AFT/WTU Agreement to assist Defendant Parker with the internal

9   management of the WTU.  **(SEE ATTACHMENT OF THE AGREEMENT,**

10   **EXHIBIT 17.)**  Said agreement is an extensive involvement into the day to day

11   operations and management of the WTU.  The "agreement" represents minimally, the

12   fourth revision of an agreement originated by the American Federation of Teachers.

13   Defendants Squires and Parker, over a period of several weeks and several revisions,

14   have intentionally watered down the agreement.    Plaintiff demanded a stronger

15   agreement to maximize benefits to the WTU membership. **(SEE LETTERS TO AFT**

16   **ON THE AGREEMENT AND THE FACT THAT EXECUTIVE BOARD DID**

17   **NOT HAVE ANY INPUT, EXHIBIT 18, 19, 20.)**  Defendant Parker desired, for his

18   own political purposes, a weak agreement for control.   For example, the AFT

19   "agreement" refers to the newly created position of Assistant to now be known as

22

1   "Assistant to the President."  WTU presently has approximately 5 similar "Assistants" to

2   Defendant Parker.  It is practically worthless and will not have any real benefits to

3   members especially given the fact that the AFT Agreement received no meaningful input

4   or involvement by the executive board and has no progress reporting guidelines to

5   membership outlined. Further, Defendant Squire is aware no executive board level

6   training has been made available to this current Executive Board which has been making

7   decisions on behalf of the WTU membership since being elected to office over nine

8   months ago.  The executive board is capable of making good decisions when they have

9   complete information, however material aspects are often not shared with them.  In most

10  instances they are simply endorsing Defendant Parker's decisions, after the fact.  Based

11  on knowledge and belief, Plaintiff knows that training of any member is contrary to

12  Defendant Parker's agenda.  Defendant Parker prides himself on being the sole source of

13  information to members.  Plaintiff asserts that no member of this 4200 union membership,

14  has had any traditional and/or official training this school year!  In many regards

15  members, while paying a premium dues amount, are defenseless.  This dereliction of duty

16  has placed the entire membership at jeopardy given the extensive changes Mayor Fenty

17  and Defendant Rhee are instituting including challenges to the seniority system, teacher

18  placement, hiring and termination practices, and the WTU collective bargaining

1    agreement.  Plaintiff has had numerous conversations with Defendant Parker and the

2    AFT about this exact issue.

3        To date, after requesting help from the AFT months ago, the WTU has not

4    received any assistance from the AFT and the AFT has not implemented any aspects of

5    the "agreement" although Defendant Parker continues to mismanage the membership

6    interest in the areas of closed and restructured schools, early out retirement plan, the

7    Teacher Transition Award program, Teacher placement for school year 2008/2009

8    among others issues.   The WTU pays AFT almost $1,000,000 per year in per capital

9    dues and it is entitled to service, when it is requested by the local, and not political

10   backstabbing and meddling.

11       On March 24, 2008, at approximately 3:20 pm, Plaintiff overheard a

12   speakerphone conversation between Defendants Parker and Squire.  Plaintiff's WTU

13   office is located directly beside Defendant Parker's and his (Parker's) door was open also.

14   Prior to the office relocation, Defendant Parker's and Plaintiff's offices were never near

15   one another. Defendant Parker regularly uses the speakerphone and has been known to

16   discuss personnel issues in this fashion.

17       In fact, on March 20, 2008, Defendant Parker allowed 5 executive board members

18   to hear certain portions of a conversation pertaining to Plaintiff on the speakerphone by

24

1   toggling in an out of the speakerphone function. (SEE EMAIL TO WASHINGTON

2   POST REPORTER, EXHIBIT, 21)  Defendant Parker attempted to derail and defame

3   Plaintiff while talking to a Washington Post reporter so badly that during the

4   conversation some board members almost resorted to fisticuffs. Defendant Parker's

5   comments became the subject of a Washington Post Blog section. (See Washington

6   Post Blog: The Wire, DISS-UNION, EXHIBIT 22)

7        In this March 24, 2008 conversation with Defendant Squires, Defendant Parker

8   detailed his plans to "Get Nathan out of my hair in this office," And "Keep him (Plaintiff

9   Saunders) out of a job."  Defendant Parker stated he had a "contact" accessing Plaintiff's

10   DCPS personnel files.  At no time during the conversation did Defendant Squires state

11   the accessing and tampering with Plaintiff's personnel records and employment status in

12   the DC government was illegal.  Defendant Parker informed Defendant Squires he could

13   keep Plaintiff's leave of absence unsigned which would disallow him from being a WTU

14   candidate in the future.  He also stated at the end of this elected term "they" would not

15   allow Saunders to resume his regular employment in DCPS as a teacher.  Based on

16   Plaintiff's knowledge and belief, "They" refers to Defendants Fenty and Rhee.   During

17   the conversation Defendant Parker referred to the other party on the speakerphone as

18   "Al". Plaintiff could tell based to the responses, intonation, language pattern, and his past

25

1   experiences in conversing with Defendant Squires, it was Defendant Al Squires on the

2   other end of the telephone. The conversation was punctuated with numerous, "Yes that's

3   good" and "You got him" made by Defendant Squires. Defendant Squires encouraged

4   Defendant Parker to "get the executive board to take action against him - I gave you what

5   you need."

6   Defendant attempted to suspend Plaintiff for 2 weeks without pay. At other times,

7   Defendant Squires stated, "You got to take it to Nathan." Defendant Squires was clearly

8   violating AFT's mandate of not involving himself in local politics.

9   Defendant Squire is the AFT Southern Region Director which includes the WTU.

10   He is also the immediate point of contact between WTU and the upper echelon of the

11   AFT. He has maintained this position through the Bullock Conspiracy whereby $5

12   million dollars of WTU union members' dues were stolen. Defendant Squire was also

13   responsible for assisting the Dade County (Florida) Teachers Union, as part of the

14   Southern Region, where they lost $20 million dollars of Dade County union members'

15   dues - also reported stolen shortly after the WTU incident. Saunders v. Hankerson et. Al.

16   caused Defendant Squire and the AFT tremendous embarrassment. It created and

17   reinforced many points of case law. It was fought aggressively by the AFT and

18   American Federation of Labor – Crafts and Industrial Organization AFL-CIO. Defendant

1    Squire has a special animus towards Plaintiff resulting from Plaintiff's actions in the

2    aforementioned case.    The Saunders v. Hankerson et. al. settlement had a financial

3    impact of approximately $1.5 million dollars worth of direct and in kind benefits to the

4    WTU from AFT.  Certain aspects of that settlement agreement will require the court

5    intervention to ensure complete implementation.  For example, the settlement requires all

6    future WTU executive boards to be trained but this present executive board has not had

7    any training at all despite numerous requests to do so.

8         Oftentimes Defendant Squire refers to Plaintiff's previous lawsuit against AFT in

9    a begrudging fashion.  As late as December 22, 2007 in a WTU executive board meeting,

10   Defendant Squires stated, ".....that is part of the reason Nathan sued us before."

11        The speakerphone conversation advances the fact that Plaintiff's leave of absence

12   request, presented to the DCPS in March 2007 remains unsigned despite exhaustive

13   efforts through the Chancellor's office to get it signed.  This aspect has already impacted

14   Plaintiffs employment and retirement contributions to his DC government retirement

15   account. **(See emails to emails concerning the leave of absence to DCPS, EXHIBIT**

16   **23.)** Plaintiff asserts that Defendant Parker used a similar strategy to keep another

17   potential WTU presidential candidate, Harold Fisher off the Ballot.  Fisher attempted to

18   run for President in the 2007 election.  Fisher sued WTU in 2007 because he was not

27

1   allowed to be a candidate for office as he was not employed by DCPS as an "active

2   teacher". Plaintiff asserts that Defendant Parker is trying the same tactic with Plaintiff

3   using insiders at DCPS.

4        This speakerphone conversation was yet another "last straw" item in that it

5   effectively explained why members were not getting the help from AFT requested and

6   agreed upon, despite our dire need. The AFT/WTU agreement had been discussed as

7   early as December 2007. This speakerphone conversation also explained Plaintiff's leave

8   of absence authorization delay from DCPS which is supposed to be standard protocol. It

9   is clear that Defendants have worked to compromise Plaintiff's personnel records thereby

10  possibly tainting everything from Plaintiff's teacher certification-employment status to

11  retirement benefits.

12       Conversely, Defendant Parker, who obtained a leave of absence through a

13  "special arrangement" with DCPS, received his approval long ago. Plaintiff has

14  maintained that DCPS' granting of a special leave of absence to WTU members who

15  become employed by their union is a tainted process which Plaintiff exposed years ago.

16  The DC government, DCPS, and others responsible have done nothing to correct it.

17  Defendant Parker has worked to keep this system in place as it directly benefits him.

18  Plaintiff believes the process compromises all parties involved including students. This

1    has been discussed with Defendant Parker numerous times. Defendant Parker benefits

2    from this system whereby DCPS and WTU pay him a salary simultaneously. Plaintiff

3    has adamantly refused to participate in this process because Plaintiff believes it to be

4    open to rampant corruption and potentially represents a serious conflict of interest. It

5    requires personnel records including sick and general leave to be maintained as if a party

6    is present for duty as a teacher in DCPS when in actuality the employee is not. It affects

7    the local school budget and, in effect, it creates a "loan" on the financial books of the

8    school system which the union repays at a later date. It creates an incentive that

9    management can waive discretely before the union to encourage compromising behavior.

10       Plaintiff long ago reported the corruptibility of this practice and the mere fact that

11   this process, if lawful, is not extended to all similarly situated employees is also of

12   immediate concern.

13

14                      **VI. COLLUSION WITH MANAGEMENT**

15

16       All earlier references are included herein. Defendant Parker has been compromised

17   against the ideals and principals of the WTU as reflected in the WTU Constitution. This

18   is not Plaintiff's opinion but common knowledge. It is reported in many news sources

19   not as opinion but as fact. Plaintiff has fielded questions from members of the DC City

1    Council, news reporters and WTU members for years on this issue. Defendant Parker's

2    slant toward management did not begin with Defendants Fenty and Rhee. Defendant's

3    bias with former Superintendent Clifford Janey and Chief Accountability Officer Maria

4    Carstarphen often caused much ire from WTU members. Plaintiff has met with

5    Defendant Parker numerous occasions over the years to inform him of the impact of his

6    actions on WTU's membership's morale. The last straw in regards to this collusion with

7    management, happened on Sunday, April 20, 2008 at approximately 6:25 a.m. Regular

8    news commentator Bill Meyers, a reporter from the Washington Examiner, stated

9    "Michelle Rhee's people told me, when we were on better speaking terms, that George

10   Parker, President of the Washington Teachers' Union, would be asked to basically

11   commit suicide but they would spread it out over time so that it would not cause a revolt

12   within the membership." This program is a regional news broadcast involving reputable

13   journalists from around the metropolitan area. Other demoralizing articles including

14   "Union-Jacked", an article written by Michael Dibonas, speak about Defendant Parker's

15   collusion with management appeared in the City Paper. Plaintiff urged Defendant Parker

16   to respond to this one-sided article. Defendant Parker did not.

17       Plaintiff has had numerous direct experiences with Defendant Parker whereby

18   Plaintiff knows these types of statements to be true. For example, during the 2006-07

1    school year, Whittier Elementary School teachers' experienced tremendous turmoil as a

2    result of a young inexperienced principal supported by the New Leaders for New Schools

3    Project, a Principal's Training contractor. As a result, the school's environment became

4    very stressful for all teachers and children involved. During this period, a talented school

5    counselor was out on stress related sick leave. Upon returning to work, she later died.

6    Prior to the Counselor's death, Plaintiff talked with her on numerous occasions about the

7    school environment. She was very concerned about her employment after her position

8    was cut to a part-time capacity. During that school year, the teachers and Plaintiff

9    resolved to work during the day and demonstrate in the mornings (before school) and in

10    the evenings (after school) to show their disapproval for the situation. As planned,

11    demonstrations took place on at least four separate occasions. Because of the staff's

12    actions, a meeting with Defendant Rhee was held at the beginning of school year 2007-

13    2008 to hear from the teachers and community about the best way to open Whittier

14    Elementary School. At said meeting, which included 25 individuals and Plaintiff,

15    Defendant Rhee passed Plaintiff a note stating that Defendant Parker had agreed the

16    Principal could stay. Plaintiff wrote on the back of Defendant Rhee's note "If she stays,

17    teachers will demonstrate on the first day of school and refuse to enter the school

18    building and I will be with them!" Later that day back at the WTU Office, Plaintiff's

31

1    actions resulted in an argument where strong and assertive language was used between

2    Plaintiff and Defendant Parker. Plaintiff is aware that Defendant Parker met with

3    Whittier Principal and her New Leaders-New Schools Advisors and negotiated a deal

4    behind the backs of the WTU members. Plaintiff refused to participate in this meeting as

5    Defendant Parker never met with the Whittier ES teacher members or heard their

6    concerns.

7    Defendant Parker failed in his duty to represent on that occasion, and many more of

8    which Plaintiff has first hand knowledge. They include but are not limited to the

9    disbanding of the National Capital Child and Family Development (NCCFD) Functional

10   Unit, the Pilot Schools Application and Program, the WTU Contract Negotiations, and

11   the Teacher Transition Awards Program. Defendant Parker, in a commitment to

12   Defendant Rhee and not the WTU membership, refused to establish a contract

13   negotiations team until Plaintiff demanded, in a letter to the Executive Board, that a team

14   be developed. (SEE LETTER TO BOARMEMBERS, EXHIBIT 1, PARAGRAPH 4).

15   Again, with the same perverted loyalties, Defendant Parker allowed the WTU contract to

16   expire without following its required negotiations process-for well over one year. This

17   action has placed the WTU teachers in peril concerning issues of salary increases, school

1    locations for next year's employment, school closings, and restructured schools/union

2    contract relationship.

3

4    The last straw in this failure to represent/breach of fiduciary responsibilities/collusion

5    with management occurred on March 6, 2008.  Plaintiff attended a meeting, called by

6    Defendant Rhee, with a DCPS employee and WTU member, a WTU field Representative,

7    and another individual from Defendant Rhee's staff.  The meeting, initially thought to

8    concern an employment related matter of lack of supplies was actually a façade to

9    intimidate the employee about her personal and political actions which took place on

10   certain days the employee had taken off.  During those days off, the employee had

11   participated in certain rallies and demonstrations against Defendants Fenty and Rhee's

12   "Political Education Policies".  Defendant Rhee noted during that meeting, specific days,

13   locations, statements, and usage of media (i.e. emails and newspapers) by said employee.

14   Plaintiff noted that the language and information being used by Defendant Rhee during

15   that meeting with the employee appeared to be coordinated with Defendant Parker.

16   Plaintiff made specific and definitive statements to Defendant Rhee about the

17   inappropriateness of her queries and demanded Defendant Rhee put them in writing.  To

1    date, Defendant Rhee has yet to put her queries in writing even when requested to do so

2    in a follow-up email (SEE EMAIL, EXHIBIT 24 ).

3    On several occasions prior to this meeting with Defendant Rhee, Defendant Parker

4    attempted to push the employee into attending the meeting with Defendant Rhee prior to

5    Plaintiff's return from educational leave from Harvard University. Employee stated to

6    Defendant Parker her reluctance to accept this meeting with the Chancellor without

7    adequate Union representation.  Defendant Parker indicated to employee that Defendant

8    White would be effective union representation for her in this matter. Employee refused to

9    fold to the pressure placed upon her by the Union and by Management to have this

10   meeting without Plaintiff's appearance because the employee believed that she would not

11   have adequate union representation without Plaintiff 's appearance. Based on knowledge

12   and belief, Plaintiff asserts that Defendants Parker's and Rhee's actions to be coordinated

13   against the members of the WTU to quiet dissention singularly and collectively.

14

15

16

17

## COUNT I
### (Breach of Fiduciary Duty pursuant to the Labor-Management Reporting and Disclosure Act against Defendants Parker, Smith and Martel)

18   Plaintiff incorporates all above references.

19   Defendants Parker, Smith, Martel, and White, as officers, agents, or representatives of the

20   WTU who owed the following fiduciary duties to the WTU and its members:

34

1          A. A duty to hold the WTU's money and property solely for the benefit of the
2             organization and its members; and
3          B. a duty to refrain from holding or acquiring any pecuniary or personal interest
4             which conflicts with the interest of such organization.

5     Parker, Smith, and Martel breached their fiduciary duties to the WTU and its members
6     by:

7          A. Conspiring to and engaging in a scheme to undermine the free speech, assembly,
8             and association rights of WTU members; and
9          B. otherwise holding or acquiring a pecuniary or personal interest which conflicted
10            with the interest of the WTU.

11    Additionally, Parker breached his fiduciary duty to the WTU and its members by

12    simultaneously holding salaried positions both in the District of Columbia government

13    and in the WTU.

14    He also failed to ensure proper financial and accounting records were followed pertaining

15    to Defendant White.

16    Smith and Martel breached their fiduciary duty to the WTU and its members by

17    neglecting and withdrawing from their affirmative responsibilities as the elected Board

18    members of the WTU.

1    As a result of the breaches of fiduciary duties committed by Parker, Smith, Martel and

2    White, the individual Defendants were able to intimidate, retaliate and silence WTU

3    members.

4    The Plaintiff has been harmed by the breaches of fiduciary duties committed by Parker,

5    Smith, Martel and White.  As a result of this, Plaintiff, as an officer and member of the

6    WTU has been injured, can not complete his duties and responsibilities and his future

7    employment has been tainted and jeopardized.

8                                          **COUNT II**
9      **(Violation of Bill of Rights of Members of Labor Organizations against Defendants**
10                          **Parker, Smith, Martel and Carillo)**

11    Plaintiff incorporates all above references.

12    On information and belief, Parker, Smith, Martel, and White created WTU policy without

13    following its constitution.

14    This action violated the WTU union members' Bill of Rights because it was an

15    unauthorized and illegal.

16    On information and belief, Parker, Smith, Martel, and Carillo created the WTU Media

17    policy without following the WTU constitution.  The Policy was not approved by either a

1    majority vote of the WTU members in good standing, nor by its delegate Assembly

2    representing the total membership or by the executive Board.

3    This media policy violated the WTU union members' Bill of Rights because it was an

4    unauthorized and illegal policy set forth.

5    WTU members and Plaintiff as a member of WTU and officer of WTU, has been

6    significantly harmed by the violation of his Bill of rights.

7

8                                **COUNT III**
9    **(Plaintiffs Right to Review Union Financial Records Against Defendant AFT)**
10

11   Plaintiff incorporates all above references.

12   On information and belief, Defendant Parker has filed materially false financial reports

13   with the Executive Board and the WTU Delegate assembly and other authorities.

14   The WTU has substantially wasted and depleted the WTU of valuable morale and union

15   democracy under threats of retaliation.

16   These facts establish good cause for Plaintiff, a rank and file union member, to review the

17   WTU's financial records pursuant to 29 U.S.C. §431(c).

1    Plaintiff therefore is entitled to review any books, records, and accounts necessary to

2    verify WTU's financial reports filed with the Department of Labor, which are in control

3    of the AFT.

4

5

6                                    **COUNT IV**

7    **(Breach of Fiduciary Duty pursuant to the Labor-Management Reporting and**

8                        **Disclosure Act against AFT)**

9

10    Plaintiff incorporates all above references.

11    The AFT, as parent and agent of the WTU, owed the following fiduciary duties to the

12    WTU and its members:

13       A. A duty to refrain from holding or acquiring any pecuniary or personal interest
14          which conflicts with the interest of such organization.
15       B. McElroy, as an President of the AFT, owed the following fiduciary duties to the
16          WTU and its members to properly supervise Defendant Squires.
17       C. The AFT breached its fiduciary duty to the WTU and its members by failing to
18          monitor said employees deep involvement in a local political agenda to silence
19          Plaintiff and other members.
20

21

22                                    **COUNT V**
23                        **(Negligence against Defendant AFT)**

24    Plaintiff incorporates all above references.

1    The AFT was negligent in assisting the WTU membership when there was compelling

2    information that Defendant Parker was incapable of providing effective leadership.

3    On information and belief, the AFT was aware by early 2005 that the WTU was

4    experiencing problems.

5    As a result of the AFT's negligence, the WTU's members working conditions and

6    compensation were damaged.

7    The WTU has been significantly harmed by AFT's negligence because it resulted in the

8    loss of union democracy and WTU is unable to adequately serve its membership.

9    Plaintiff, as a member of WTU, and other WTU members have been injured because he

10    has been deprived of the benefits of the dues that he has paid to WTU.

11              **COUNT VI**
12    **(Breach of National Constitution pursuant to the Labor-Management Relations Act**
13                         **against Defendant AFT)**

14    Plaintiff incorporates all above references.

15    The AFT's constitution requires local union autonomy.

16    AFT's lack of oversight and failure to enforce its constitution against the WTU regarding

17    union democracy and autonomy constituted a breach of the AFT constitution.

1    The AFT's breach prevented the AFT from taking appropriate remedial actions in regards

2    to Parkers' mismanagement of WTU's Resources and union democracy.

3    Plaintiff, as a member of WTU has been injured because he has been deprived of the

4    benefits of the dues that he has paid to WTU.

5

6                                    **COUNT VII**
7                    **(Fraud against Defendants Parker and White)**

8    Plaintiff incorporates all above references

9    Defendants Parker and White, as an officers and an employee of the Union, respectfully,

10   had a duty to report accurate information about the financial condition of the WTU to the

11   WTU's Executive Board, Board of Trustees, and members.

12   Despite that duty, they falsely represented and concealed material information about the

13   WTU's financial condition from the WTU's Executive Board, Board of Trustees, and

14   members, including, but not limited to the amounts of money paid to vendors.

15   The WTU and its membership relied on them and this reliance was justified.

40

1    These and other misrepresentations and omissions were made intentionally by Parker and

2    White with the intent to conceal the true financial condition of the Union so that they,

3    along with the other Individual Defendants, could continue the wrongful embezzlement

4    and conversion of WTU's funds.

5    Their misrepresentations and omissions were material.

6    The WTU has been significantly harmed by Defendants Parker's and White's fraud.

7                                  **<u>COUNT VIII</u>**

8                **<u>(Conversion against Defendants Parker and White)</u>**

9    Plaintiff incorporates all above references

10

11   Defendant Parker had access to and control of the WTU's bank accounts to carry his

12   duties of President as required by the constitution and by-laws of the WTU.

13                                **<u>COUNT IX</u>**

14   **<u>(Aiding and Abetting against Defendants Parker , Rhee, Jane Doe, and John Doe)</u>**

15

16   Plaintiff incorporates all above references

17

18   Defendants Parker and Rhee each played a role and provided assistance to each other in

19

20   carrying out their unlawful scheme to breach the fiduciary duties owed to the WTU and

21

22   he citizens of the District of Columbia by corrupting government records including but

23

24   not limited to personnel files.

1

2                              **COUNT X**

3      **(Civil Conspiracy against Defendants Parker, Squires, Smith, Martel, Carrillo &**

4                                    **Tatum)**

5      Plaintiff incorporates all above references

6

7      Defendants entered into an agreement with each other to undermine union democracy,

8      freedom of speech, association, and assembly for their personal convenience and that of

9      each other.

10     The above-described acts, carried out by defendants were done pursuant to and in

11     furtherance of a common scheme against the WTU for their personal use and constitute

12     common law civil conspiracy.

13     WTU has been significantly harmed and the WTU is significantly impaired from

14     adequately serving its membership.

15

16                              **COUNT XI**

17     **(Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO")**

18     **18 U.S.C. § 1964(c) Against All Individual Defendants)**

19     Plaintiff incorporates all above references.

20     Plaintiff asserts standing on behalf of the WTU under the LMRDA (Count I above). As a

21     direct result of the Individual Defendants' association-in-fact enterprise, the WTU has

22     suffered serious financial injury to its property and serious financial injury to its business.

23     Plaintiff and other WTU members have been injured in their property and business by the

1    Individual Defendants' participation in their association-in-fact enterprise. In addition,

2    members of the WTU have been injured in their business because as teachers for the

3    DCPS, they are dependent on a solvent and productive WTU to engage in representation

4    on their behalf. As a result of the Individual Defendants actions, the WTU is currently not

5    capable of adequately representing Plaintiff or any of its other 4200 members.

6    At all times relevant to this complaint, the Individual Defendants formed an association-

7    in-fact enterprise as defined by 18 U.S.C. §1961(4) to defraud the WTU, embezzle its

8    funds and launder those funds to disguise their origins in violation of 18 U.S.C. §1962(c)

9    ("Enterprise"). The structure of this Enterprise was that Parker and White were the

10   organizational heads of the enterprise.

11   The activities of the Enterprise affected interstate commerce in many ways including that:

12       A.  Parker and White conducted part of their racketeering activity through the WTU
13           offices at 1717 K. St. N.W., Washington D.C. and 490 Lenfant Plaza SW Suite
14           720 Washington DC 20024.
15       B.  Parker and White used out of state vendors to conceal their actions.

16   All of the Individual Defendants conducted or participated directly or indirectly in the

17   conduct of the Enterprise's affairs through a pattern of racketeering activity.

18   The predicate acts of racketeering activity include embezzling union funds by an officer

19   or employee of a union under 29 U.S.C. § 501(c); money laundering under 18 U.S.C. §

20   1956; and engaging in monetary transactions in property derived from specified unlawful

21   activity under 18 U.S.C. § 1957.

1
2

## Embezzling Union Funds 29 U.S.C. § 501(c)
## (Defendants Parker and White)

3    Plaintiff incorporates all above references

4    Defendants Parker and White, while serving as officers of the WTU, embezzled, stole, or

5    unlawfully and willfully converted WTU money and funds to their own use or the use of

6    others.

7
8

## Money Laundering 18 U.S.C. § 195
## (Defendants Parker and White)

9    Plaintiff incorporates all above references

10
11    Acts under 18 U.S.C § 1956(a)(1)(B)(i). Between 2005 and 2008, all of the Individual

12
13    Defendants entered into multiple financial transactions that affected interstate commerce

14
15    as defined by §§ 1956(c)(3) and (4) knowing that the property involved in the financial

16
17    transactions -- WTU funds-represented the proceeds of some form of unlawful activity,

18
19    and with the intent to conceal or disguise the nature, the location, the source, the

20
21    ownership, or the control of the proceeds of the embezzlement from the WTU.

22
23    Acts under 18 U.S.C § 1956(a)(1)(B)(ii). Between 2005 and 2008, Defendants entered

24
25    into multiple financial transactions as defined in §§1956(c)(3) and (4) knowing that the

26
27    property involved in the financial transactions-WTU funds-represented the proceeds of

28
29    some form of unlawful activity, and knowing that the transactions were designed in

30    whole or in part to avoid a transaction reporting requirement under State or Federal Law.

**Engaging in Monetary Transactions In Property Derived From Specified Unlawful Activity**

**18 U.S.C. § 1957**

Plaintiff incorporates all above references.

The WTU has been significantly harmed by the Individual Defendants' Enterprise and pattern of racketeering activity in furtherance of it.

## COUNT XII
## (Civil RICO Conspiracy)

Plaintiff incorporates all above references

In addition to committing the acts alleged in Count XIV, the Individual Defendants conspired to commit the acts alleged in Count XIV and each agreed to the commission of at least two predicate acts in furtherance of the conspiracy.

The WTU has been significantly harmed by the Individual Defendants' conspiracy to enter into the Enterprise and commit acts in furtherance of it.

## VII.    PRAYER FOR RELIEF

Wherefore Plaintiff prays for the following relief:

A.  Injunctive relief against the AFT, to appoint an independent monitor to oversee the actions of the WTU, with costs to be borne by the AFT.

B. Compensatory damages against all defendants personally named .

C. Treble damages against the Individual Defendants under 18 U.S.C. 1964 (c)

D. A court order voiding the WTU media policy and requirement to notify and post to all union members and media sources.

E. A court order reinstating all duties and responsibilities of the General Vice President to conditions prior to controversy included herein and past practices establish with Plaintiff.

F. A court order requiring the WTU to enter into a written employment contract with Plaintiff.

G. A court order sealing the personnel records of the Plaintiff within DCPS.

H. A court order terminating any employee who interferes with a officer attempting to perform his or her duty.

I. A court order requiring the monitoring of implementation of any findings of this court or outstanding Saunders v. Hankerson et. Al. matters.

J. Appoint an independent party(ies) to protect and secure the WTU records, provide full objective cooperation and disclosure to Plaintiff and to the general membership.

K. Establish separate court orders for personal fines against all guilty Defendants in an amount not less than 2 years of their gross annual salary or $2 million dollars whichever is less;

1    L. Order all guilty Defendants permanently barred from holding any position of

2         confidence or authority within the WTU and/or AFFT.

3    M. Pay Plaintiff's court cost and applicable fees associated with this litigation.

4    N. Appoint Plaintiff court representation consistent with LCvR83.10 (a). Said

5         counsel can be paid out of union dues in WTU's treasury. Normal union

6         business practices would entitle Plaintiff to proper representation had his work

7         related issue not involved his local and parent union affiliate as defendants.

8

9    O. Any other just and equitable relief the Court deems appropriate,

10

11

12                    Respectfully Submitted,

13

14

15                    Nathan A. Saunders    3224 Wheeler Rd

16                    Pro se               Washington DC

17                                       20037

18

19    April 25, 2008                         202 565 2363

20

21

22                    Verification

23

24    I declare under penalty of perjury that the foregoing is true and correct. Executed on

25    April 25, 2008

26

27

28                        Nathan A. Saunders

**Nathan A. Saunders**
General Vice President
Washington Teachers' Union

*Exhibit*
*#1  2 pgs*

October 16, 2007

<u>**CONFIDENTIAL**</u>

Dear George,

This letter informs you of my deep concern regarding the repeated public comments of Chancellor Michelle Rhee. Educational activists and union members are circulating a "YourTube" video clip, and other various media reports including but not limited to a negative feature article in the Washington City Paper portray The Chancellor as a savior and all other employees as incompetents. The Chancellor's recorded statements at last week's Press Conference, is the last straw. Make no mistake about it, <u>**all**</u> teachers are under siege and we must respond.

Equally alarming is her continued insistence that she is instituting these egregious actions with your knowledge and consultation. If so, this is a fundamental challenge to the union's core values and principles; otherwise it is an unacceptable action by a partner, including Mayor Fenty, whom WTU has graciously extended itself. Public Education is being unnecessarily politicized and polarized at the expense of working people and children.

I have cautioned you privately about the potential misconception of said meetings. In light of the chancellor's recent public statements, I am compelled to advance this issue. I cannot condone these private meetings as they are contrary to the collective decision-making process of unionism, and I believe, violates the oath of office we took to act in the best interest of the WTU membership.

On June 12, 2007, Chancellor Rhee was installed and on September 30, 2007, the WTU contract expired. The WTU must construct a contract negotiating team immediately, as is our tradition, and establish a pre-negotiation platform. The pre-negotiation platform, the composition of the negotiation team and the proposed dates for contract negotiation meetings are overdue. We must enter into formal negotiations now, as required by law, in order to protect our members' rights.

At every opportunity, we must engage Mayor Fenty and Chancellor Rhee with aggressive actions on public education as active participants. This includes development of a strategic plan for our union to oppose the unprecedented legislation converting government workers to 'at-will' employees by Mayor Fenty. The implication of this legislation is unparalleled. Our local, regional, and national stakeholders are prepared to assist, but we must mobilize now!

08 0715

**FILED**

APR 25 2008

Clerk, U.S. District and
Bankruptcy Courts

This action is necessary because:

1.) the legislation is a violation of the spirit and trust of the labor letter agreement between the Metropolitan Washington Labor Council and Mayor Fenty thereby constituting the second major breach after the Chancellor's selection debacle;

2.) the legislation is devoid of an educational improvement plan for children at the classroom level. In addition, all funds available for public education should be used in local schools directly to provide educational services for children--not buyouts for downtown administrators brought in by previous administrations. Any government employee who fails to perform can be separated from service for cause, at no public expense, without violating all employees' rights to due process. The existing law pertaining to the rights of government employees has been grossly understated, thereby creating a foundation for poor public policy.

3.) the legislation amends a critical component of the original law, the District of Columbia Public School Reform Act of 2007, which is less than 8 months old. It unnecessarily changes the Comprehensive Merit Personnel Act of 1978 for DCPS employees thereby making the positions harder to fill with talent-- not easier. Statements to the effect that good managers will not come without this legislation, are self serving; and

4.) the concept that employees will work harder, longer, and smarter out of fear is not supported in any realm of educational best practices or logic nor can it be sustained over the long term.


I look forward to your response as well as feedback from the Executive Board Members and Trustees of the Washington Teachers' Union.



Nathan A. Saunders
General Vice President
Washington Teachers' Union



cc: WTU Executive Board Members
    WTU Board of Trustees

Exhibit
#2 3 pgs

argument. None of the affected employees are unionized, but the concern among the union honchos is that their members are next.

Josh Williams of the local AFL/CIO council adapted the famous line of Lutheran minister Martin Niemöller about the Holocaust: "They came for the management workers, and we were silent. They came for the nonunion workers, and we were silent. Then they came for the unionized workers and we were on our own."

A particularly interesting case in the WTU, whose members' contract expired recently and is soon to begin negotiations with Rhee on a new employment agreement. President George Parker and General VP Nathan A. Saunders both testified against the legislation, citing a meeting Tuesday where more than 200 WTU members voted "overwhelmingly" to oppose the central-office firings. Last month, Saunders sent a letter to union leadership urging them to fight the "at-will" bill.

But there's plenty of support out there, too: A previous panel at the hearing, composed of parents from Ross Elementary School in Dupont Circle, each strongly endorsed passing the Fenty/Rhee legislation.

Also of note: Council Chairman Vincent C. Gray took a pretty big smack himself at Fenty. Gray noted on the dais that mayoral aides wanted him to attempt passing the bill as emergency legislation at next Tuesday's council meeting. (Emergency legislation goes into immediate effect after a single council vote.) When he refused, Gray says, mayoral staffers approached other councilmembers, trying to get someone else to introduce an emergency bill. No one bit, apparently.

Doing emergency legislation, he says, "would have been an incredibly disingenuous way of dealing with an issue of serious importance."

Exhibit #_____

**Teachers' Union Is Urged to Fight Plan - No. 2 Official Fears Precedent of Move At Central Office**

By *Theola Labbé*

**The Washington Post, Thursday, October 18, 2007**

08 0715

**FILED**

APR 2 5 2008

Clerk, U.S. District and Bankruptcy Courts

pg 1 of 3



A top leader in the Washington Teachers' Union has urged its executive board in a confidential memo to fight the Fenty administration plan to fire school central office employees, saying union members should immediately organize a strategy to oppose the legislation.

"We must mobilize now!" General Vice President Nathan A. Saunders wrote in a two-page letter addressed to President George Parker and copied to the 23 members of the union's executive and trustee boards. "At every opportunity we must engage Mayor [Adrian M. Fenty] and Chancellor [Michelle A.] Rhee with aggressive actions on public education as active participants."

Tuesday's letter, which The Washington Post obtained, is the first indication of where a leader of the 4,000-plus-member union stands on the proposal.

It also sets up a potential showdown between organized labor and the Fenty-Rhee team in its high-profile efforts to overhaul the 49,000-student school system, which is plagued by declining enrollment, poor test scores and dilapidated buildings.

In an interview yesterday, Saunders would not detail a strategy but said he would reach out to other labor organizations to begin planning. His letter said he has raised those issues with Parker privately, "but in light of the chancellor's recent public statements, I am compelled to advance this issue."

Fenty's legislation, submitted to the D.C. Council last week, would reclassify 754 nonunion employees as "at-will" workers, meaning they could be terminated at any time for non-disciplinary reasons because they would work at the chancellor's discretion.

At a news conference last week announcing that legislation, Rhee said she has spoken with Parker about the expired teachers contract and was looking for similar authority on poorly performing teachers.

The legislation would not affect the 180 central office unionized employees. Although the proposal would only affect only nonunion workers, Saunders said he wrote the letter because the plan sets a precedent for other government employees.

Mafara Hobson, a Rhee spokeswoman, would not comment yesterday on the letter but said the chancellor stood by her remarks last week about rewarding high-performing teachers and removing ineffective educators.

Pg 2 of 3

Parker said the union's executive board members frequently circulate confidential memos among each other on union issues, "and we will address this internally as we always do."

"We encourage all of our board members to express themselves openly on issues concerning our union," Parker said.

In the letter, Saunders also wrote that Parker should not hold what he called "private meetings" with Rhee to discuss the union contract, which expired Sept. 30.

**Nathan A. Saunders**
General Vice President
Washington Teachers' Union
490 East L'Enfant Plaza, SW
Washington, DC   20024

*Exhibit*
*#3  4p4s*

December 15, 2007

**CONFIDENTIAL**

Dear Boardmembers,

This letter brings to your attention incidences and a pattern of behavior which is improper and could place The Washington Teachers' Union (WTU) in serious jeopardy. On December 12, 2007 at approximately 5:49 pm, President Parker telephoned me and stated he heard I was going to speak on WPFW – The Gloria Minot Show and forbade me to speak. He further stated I was being placed on leave. I requested he provide me with his source of information and this written directive with legal reference. He did not do so. I reminded him of my elected officer status, challenged his authority to place me on leave or curtail my rights to free speech. This was the second incident this week alone.

The first happened on Monday, December 8, 2007 before a scheduled meeting out of the office. His sole focus within 30 seconds into our conversation was my attendance at a Friday, December 7, 2007 rally organized by concerned teachers, parents and community groups. He berated the participants of that rally and attempted to chastise my participation. Conversation grew so heated that I determined it was in our collective best interests to excuse myself as the meeting had not started. These two incidences reflect the type of harassment and retaliation to which I am being subjected. This impacts my ability to perform in my elected capacity as General Vice President.  The pattern is the same. Anytime I am quoted in the newspaper, mentioned, or attend a public event or demonstration, the President's actions are overtly hostile. The remarks now have gravitated to comments concerning "acting like a President" or "your running against me in 2010."

08 0715

**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

This pattern has caused me to believe the tools and supports I need to perform my job are being intentionally denied, now as well as in the past, such as the following:

1. Since demanding action on the WTU membership contract, I have been isolated from the negotiating process again negating my ability to perform my constitutional function of acting in the absence of the President, if necessary.

2. The field staff, which I have some constitutional authority, has been reduced significantly yet the "Office of the President" has expanded exponentially. This "union of the teachers" can not produce an organizational calendar, a monthly newsletter or a quarterly newspaper (a constitutional requirement), updated membership cards, the hotline, its website, or even a sign on the office building door notifying our members of our location.

3. An obstructive office structure, whereby every single person reports directly to the President, has severely limited my ability to perform my job. Micromanagement of even sending a building representative notice must be personally approved by the President.

4. Assignments have been tasked to me which are intentionally deadened and timewasters such as the community collaboration yielding the "Campaign for Good Information" document. This project ended up costing me personally approximately $820 as the President abandoned the project at the last minute.  This was done to cause me political embarrassment.

5. My WTU email system has been broken, yet the President shows no signs of urgency to have it fixed. I am thereby negated from maintaining the necessary contact with members and performing my job. Resources to do similar work have been denied to me yet extended to less senior staff

members and the President. For example, laptop computers were purchase for the field representative staff and the President 2 years ago but not for me. I recently had to purchase my own to do WTU work in the field.

6. The President states I can only speak publicly upon his approval because that is WTU's policy. I dispute (his) policy.

The above verifiable actions are done for political purposes in collusion with a small group of executive board members acting on personal alliances and not organizational goals and efficiencies. The union's reputation and treasury have suffered immeasurably when a similarly disposed group of untrained executive boardmembers allowed rampant abuse by a former President.

Immediately after my communication to this executive board which exposed issues associated with the expired WTU contract and At-Will legislation, I knew I would be retaliated against and harassed.

The above pattern, while applicable to me is symbolic of a larger management trend of retaliation against those who fall out of favor with the President - at the union's expense.

1. One employee, also viewed as a political threat, was fired unilaterally only to be reinstated with full rights and privileges including pay after taking legal action against the WTU. The political firing, which I advised against upon reading the weak supporting documentation and letter of termination, was summarily overturned at an unnecessary expense to the WTU. The action was unjustifiable.

2. Another employee fell out of favor and his ample sick leave was not paid at the Presidents behest causing the employee personal and financial hardship. I had to advocate for that employee to be restored his rightful pay.

3

3. On the other-hand, favored employees are rewarded, given lofty titles, lucrative employment contracts with unprecedented terms and conditions, allowed special 'benefits', and professional development opportunities at the membership's expense. Out-of-favor employees, upon request of similar employment terms, are summarily or constructively denied.

The result is high turnover and low morale. No transparency, accountability, and another castle being built to a leader while our members are restructured consolidated, and deal with reduced spirits.

The actions and patterns described herein must cease immediately. The executive board is hereby reminded of its responsibility and requisite fiduciary duties. When issues such as those described herein remain unresolved and responsible parties are not held accountable internally, the corporation can become liable as well as its board members individually, jointly and personally. Failure to act will require the issue be moved to the appropriate forum.

Thank You in advance for your attention to this matter.

Sincerely,

Nathan A. Saunders
General Vice President

4

_Tuesday,_ _Exhibit_
_#4 2pgs_

# Joseph M. Carrillo, Ed.D.
6816 32nd Street, NW
Washington, DC 20015
Tel. 202.492-4556

**George Parker**
President, WTU
**WTU EXECUTIVE BOARD**
AFT/CIO Local 6
Washington, DC

**[SENT VIA EMAIL]**

Dear George:

RE: **Nathan Saunders, General Vice President**

On Saturday, December 8th, 2007, an article appeared in the Washington Post entitled, **_"Group Protests Proposed Firings, Closings, Parents and Teachers Rally at Wilson Building."_** At the center of this article was a picture of Nathan Saunders, General Vice President, WTU. The caption beneath the picture read: **_"Nathan Saunders, General Vice President of the Washington Teachers Union Speaks at the rally."_** If you haven't read this article, I suggest that you do so immediately, as this article is indicative of a serious problem within WTU and portrays a confused and distorted image of the WTU to its members, and the Washington, DC community. We cannot have this. Mr. Saunders needs to be reined in.

In reviewing the Constitution and Bylaws of WTU, it is clear that the scope of Mr. Saunders duties, as General Vice President is limited to the following:

A. **Perform other duties as delegated by the President or assigned by the Executive Board.**
B. **Oversee and assist the building representatives in their duties.**
C. **Supervise the field representatives and other employees as designated by the President.**
D. **Co-sign checks and other financial documents in the absence of the President or the Treasurer and serve as a fiduciary of the Union. The General Vice-President shall be bonded and such expense shall be borne by the Union**
E. **Perform all the duties of the President in the absence of the President.**
F. **Complete the un-expired term of the President should the office become vacant**
G. **Convene the elections committee.**

These are the only duties that Mr. Saunders has and is constitutionally entitled to perform. He has no authority to speak on our behalf, nor act on our behalf unless you as the President or the Executive Board have authorized him to do so. And I am quite sure that neither you nor the Executive Board allowed him to appear in public in such a divisive manner representing the WTU and its 4,000 plus members.

08  0715

**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

1

Executive Board has a duty to ensure that our Union operates according to our Constitution and By-laws. As a full dues paying member, I am requesting that you and the Executive Board immediately address these concerns by holding Mr. Saunders accountable for his actions. I further request that you direct him to only function within the confines of his duties as outlined in the WTU Constitution.

With kindest personal regards,

Joe Carrillo,

WTU Building Representative, Powell ES
WTU Negotiations Team Member

Copy:      Executive Board
           Al Squire, Regional Director, WTU

More new features than ever. Check out the new AOL Mail!

Exhibit
#5
2 pgs

## MOTION:  PUBLIC REPRESENTATION OF WTU POLICIES

WHEREAS the WTU is currently engaged in contract negotiations with the Mayor of the District of Columbia and the Chancellor of the D.C. Public Schools; and

WHEREAS 27 DCPS schools are faced with mandatory restructuring requirements as mandated by NCLB and as implemented by the Chancellor the D.C. Public Schools; and

WHEREAS approximately 22 DCPS schools are faced with closure; and

WHEREAS bills relating to aspects of DCPS employee rights are presently before the Council of the District of Columbia; and

WHEREAS Article VIII, Section 1 of the By-laws of the WTU, which designates the President as the Chief Executive Officer of the WTU, specifically assigns to him the responsibility to

"Administer all the affairs of the Union and executive policy of the Union as determined by the membership and the Executive Board" (Para. A); and

"Serve as a fiduciary of the union, chief negotiator of the Union contract and appoint the bargaining team for all negotiations with the advice and consent of the Executive Board" (Para. D); and

"Represent the organization before the public, community organizations, and the news media" (Para. J); and

WHEREAS the President of the WTU has selected a contract negotiating team which has already held several negotiating meetings with the Chancellor and her negotiating team; and

WHEREAS the President of the WTU has convened meetings with the AFT restructuring specialists for the purpose of developing WTU restructuring policies and specific proposals that promote improved student achievement while preserving the WTU's fiduciary obligations to its members; and

WHEREAS the President of the WTU has met with the Washington, D.C. Central Labor Council for the purpose of developing a common position in defense of all DC Government and DCPS employees' procedural rights; and

WHEREAS public statements, agreements with community organizations and monetary commitments by WTU officers on matters relating to contract negotiations and/or NCLB restructuring mandates and/or school closure and/or bills before the Council of D.C. affecting DC Government employees' procedural rights that have not been approved by the WTU Executive Board or by the President or that are implied through existing "duties … delegated by the President or assigned by the Executive Board" (Art VIII; Section 2; Para. A) compromise the public image of the WTU, the WTU Executive Board and the WTU President, thereby undermining the educational mission and fiduciary responsibility of the WTU;

08 0715
**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

THEREFORE, BE IT RESOLVED THAT

The WTU Executive Board affirms the letter and intent of the WTU Constitution and By-Laws that designate the WTU President as the **only spokesman** of and for the WTU on all policy issues and as the only WTU officer who is empowered to delegate that responsibility to other WTU officers, Executive Board Members, staff or other designees; and

The WTU Executive Board specifically directs all WTU officers and Executive Board Members, when identified as such to the media or to community organizations or to elected or appointed officials of the DC Government or DC Public Schools, to refrain from making statements or commitments of a policy nature regarding contract negotiations, NCLB Restructuring Issues for the 27 affected schools, Potential School Closures or Bills before the Council of DC; and

The WTU Executive Board authorizes the President of the WTU to communicate to the WTU membership, to the Mayor, to the Deputy Mayor for Education, to the Chancellor of the DC Public Schools, to the Chairman and Members of the Council of DC, to community organizations and to the media, as and when he deems it necessary, a letter summarizing this Executive Board resolution reconfirming that the WTU President and those specifically designated by him to be the only spokespersons for the WTU on these issues; and

This Resolution will go into effect immediately.

*not specified by the WTU Exec Board or President*





Exhibit
#6  1p4

### THE WASHINGTON TEACHERS' UNION

### MEDIA POLICY & GUIDELINES

The Washington Teachers' Union (WTU) enjoys a strong relationship with members of the media, and our goal is to be responsive to your needs as well as provide accurate and timely information. In order to continue to ensure productive media interaction, we have established the following media guidelines.

1. All media inquiries or requests for information should now be directed to our Director of Communications, Monique LeNoir. You may contact Monique LeNoir directly by phone: (202) 293-8620 or by e-mail: mlenoir@wtulocal6.org.
2. Interviews with the WTU President or any other WTU Officers must be arranged through the Director of Communications.
3. When contacting the WTU for an interview or to request information, all media representatives must identify their media outlet, purpose of request and deadline.
4. Advance notice is appreciated when requesting an interview so that detailed arrangements can be made.
5. If the WTU President is not available to speak, he will designate an official spokesperson via the Director of Communications to comment on behalf of the WTU.
6. **Please note:** If you do not adhere to this process when requesting WTU statements or interview requests, statements or opinions received will not represent the <u>official</u> WTU position as it relates to your media topic.

We appreciate your continued support and adherence to the above policy. For additional questions, you may contact (202) 293-8620.

---

**The Washington Teachers' Union**        490 L'Enfant Plaza, SW, Suite #7200   Washington, DC 20024
                                          Phone (202) 293-8600

08 0715

# FILED

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

*Exhibit*
*# 7*
*3P45*

**DRAFT**
Washington Teachers' Union
Special Executive Board Meeting
December 22, 2007
Minutes

President George Parker called a Special Meeting for the Washington Teachers' Union (WTU) Executive Board to order at 9:35 a.m. The Secretary was not present and President George Parker asked Lorraine Smith, Vice President of Elementary Schools, to take the minutes. **Attendees:** President George Parker, General Vice President (GVP) Nathan A. Saunders, Willie Brewer, Lorraine Smith, Derek Davis, Milton Williams, Erich Martel, Camille Locke, Agnes Dyson, Pablo Gi'ron, Deborah Hines, Sheila Gill Gloria Everett, and Dr, John Taylor. **Board of Trustees:** Candi Peterson and Joshua Rascoe. **Parliamentarian:** John F. Tatum, Jr.; Al Squire, **Director, American Federation of Teachers Southern Region. Absent:** Joyce Amoo, Sallie Dorsey, Robert Willis, Maria Angala, Andre Taylor, Diane Terrell, Tenia Prichard, Rashida Young, and Jacqueline Hines.

A quorum was present.

By unanimous consent the board meeting went into executive session with the exception of Mr. Al Squire, Director, AFT Southern Region.

Motion

It was moved that the President and the General Vice President follow the rules as prescribed by the Constitution and its by-laws of the WTU, Local 6, American Federation of Teachers, AFL-CIO - (Article VII - Union Officers, Sections 1 & 2).

    Motion made by:    Derek Davis
    Motion seconded by:    Gloria Everett
    Motion passed by unanimous consent.

Motion

Moved that the Board directs the General Vice President to limit his activities to the performance of his responsibilities as prescribed in the Washington Teachers' Union (WTU) Constitution ONLY, and to cease and desist representing the Washington Teachers' Union organization before the public, community organizations and the news media without the written approval of the Washington Teachers' Union (WTU) President and/or by majority vote and approval of the Washington Teachers' Union (WTU) Executive Board. (Article VII - Section 2).

    Motion made by:    Erich Martel
    Motion seconded by:    Milton Williams
    Motion passed by unanimous consent.

*08 0715*

**FILED**

APR 2 5 2008

**Clerk, U.S. District and
Bankruptcy Court**

Motion

Should the General Vice President fail to adhere to this directive, the President has the authority to suspend him without pay until such time as the Executive Board can meet and take appropriate disciplinary actions.

| | |
|---|---|
| Motion made by: | Erich Martel |
| Motion seconded by: | Milton Williams |
| Motion passed by unanimous consent. | |

Motion

It is moved that educational leave be approved for the General Vice President by the Executive Board.

| | |
|---|---|
| Motion made by: | Derek Davis |
| Motion seconded by: | Agnes Dyson |
| Motion passed by: | 7 approved    1 opposed    2 abstained |

Motion

It is moved that the Executive Board directs the President of Washington Teachers' Union (WTU) request assistance during the General Vice President's absence from Mr. Al Squire, Director, AFT Southern Region.

| | |
|---|---|
| Motion made by: | Derek Davis |
| Motion seconded by: | Gloria Everett |
| Motion passed by unanimous consent. | |

Motion

Moved that the Washington Teachers' Union (WTU) Executive board limit their executive sessions no longer than an hour.

| | |
|---|---|
| Motion made by: | Pablo Gi'ron |
| Motion seconded by: | Agnes Dyson |
| Motion passed by: | 13 approved    1 opposed |

Motion

It is moved that the General Vice President provide all requested data, so that matters of money and description of class will be provided, so that the Executive Board can make a decision regarding the request for payment for class at the January 12 Board Meeting.

Motion made by:

Motion seconded by:
Motion passed by unanimous consent (10).

General Vice President did not vote on either matter.

Motion

It is moved that the President provide the Executive Board of the Washington Teachers' Union (WTU) a copy of the liability policy and that it reflects all the names of the current Executive Board members.

Motion made by:        Erich Martel
Motion seconded by:    Derek Davis
Motion passed by unanimous consent.

Motion

Moved that the President and the General Vice President draft a press release describing the educational award that the General Vice President was awarded from the Harvard Labor School Program.

Motion made by:        Erich Martel
Motion seconded by:
Motion passed by unanimous consent.

Motion

Moved that the all motions made and approved in the executive session by the President, General Vice President, AFT Regional Representative and the Executive Board of the Washington Teachers' Union were heartily approved in general session.

Motion made by:        Nathan Saunders
Motion seconded by:    Gloria Everett
Motion passed.

Meeting adjourned 1:15.

Lorraine Smith

To all Staff,

Effective immediately and until further notice, all WTU Staff and Field Representative meetings will be held from 10:00 am-12:00 pm each monday. In cases where a monday falls on a holiday or school is closed, affected staff will be informed of the substitute meeting date. This week's staff meeting will be held from 10 am-12 pm this wednesday, March 12th. All Staff will meet from 10-10:45 am and Field representatives will meet from 10:45 am -12PM. Please adjust your schedules accordingly. This policy shall remain in effect while the WTU addresses issues related to internal supervisory roles and responsibilities. If you have questions, please feel free to contact me.

Thanks,

George Parker
President
202-293-8600

08 0715

**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

3/10/2008





Exhibit #10 1pg

# THE WASHINGTON TEACHERS' UNION

## <u>MEDIA STATEMENT</u>

Over the past several months, the Washington Teachers' Union has received numerous calls from our members requesting that we advocate for an "early out" retirement program for our teachers. We are supportive of the fact that the DCPS Teacher Transition Award Program allows our teachers, who are eligible for retirement, to receive a financial bonus for their dedicated service and commitment to the children of DCPS. We are also hopeful that this Teacher Transition Award Program will reduce any future need for a reduction in force caused by a recent decrease in student enrollment within the DC Public School System.

Certainly our members would have preferred a broader based program inclusive of an "early out" retirement opportunity for all teachers, especially those who wish to leave the system but are not eligible for full retirement, unfortunately, this could not be accomplished legislatively before the end of the school year. However, the WTU supports the fact that this Teacher Transition Award Program is beneficial for those teachers of retiring age.

The WTU will continue to work with DCPS to ensure that our teachers are sufficiently rewarded for their service.

George Parker
President
The Washington Teachers' Union

08 0715

---

The Washington Teachers' Union        490 L'Enfant Plaza, SW, Suite #7200  Washington, DC 20024
                                      Phone (202) 293-8600

FILED

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

*Exhibit #11 2 pgs*

# washingtonpost.com

# 700 Teachers Are Offered Buyout

Longtime Educators Would Receive $20,000 Bonus to
Leave System This Year

Advertisement



**Bluegrass Blockbuster**

DelFest: May 23 - 25, 2008   MARYLAND

By V. Dion Haynes
Washington Post Staff Writer
Friday, April 11, 2008; B04

D.C. Schools Chancellor Michelle A. Rhee said
yesterday that the school system will offer buyouts to
as many as 700 teachers nearing retirement or working
at 50 schools slated either for closure or an academic
overhaul.

In introducing the program, called the Teacher
Transition Award, city and school leaders said they
recognize the widespread uncertainty expressed by many teachers over what likely will be a tumultuous
new school year. In the fall, Rhee plans to close 23 schools and reorganize 27 others where students
have repeatedly lagged on the system's standardized tests, two initiatives that are expected to displace
numerous teachers.

Many teachers "are aware of the fast-paced changes," Mayor Adrian M. Fenty (D) said at the news
conference, held outside the central administration building at 825 North Capitol St. NE. "It's safe to say
this will give principals and the chancellor more certainty about staffing plans."

Rhee and other officials said the program will cost $10 million this year and will offer buyouts ranging
from $1,000 to $20,000 depending on years of service. It is not a way to get rid of teachers deemed to be
poor performers, they added, but a response to a huge demand from teachers who are interested in
leaving the system early.

While the program does not lower the retirement age, it offers a $20,000 bonus to those who opt to leave
the school system this year. Teachers eligible for the $20,000 bonus are those who are 55 with 30 years
of service, 60 with 20 years of service or 62 with five years of service.

Teachers at the schools slated for closure or reorganization qualify for the program regardless of their
years of service. Bonuses are offered on a sliding scale: Teachers with more than 20 years would get
$20,000, and those with five years or fewer would get $1,000.

"This will benefit the system and our hardworking teachers," Rhee said.

Although 1,700 of the system's 4,300 teachers are eligible for the buyout, city officials limited the offer
to the first 700 who apply. Officials expect the program to ultimately save $13 million. Eligible teachers
are required to apply for the program by April 25.

"We wanted to allow ourselves to offer the award to as many qualified teachers as possible," said Rhee's
spokeswoman, Mafara Hobson. "There's a certain amount of money. Once we hit that limit, it's all
gone."

08 0715

**FILED**

APR 2 5 2008

**Clerk, U.S. District and
Bankruptcy Courts**

Several teachers contacted yesterday, none of whom wanted to be identified because of fears that they would be reprimanded, expressed anger that the retirement age was not lowered and that more money was not offered.

"The union and the administration led us to believe this would be an early-out program," said a 20-year veteran. "We were expecting them to lower the [retirement age] to 50 or 53. . . . This is disappointing."

A teacher at a school slated for closure, who also has worked in the system for more than 20 years, said she expected a bonus of $25,000. "We're part of the D.C. government. Why aren't we getting what they're getting?" she said.

"I don't want to work where someone doesn't want me," she added. "There's no positive attitude for senior teachers. They don't feel we're doing a good job."

Clay White, chief of staff for the Washington Teachers' Union, which worked with Rhee in devising the program, said: "Certainly our members would have preferred a broader-based program inclusive of an early-out retirement opportunity for all teachers, especially those who wish to leave the system but are not eligible for full retirement. Unfortunately, this could not be accomplished legislatively before the end of the school year."

Nathan Saunders, general vice president of the union, said he opposed the buyout program. "I'm interested in seeing people come into the profession and staying instead of people so dissatisfied with public education that they can't wait to get out," he said.

Rhee said she is in the process of determining how many teachers will be needed in the new downsized system next year. At the same time the school system is offering buyouts, she said it also is conducting an aggressive recruiting campaign to find teachers to fill vacancies.

**Post a Comment**

**View all comments** that have been posted about this article.

You must be logged in to leave a comment. Login | Register

Submit

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

© 2008 The Washington Post Company

Ads by Google

Send to Printer          << Back to Article



Exhibit
#12, pg 1

# Local
**D.C. schools offer teachers bonuses to retire early**
Dena Levitz, The Examiner
2008-04-11 07:00:00.0
Current rank: # 362 of 16,064

**WASHINGTON -**
D.C. Public Schools Chancellor Michelle Rhee on Thursday announced an aggressive early-retirement program that experts fear could drive out some of the system's most talented educators.

The program — which Rhee said was offered in response to requests from the teachers union — allows two categories of teachers to collect bonuses if they leave the school system at the end of the school year: unionized teachers eligible to retire in June or teachers in any of the 50 schools that are either closing due to declining enrollment or being restructured under the No Child Left Behind Act.

That comes to 1,700 people who qualify. The bonuses will range from $1,000 to $20,000 based on years of service. The catch, though, is that the $10 million set aside for the program will only cover bonuses for about 500 to 700 teachers. The money will be pulled from debt-repayment funds.

According to the chancellor, the bonus money will be distributed on a first-come, first-served basis, and the application deadline is April 25.

Mary Levy, with the Washington Lawyers Committee, told The Examiner that administrators "need to do this" but that it could have unfortunate consequences.

"My concern is that good teachers will retire from the system thinking that they can get the money and work elsewhere, and what's left are teachers that are not going to get another job," Levy said. "There's no correlation between teacher quality and years of experience."

She said many of Rhee's predecessors have tried similar opt-out strategies. When they did, though, a sizable number of effective teachers left in favor of getting teaching jobs elsewhere.

Leaders of the teachers union are divided on the program. Union President George Parker indicated in a statement that he's as pleased as he could be with the plan.

"Certainly our members would have preferred a broad-based program inclusive of an 'early-out' retirement option for all teachers. ... Unfortunately this could not be accomplished legislatively before the end of the school year," he said.

Meanwhile, Union Vice President Nathan Saunders told The Examiner the program signals to him that the chancellor wants to get rid of as much of the current work force as she can.

"She's saying she clearly doesn't want them; there's no other way to interpret it," Saunders said.

dlevitz@dcexaminer.com

*Examiner*

08 0715

# FILED

APR 2 5 2008

**Clerk, U.S. District and Bankruptcy Courts**

*Exhibit #13 3/95*

**AFRO AMERICAN**

### D.C. teachers are cool to Chancellor Rhee's buy-out plan

Lorraine Smith loves teaching kindergarten and her eyes perk up when she sees that one of her students understands a concept or how to play a game. The 57-year-old Bancroft Elementary School educator would love to teach forever but realizes that at some point she must move on.

Smith said she would like to cook or travel when she retires. But she does not want to just leave; she wants to go out on her own terms.

When the Teacher Transition Award Program proposed by D.C. Public Schools Chancellor Michelle Rhee is mentioned to her, she lets out a heavy sigh.

## *"They wanted to get out of the system with full retirement benefits. This is not the case."*

"I am not excited about the new plan offered by her," Smith said. "What teachers want is an early-out, but this buy-out is not it. Besides, when we first heard of the plan, she was thinking of offering people to retire early a payout of $25,000.

"Now, it is $20,000. What is going on?"

Smith's frustration with Rhee's buy-out program has caused a great deal of discussion and consternation among D.C. teachers and its union, the Washington Teachers Union, because they do not feel it is adequate for the years of service that they put in. The Rhee plan would have a teacher who is 55-years-old with 30 years of service, 60 with 20 years and 62 with five years or more service, retire from the school system with a $20,000 payout and at least 58 percent of their pension for the rest of his or her life.

Teachers who work at schools that will be closed or restructured in the fall will have the chance to retire or leave the system on a sliding scale. For example, teachers who have 20 years of service will get a $20,000 payout and their retirement, if eligible. Teachers who have over 15-20 years will get $15,000; 10-15 will get $10,000; 5-10 will get $5,000 and up to five years, $1000.

An early-out is when the school system gives employees an option to leave the system before their retirement age with a bonus payment, some benefits coverage but a small penalty with the pension plan.

A buy-out is a straight payment for leaving the school system without a benefits package.

In a buy-out, if there are benefits, they are weighted more toward employees with more years of service than those with less.

08 0715

**FILED**

APR 25 2008

Clerk, U.S. District and
Bankruptcy Courts

Teachers in the closed/restructured schools who are not vested in the retirement system would have to work for five years, take the $1000 and move on. Those with more will be able to take the money out of the system.

Teachers have until April 25 to decide whether to take the buy-out. If they do, their final date of employment would be June 30.

If Lorraine Smith decides to retire, she would be eligible only for the first component of the Teachers Transition Award because Bancroft Elementary, located in Northwest, is not slated to be closed or restructured.

Rhee said that the plan will allow the school system to focus more on educating its children and allocate resources in other "critical areas." The initial cost of the plan is estimated to be $10 million but could go as high as $13 million.
D.C. Mayor Adrian Fenty supports the plan.

"The school system is undergoing a massive reform effort, which requires a great deal of transition and adjustment," Fenty said. "The administration believes that teachers should have the opportunity to weigh their career options and make sound decisions that will have a positive impact on their futures."

George Parker, president of the Washington Teachers Union, said that the plan is not what his members wanted.

"My members were telling me that they want an early-out," Parker said. "They wanted to get out of the system with full retirement benefits. This is not the case.

"Members who are 55 and over and have been in the system for 30 years should get a bonus, but we were pushing for $25,000 not $20,000. They are only getting a portion."

Parker said that Rhee and her staff did consult the union when formulating the plan but the union was not a partner in its design.

"The school system had the final say-so on it," Parker said.

While he has serious concerns about the plan, Parker does like the part about the departing bonus. "Many of our teachers leave the system year after year without a thank you," Parker said. "At least this will make things better."

He noted that some of his members in recent years have retired from the D.C. school system, taking various types of early-outs and gotten jobs in the Prince George's County school system.

"Those former members are really doing well," he said. "They get an early-out and a paycheck from Prince George's. They are able to pay up their houses and do other things."

Teaching in other jurisdictions is not something that Smith is interested in, despite the fact that she could get a job in Maryland or Northern Virginia.

"I am a Washingtonian," she said. "When I decide to retire, I will not go anywhere else to teach. I know of people who are getting their retirement and teaching in other places, but that is not for me."

Parker said that teachers at the affected schools who are not at retirement age can compete for jobs in the D.C. school system or pursue other careers.

The plan does not need the approval of the D.C. City Council because it falls under the powers that Rhee was given under Fenty's school reorganization plan last year. As the chancellor, Rhee can make changes in personnel and policy without council consultation or approval.

While she must deal with unions in terms of benefits and rights of members, she can implement any plan she wants for a subset of union membership (i.e., retiring teachers).

Doxie McCoy, a spokeswoman for D.C. City Council Chairman Vincent Gray (D), said that her boss has heard concerns about the plan but has not scheduled hearings to look into the matter.

When asked whether the Rhee plan is designed to move long-time teachers out of the system to get younger, cheaper educators, Lorraine Smith would not confirm that.

"I will say that two new people could take my salary," she said matter-of-factly.

*Exhibit 14*

**D.C. Teachers' Union Officials Urge Rejection of Rhee's Buyout Offer**

**Some** teachers' union officials in Washington are urging educators at 50 schools slated for closure or academic overhaul in the nation's capital to reject a buyout offer announced earlier this month by Schools Chancellor Michelle Rhee that would let up to 700 teachers accept bonuses ranging from $1,000 to $20,000 in exchange for leaving in June.

Washington Teachers' Union officials say teachers are upset that Ms. Rhee dropped an initial proposal to offer an "early out" program to those nearing retirement. Candi Peterson, a member of the union's board of trustees, criticized the buyout program, saying it encourages young and midlevel teachers to resign.

08 0715

**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

*Exhibit 15*

*2 pgs*

**THE WASHINGTON POST, April 15, 2008**

## Some Union Officials Tell Teachers To Spurn District's Buyout Offer

The vice president and a trustee of the Washington Teachers' Union said yesterday they are urging teachers at 50 schools slated for closure or academic overhaul to reject Schools Chancellor Michelle A. Rhee's buyout offer.

Last week, Rhee and Mayor Adrian M. Fenty (D) announced a plan that would allow up to 700 teachers to accept bonuses ranging from $1,000 to $20,000, depending on their years of service, in exchange for agreeing to leave the school system in June. Rhee said she offered the plan after leaders of the 4,200-member union informed her of widespread dissatisfaction among teachers about the turmoil that will be created next school year when she closes 23 schools and reorganizes 27 others.

Nathan Saunders, the union's general vice president, and Candi Peterson, a member of its board of trustees, said they have heard from numerous teachers who are angry about the buyout. The teachers, they said, are upset that Rhee dropped an initial proposal to offer an "early out" program to teachers nearing retirement, replacing it with a buyout program that applies to teachers across the board at the 50 schools.

"They need to know they have jobs. There's no need to be forced out, unless they want to leave," said Peterson, a special education social worker who works at four schools. She said she is using e-mails and conversations with building representatives to discourage teachers at the 50 schools from taking the buyout.

"No credible school system would encourage young and mid-level teachers to resign," she said, adding that she demanded to be placed on the agenda of next week's meeting of the union's board and delegates so she can ask WTU President George Parker to explain the extent of his involvement in the plan. "Most teachers in the restructured and closed schools are certified. . . . Rhee will probably hire teachers who are not certified."

Saunders said: "I'm against workers selling their jobs back to management and for new workers to be hired. . . . I am making these statements to every teacher I see."

08 0715

**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

pg 1 of 2



Rhee's spokeswoman, Mafara Hobson, said in a statement: "While the plan may not completely satisfy adults, the students of the District of Columbia are the motivating factors in this and every decision the Mayor and Chancellor make. This initiative is simply an option, and under no circumstance should anyone feel obligated to participate."

The program offers a $20,000 bonus to those who have reached retirement age and opt to leave the school system this year. That applies to teachers who are 55 years old and have 30 years of service; 60 with 20 years of service; or 62 with five years of service.

The other teachers at the schools slated for closure or reorganization would be eligible for bonuses on a sliding scale based on years of service. Those with more than 20 years would get $20,000, and those with five or fewer years would get $1,000.

Parker said he also is frustrated that Rhee replaced the early out with the buyout, which he called "unattractive," but he is not advising teachers how to respond. He said school leaders told him they could not offer the early out because it required legislative action that could not be completed before the end of the school year. He said he learned about the final details of the program Wednesday afternoon, the day before Rhee's announcement.

"If the chancellor was looking to get rid of a large number of teachers without [a layoff], she could have done it more effectively through an early out," Parker said. "I trust the judgment of our teachers; they can decide for themselves whether it will benefit them financially."

Kerry Sylvia has taught government for eight years at Cardozo High in Northwest, one of 27 schools to be reorganized because it failed to meet adequate yearly progress under the No Child Left Behind law for five consecutive years. Sylvia, who won an educator of the year award for her work in teaching students street law, said she is reluctantly considering the buyout because she feels "highly insulted" by the school system.

Rhee's message in offering the buyout, Sylvia said, is, "We don't care how good of a teacher you are, we just want you out of here." That, Sylvia said, "infers that teachers are the problem."

The buyout "is tempting," she added. "I'm working in a system that's not putting children first."

pg 2 of 2

*Exhibit 16 + 10 pgs*

# WASHINGTON TEACHERS UNION LOCAL # 6

## FINANCIAL STATEMENTS
## AND ACCOUNTANT'S REPORT

### JUNE 30, 2007 and JUNE 30, 2006

08 0715

**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

## HALEY & ASSOCIATES, LLC

CERTIFIED PUBLIC ACCOUNTANTS
BELTSVILLE, MARYLAND 20705

<u>WASHINGTON TEACHERS UNION LOCAL # 6</u>

<u>TABLE OF CONTENTS</u>

<u>FOR YEARS ENDED JUNE 30, 2007 and 2006</u>

<u>CONTENTS</u>

|  | <u>Reference</u> |
|---|---|
| Report of Independent Auditors | 1 |
| Exhibit "A" - Statement of Assets, Liabilities And Net Assets | 2 |
| Exhibit "B" - Statement of Revenue, Expenses And Changes in Net Assets | 3 |
| Exhibit "C" – Statement of Cash Flows | 4 |
| Exhibit – Supplementary Statement of Expenses | 5 - 6 |
| Notes to Financial Statements | 7- 10 |

5000 Sunnyside Avenue, Suite 304
Beltsville, Maryland 20705

Phone (301) 595-5600
Fax (301) 937-0187

# HALEY & ASSOCIATES, LLC
## Certified Public Accountants

### INDEPENDENT AUDITOR'S REPORT

Officers and Members
Washington Teachers Union Local # 6
Washington, DC

We have audited the accompanying balance sheet of Washington Teachers Union Local # 6 (a nonprofit organization) as of June 30, 2007 and June 30, 2006 and the related statements of financial activities, and cash flows for the years then ended. These financial statements are the responsibility of the organization's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards, as established in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Washington Teachers Union Local # 6 as of June 30, 2007 and June 30, 2006, and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

September 14, 2007

Haley & Associates, LLC,
Certified Public Accountants

WASHINGTON TEACHERS UNION LOCAL # 6                           EXHIBIT A
Statement of Assets, Liabilities, and Net Assets
As of June 30,2007 and 2006

## ASSETS

|  | 2007 | 2006 |
|---|---|---|
| Current Assets: | | |
| Cash and Cash Equivalents | $ 806,831 | $ 170,988 |
| Other Current Assets - Prepaid Expenses | 2,986 | 50,103 |
| Total Current Assets | $ 809,817 | $ 221,091 |
| | | |
| Other Assets: | | |
| Accounts Receivable | $ 128,518 | $ 294,735 |
| Furniture and Equipment (Net of Accumulated Depreciation) | 19,950 | 29,824 |
| Total Noncurrent Assets | $ 148,468 | $ 324,559 |
| | | |
| Total Assets | $ 958,285 | $ 545,650 |

## LIABILITIES AND NET ASSETS

|  | 2007 | 2006 |
|---|---|---|
| Current Liabilities: | | |
| Accounts Payable | - | $ 47,660 |
| Payroll, Withholdings & Accrued Vacation | 221,156 | 77,319 |
| Pension Plan Contribution | 132,703 | 98,035 |
| Due DCPS Release Time | 203,080 | 238,171 |
| Due Affiliate - Parent AFT (Note 3) | 262,898 | 415,390 |
| Total Current Liabilities | $ 819,836 | $ 876,575 |
| | | |
| Net Assets: | | |
| Unrestricted: | | |
| Operating | | |
| Total Unrestricted Net Assets | 138,448 | (330,925) |
| | | |
| Total Liabilities and Net Assets | $ 958,285 | $ 545,650 |

See Auditor's Report and Accompanying Notes to Financial Statements

## WASHINGTON TEACHERS UNION LOCAL # 6
### Statement of Revenues, Expenses, and Changes in Net Assets
### For the Years Ended June 30, 2007 and June 30, 2006

EXHIBIT B

|  | 2007 | 2006 |
|---|---|---|
| **Revenue:** | | |
| Member and Retiree Dues | $ 3,408,517 | $ 3,000,242 |
| Cost paid by AFT on behalf of the Washington Teachers Union | 148,466 | 369,169 |
| Optical and Dental Plan Contributions and Fees | 187,687 | 266,818 |
| Affiliate AFT Grants & Subsidy | 92,960 | 32,332 |
| COPE Contributions | 10,862 | 7,280 |
| Staff Development Fees | 18,174 | 6,065 |
| Legal Fee recovery | 18,478 | 43,848 |
| Interest | 14,072 | - |
| Miscellaneous Income | 204,207 | 6,186 |
| Total Revenue | $ 4,103,423 | $ 3,731,940 |
| | | |
| **Expenses:** | | |
| Salaries | $ 1,344,666 | $ 989,693 |
| Administrative cost paid directly by AFT on behalf of the Washington Teachers Union | 148,466 | 369,169 |
| Employee Benefits( see schedule page 5) | 336,163 | 276,990 |
| Administration (see schedule page 5) | 557,945 | 532,371 |
| Professional Fees | 129,183 | 239,450 |
| Meetings and Workshops | 146,712 | 106,035 |
| Affiliate - AFT Per Capita Tax | 693,363 | 626,364 |
| AFL-CIO and Other Per Capita Tax | 41,615 | 44,571 |
| Member Insurance Programs | 36,379 | 46,105 |
| Membership Services (see schedule page 6) | 199,559 | 219,144 |
| Total Expenses | $ 3,634,050 | $ 3,449,892 |
| | | |
| Change in Net Assets | $ 469,373 | $ 282,048 |
| | | |
| Net Assets (Deficit) at Beginning of Year | $ (330,925) | $ (612,973) |
| | | |
| Net Assets (Deficit) at End of Year | $ 138,448 | $ (330,925) |

See Auditor's Report and Accompanying Notes to Financial Statements

WASHINGTON TEACHERS UNION LOCAL UNION # 6       EXHIBIT C
Statement of Cash Flows
For the Years Ending June 30, 2007 and June 30, 2006

| | 2007 | 2006 |
|---|---|---|
| Cash Flows from Operating Activities: | | |
| Change in Net Assets | $ 469,373 | $ 282,048 |
| Adjustments to Reconcile Change in Net Assets to | | |
|   Net Cash Provided by Operating Activities: | | |
| Depreciation | 11,555 | 6,088 |
|  Changes in Operating Assets and Liabilities: | | |
| Decrease (Increase) in Receivables | 166,217 | (170,995) |
| Decrease (Increase) in Pre-Paid Expenses | 47,117 | (37,845) |
| Increase (Decrease) in Current Liabilities | (56,739) | 7,293 |
| Net Cash Provided by Operating Activities | $ 637,523 | $ 86,589 |
| Cash Flows from Investing Activities: | | |
| Purchase of Furniture and Equipment, net of adjustments | (1,680) | (32,824) |
| Net Cash from Investing Activities | (1,680) | (32,824) |
| Net Increase (Decrease) In Cash and Cash Equivalents | $ 635,843 | $ 53,765 |
| Cash and Cash Equivalents at Beginning of Year | $ 170,988 | $ 117,223 |
| Cash and Cash Equivalents at End of Year | $ 806,831 | $ 170,988 |

See Auditor's Report and Accompanying Notes to the Financial Statements

## WASHINGTON TEACHERS UNION LOCAL # 6
### Supplementary Schedules - Audit
### For the Years Ended June 30, 2007 and June 30, 2006

|  | 2007 | 2006 |
|---|---|---|
| Schedule of Employee Benefits: |  |  |
| Health Insurance | $ 42,055 | $ 45,369 |
| Life and Disability Insurance | 10,651 | 12,596 |
| Automobile Allowance and Insurance | 41,400 | 42,750 |
| Parking | 31,688 | 28,420 |
| Pension | 129,295 | 72,260 |
| Employment Taxes | 72,146 | 71,845 |
| Meals and Other Travel | 8,928 | 3,750 |
|  | $ 336,163 | $ 276,990 |
|  |  |  |
| Schedule of Administrative Expenses: |  |  |
| Office Rent | $ 315,810 | $ 307,009 |
| Supplies | 25,829 | 10,617 |
| Postage and Delivery | 23,196 | 26,745 |
| Telephone | 34,396 | 37,146 |
| Software/Computer Expenses | 3,363 | 4,886 |
| Printing & Publications | 54,555 | 67,234 |
| Office Equipment Leases | 37,469 | 31,965 |
| Office Repairs and Maintenance and Expensed Equipment | 5,031 | 14,535 |
| Office Cleaning | - | 765 |
| Contributions | 2,625 | 6,230 |
| Payroll Processing Fees | 3,267 | 3,454 |
| Advertising | 375 | 2,925 |
| Temporary Services | 7,395 | 2,772 |
| Office Insurance | 21,296 | 7,005 |
| Depreciation | 11,555 | 6,088 |
| Interest, Taxes and Other | 11,784 | 2,995 |
|  | $ 557,945 | $ 532,371 |

See Auditor's Report and Accompanying Notes to Financial Statements

WASHINGTON TEACHERS UNION LOCAL # 6
Supplementary Schedules- Audit
For the Years Ended June 30, 2007 and June 30, 2006

| | 2007 | 2006 |
|---|---|---|
| Schedule of Membership Services: | | |
| Dental / Optical Plan Fees | $ 99,107 | $ 130,133 |
| Negotiation Expense | - | 2,493 |
| General Services | 16,349 | 6,779 |
| Election | 33,307 | 9,972 |
| Public Relations and Goodwill | 29,537 | 33,921 |
| Staff Training | 15,929 | 24,322 |
| Dues Refunds | 5,329 | 11,524 |
| | $ 199,559 | $ 219,144 |

See Auditor's Report and Accompanying Notes to Financial Statements

Washington Teachers Union Local # 6
NOTES TO FINANCIAL STATEMENTS

## NOTE A - ORGANIZATION AND NATURE OF BUSINESS

Washington Teachers Union Local # 6 was chartered in 1916 under the laws of the District of Columbia as a non-stock, nonprofit organization for the purpose of representing public teachers in the District of Columbia.

Please refer to the Union Constitution and By-Laws for a complete description of their mission statement and purpose.

## NOTE B - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1.  Basis of Accounting

    Washington Teachers Union Local # 6 (the Union) follows the accrual basis of accounting and principles of nonprofit accounting to comply with restrictions placed on contributions by donors. All assets, liabilities, and activities are classified for accounting and reporting purposes in accordance with Statement of Financial Accounting Standards (SFAS) No. 117 of the Financial Accounting Standards Board, *Financial Statements of Not-for-Profit Organizations*. All financial transactions have been recorded according to the three classes of net assets described in SFAS No. 117 - unrestricted net assets, temporarily restricted net assets, and permanently restricted net assets. The Union has no temporarily or permanently restricted net assets.

2.  Income Taxes

    Washington Teachers Union Local # 6 is a labor organization exempt from taxes under section 501(c)(5) of the Internal Revenue Code. There is no provision for income taxes in these financial statements. The Union annually files with the Internal Revenue Service form 990 *Return of Organization Exempt from Income Tax*. This form is open to public inspection. Management represents that there are no activities that would generate unrelated business income tax. The most recent tax examination did not affect the organization's tax exempt status.

( Continued )

7

Washington Teachers Union Local # 6
NOTES TO FINANCIAL STATEMENTS – CONTINUED

3.    Related Party Activity

The Union is currently in arrears of Per Capita tax to the American Federation of Teachers (AFT) in the amount of $262,898 as of June 30, 2007 and $415,390 as of June 30, 2006.  WTU and AFT have agreed to a 48-month non-interest payment plan for the arrears amount.  The payment schedule is for monthly payments of $10,000, with additional principle payments as WTU finances permit, under the "recapture agreement".  WTU has granted AFT a security interest in their monthly dues payments from the District of Columbia Public Schools (DCPS).

The AFT has also provided administrative services assistance to the local at no charge.  The AFT paid on behalf of the Washington Teachers Union $148,466 during the year ending June 30, 2007 and $369,169 year ending June 30, 2006.  The Union recorded an in-kind revenue and expense amount for these services.

The AFT also provided direct grants and subsidies aid to the Union in the amount of $91,890 in the year-ending June 30, 2007 and $32,332 during the year ending June 30, 2006.

4.    Depreciation

Depreciation is provided in amounts sufficient to relate the cost of the depreciable assets to operations over the assets useful life using the straight-line method.  During the year ended June 30, 2007 the depreciation was $11,555 and $6088 in 2006.  The Union did not maintain a listing of fixed assets prior to July 1, 2005, accordingly all pre-existing furniture and fixtures was assumed to be fully depreciated a manual inventory was conducted to include in these financial statements, during the year ended June 30, 2007.

| Furniture & Equipment (at cost): | $197,495 |
| Accumulated Depreciation: | (177,545) |
| Net Furniture & Equipment: | $ 19,950 |

5.    Use of Estimates in the Preparation of Financial Statements

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from these estimates.

( Continued )

8

Washington Teachers Union Local # 6
NOTES TO FINANCIAL STATEMENTS – CONTINUED

6.    Commitments

The Union entered into a long-term lease arrangement for the office space at 1717 K NW, Washington DC, the lease was scheduled to expire on December 31, 2008, and the following represented the minimum future lease payments, exclusive of escalation clauses:

| Year | Amount |
|------|--------|
| 2008 | $ 278,825 |
| Total | $ 278,825 |

The Union is currently in the process of vacating the lease at 1717 K NW, Washington DC and in the process of obtaining a new sub-lease agreement for an office space at an alternate location. At which time they will vacate their present lease agreement and enter into new one. ·

7.    Retirement Plans

The Organization participates in a defined contribution retirement plan for all full time employees and officers. The plan requires monthly contributions in the amount of 11.1% of salary. During the year ended June 30, 2007 the expense incurred was $129,295 and year ending June 30, 2006 the expense incurred was $72,260. Of these amounts $61,170 was not funded for former officers and employees that had embezzled funds form the Union. These amounts were being withheld as a potential restitution.

8.    Contingencies

According to the Organization's legal counsel the fund is involved in no litigation that would require disclosure in the financial statements.

9.    Compensated Absences

The Union provides vacation, severance and sick leave to employees based on longevity. As of June 30, 2007 and 2006 the amounts of accrued leave liabilities were $ 121,341 and $ 77,319 respectively.

10.    Post-Employment Health Care Obligations

The union does not provide health care benefits to employees upon separation of employment, other than what is required under COBRA; accordingly, there is no accrued liability for post-employment healthcare obligations as required under SFAS #106.

( Continued )

9

Washington Teachers Union Local # 6
NOTES TO FINANCIAL STATEMENTS – CONTINUED

11.   FDIC Limits

The Union has the following Cash Accounts

| | |
|---|---:|
| Amalgamated Operating MMKT & Sweep- | 337,121 |
| Amalgamated Thought Bridge MMKT& CD- | 173,290 |
| Amalgamated Member Services MMKT& CD- | 219,419 |
| Amalgamated Cope MMKT | 15,993 |
| Amalgamated Escrow MMKT- | 60,708 |
| (Petty Cash)- | 300 |
| | $806,831 |

To the extent that the cash balance at this bank exceeds the $100,000 FDIC limit, the
union has exposure.  The union uses a sweep account to minimize their risk.

**aft** *A Union of Professionals*

Exhibit
#17
6 pgs

American Federation
of Teachers, AFL-CIO

AFT Teachers
AFT PSRP
AFT Higher Education
AFT Public Employees
AFT Healthcare

Edward J. McElroy
PRESIDENT

Nat LaCour
SECRETARY-TREASURER

Antonia Cortese
EXECUTIVE VICE PRESIDENT

Southern Regional Office

Al Squire
DIRECTOR

Leonard Lee
DEPUTY DIRECTOR

555 New Jersey Ave. N.W.
Washington, DC 20001
T: 202/393-5673
F: 202/393-5672
E: asquire@aft.org
   llee@aft.org

March 14, 2008

George Parker, President
Washington Teachers Union
490 L'Enfant Plaza, SW
Suite 7200
Washington, DC 20024

Dear George:

I was on out of town travel when communications from General VP Nathan
Saunders and yourself were received. While these communications were
directed to President McElroy, please accept my apologies for any delay in
responding. As the point person for this endeavor, I wanted to respond on
behalf of the AFT since it does appear to be a difference in opinion among
the WTU leadership around the drafting and completion of the agreement.

As you are well aware, we began a process in January to develop an
agreement for assistance, responding to the December 22, 2007 WTU
Executive Board request. As we conferred and drafted a Memorandum of
Understanding, it was my understanding that various meetings
(formal/informal) and discussions occurred along the way with the WTU
Executive Board. Consequently, this process concluded with your receiving
authorization to sign off on the Memorandum of Understanding. The
February 8, 2008 document served as the basis for the agreement between
the AFT and WTU. As such, I met with the WTU Executive Board on
February 28, 2008 to formally present the agreement with an expectation
that a more in depth discussion would be held and the agreement would be
voted on by March 8th.

I now have the approval of AFT President Ed McElroy and attached is a copy
with his signature. While respectfully there may still be some reservations as
referenced by General VP Saunders, I would recommend that the leadership
of WTU come together, resolve whatever concerns remain internally and
let's move forward. We have a lot of work to do and the sooner the internal

08 0715

**FILED**

APR 25 2008

Clerk, U.S. District and
Bankruptcy Courts

Parker/Page 2

challenges are resolved by WTU, the sooner I will be able to move the process for the assignment of staff.

As always, please do not hesitate to advise if you have any questions.

In Unity,

Albert Squire, Director

AS:me opeiu#2 afl-cio
Enclosure

cc: Ed McElroy
    Nathan Saunders
    Phil Kugler
    David Strom
    David Sherman
    Rob Weil
    WTU Executive Board

## AGREEMENT
### for the Appointment of
### the Assistant to the President of the Washington Teachers' Union

This Agreement by and between the American Federation of Teachers, AFL-CIO (AFT) and the Washington Teachers' Union, Local 6, AFT, AFL-CIO (WTU), hereinafter collectively referred to as the "Parties", shall be effective upon execution by the Parties.

### WITNESSETH:

**WHEREAS,** WTU is under extraordinary pressure from outside forces, resulting from the Mayor's takeover of DC public schools, including the fast paced school reform initiatives including school restructuring and school closings; and

**WHEREAS,** the Parties desire that WTU should be in a better position to meet the needs of its members and respond to the challenges it faces; and

**WHEREAS,** the AFT, in consultation with the WTU Executive Board, has determined that the current governance and internal operational challenges, as well as member representation capacity at the WTU, urgently requires additional support and assistance from the AFT per the request of the WTU Executive Board at its December 22, 2007 meeting; and

**WHEREAS,** the Parties want to ensure that sound policies and procedures are implemented by WTU and that WTU should emerge as a stronger, more stable, and more politically influential labor union; and

**WHEREAS,** AFT is committed to helping WTU address the enormous challenges it faces during the current political climate in the District of Columbia and wants WTU to be a strong and active force within AFT, the labor movement, and the District of Columbia; and

**WHEREAS,** AFT believes that the decision by the WTU Executive Board to request assistance from the AFT at a time of tremendous need for the local, demonstrates the Executive Board's desire and commitment to strengthen WTU; and

**WHEREAS,** the AFT and WTU both desire to commit human and financial resources to meet the goals set forth in this Agreement; and

**WHEREAS,** WTU intends to fully cooperate with the AFT in accomplishing the goals of this Agreement,

**NOW, THEREFORE,** in consideration of the mutual promises and benefits herein expressed, the Parties covenant and agree as follows:

## COVENANTS AND AGREEMENTS

1.    AFT shall assign a full-time staff person to WTU to provide direct supervisory support and oversight over WTU's day-to-day operations. Such person shall bear the title "Assistant to the President of the Washington Teachers' Union" (Assistant to the President). AFT shall have sole authority to appoint the Assistant to the President, however AFT will solicit the advice of WTU in filling the position.

2.    As soon as possible after the execution of this Agreement, the Assistant to the President will engage in a full-scale evaluation of the WTU, its structural and administrative strengths and weaknesses, staff deficiencies, governance, office operations, and finances.

3.    The Assistant to the President will have the authority delegated to him or her by the president, officers, and Executive Board of the WTU, within the bounds set by the WTU Constitution, to take corrective action to address the WTU's needs.

4.    The Parties recognize that a full and complete description of the responsibilities of the Assistant to the President cannot be created prior to the evaluation described in paragraph 2 of this Agreement having taken place. Nonetheless, the Parties agree that the Assistant to the President must be delegated clear authority to:

   a. Develop and implement an organizational and operational strategy which will allow WTU to effectively meet the day-to-day challenges of its restructuring initiatives and activities; and

   b. Define officer and staff responsibilities and implement procedures for assignment and direction of staff; and

   c. Develop and implement effective accountability measures, making whatever human resource changes needed for the effective functioning of WTU, including but not limited to the responsibility to direct and supervise staff; and

   d. Develop and implement an organizing plan for the recruitment of agency fee payers, charter school teachers, and facilitation of member involvement and mobilization; and

   e. Develop and implement WTU's Professional Issues/Development Operation in a meaningful way to better serve the organizing of agency fee payers and charter school teachers, support current members and engage them as union activists through the establishment of a WTU Teacher Center and a variety of educational and reform initiatives; and

   f. Implement the WTU Constitution and establish, where needed, constitutionally required structures, including but not limited to functional chapters, the school chapter advisory committee, the representative assembly and other WTU constitutionally mandated committees; and

2

g. Review the WTU finances, implement AFT's recommended accounting policies and procedures and advise the WTU treasurer and bookkeeper on financial best practices; and

h. Engage in all aspects of WTU's collective bargaining responsibilities; and

i. Implement, develop, and engage in all other duties that are necessary and proper to effectuate the goals of this Agreement.

**5.**    The Assistant to the President shall have authority to: oversee and direct WTU's finances as set forth in the per capita loan agreement with AFT; direct WTU's collective bargaining work; engage with third parties including DCPS Administration, parents, community groups, political leaders; direct the development and enforcement of organizational policies; supervise and direct WTU staff; and assign officers to specific projects in accordance with the WTU Constitution.

**6.**    If WTU, its officers or staff, fails to fully cooperate and implement the recommendations of the Assistant to the President, AFT reserves the exclusive right to end its financial support for the Assistant to the President position. Full cooperation shall be defined exclusively by the AFT.   WTU may be relieved of its obligations under this Agreement only upon a material breach of the terms of such Agreement by AFT.

**7.**    The Assistant to the President will evaluate WTU's current situation after consultation and discussion with the officers and immediately develop a comprehensive action plan to move the local forward.  The officers of the WTU will work cooperatively with the Assistant to the President to ensure full and successful implementation of the action plan.  This collaborative effort between the AFT and WTU will provide officers exposure to a variety of successful managerial and administrative strategies for improving the overall performance of the WTU in servicing its members and will have the full support of the AFT. Similarly, the Assistant to the President will require the input and cooperation of the staff in meeting the objectives of the union as established by him or her.

**8.**    The length of the assignment of the Assistant to the President will depend on the significant challenges facing WTU and the time required to develop the internal and operational capacity to successfully meet these challenges.  AFT does not have any interest in maintaining this assignment longer than necessary, but desires to ensure that sound policies and procedures are implemented and that WTU emerges as a strong, stable and politically influential labor union. Given the current circumstances, the Assistant to the President assignment will last at least twelve (12) months, at which point the Assistant to the President will consult and discuss his findings and evaluation of the progress, capacity and conditions of the WTU with its officers. If necessary, the assignment will be extended until such time that AFT, in conjunction with WTU, determine that the assigned AFT staff is no longer needed. However, the AFT financial oversight provided for in the per capita loan agreement will continue until all the terms in that agreement are satisfied.

3

9.     Both AFT and WTU resources will be used to meet the goals set forth in this Agreement. WTU understands and acknowledges that this represents an enormous financial and staff commitment from AFT, which AFT is committed to provide only when there is **full** cooperation from WTU in carrying out this effort.

10.     Prior to the execution of this Agreement by the Parties, it shall be approved in its entirety and without modification whatsoever by a meeting of the WTU Executive Board in a meeting duly called pursuant to the terms of the Constitution and Bylaws of the WTU.

**IN WITNESS WHEREOF,** the Parties have read, understood, and caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date set forth below:

_____
GEORGE PARKER, PRESIDENT
AND ON BEHALF OF THE
WTU EXECUTIVE BOARD

March 10, 2008
DATE

_____
FOR THE AFT

March 12, 2008
DATE

4

Exhibit
#18
3 pgs

March 10, 2008

Edward J. McElroy
President

Dear President McElroy,

This letter follows the March 8, 2008 WTU Executive Board meeting where the approval of the WTU/AFT agreement also known as the "Agreement for the appointment of the Assistant to the President of the Washington Teachers' Union" was discussed. Attached, please find my prior two communications to your office concerning contributing recommendations in order to strengthen the agreement (See attachments #1 and 2). During our March 8 meeting, the Executive Board was told by WTU President Parker if any changes were made to the agreement, it would be 'off the table' or retracted by AFT. AFT's Southern Region Director Al Squire's email, dated March 8, 2008, was brandished, like a pistol in an armed robbery, to coerce and persuade Executive Board action without tangible input of the Executive Board other than an affirmative vote (see attachment #3). Another Executive board member Erich Martel also circulated his recommendations which are similar to my recommendations.

Needless to say, all conversation focused on why the executive board did not have reasonable assess to read, offer recommendations, and craft this important document. Disappointingly, AFT was cast as the culprit until further questioning revealed the document was revised numerous times without any executive board knowledge or input. I agreed to approve the agreement under the duress of failing to do so would leave our teachers destitute. The WTU Executive Board or the AFT should have never been placed

08 0715

FILED
APR 2 5 2008
Clerk, U.S. District and
Bankruptcy Courts

in this position. I promised my colleagues I would write this letter when I voted yes under compulsion because it was made clear that we had been hoodwinked!

This episode emphasizes why a definitive written reporting requirement at specific intervals is necessary in the agreement; why the reporting requirement has to be directly to the executive board; why training of the executive board and representative assembly is crucial; and why staff meetings and scheduling must be within the scope of said executive. Lastly, the title -Assistant to the President of the Washington Teachers' Union- is offensive. Currently all WTU staff members report directly to the President including another special assistant, administrative assistant, project manager, chief of staff and the WTU is lethargic on its best day. The title of this new position implies that the status quo is acceptable and will continue in the same manner. Twenty-one (21) Public Schools are being closed and twenty-seven (27) other school programs are being reconstituted and the WTU is speechless without any official message for its members. Some of our members are actively seeking to start there own charter schools out of fear and desire to protect their economic well being. Additionally, the collective bargaining agreement has expired and management was not made to respect our members' lawful right to enter into negotiation 1 full year prior to the expiration date of October 1, 2007. This showed every sign of being converted to a private back room deal as opposed to a democratically negotiated union contract. Advocacy and support must be at the membership, executive board, and representative assembly levels to build capacity and strengthen WTU. This agreement may be the last resort before the members reject the

WTU and unionism as ineffective for their needs. We deserve every chance and opportunity to survive.

Take the time to revisit the recommendations attached for reasonableness and assess whether they increase the probability of a successful end result for members. Thank you in advance for your consideration.

In Solidarity,

Nathan A. Saunders
General Vice President

Exhibit
#19
1 Pg.

Dear Gentlemen,

This email follows up the last executive board meeting of Thursday, February 28, 2008. It was agreed that recommendations for improvements could be submitted. The following are my recommendations:

1. The title of the position be changed to - <u>AFT Executive Director</u> reporting to the WTU Executive Board. All references thereafter should include that name.

2. Duties and Responsibilities shall include attending all representative assembly, and executive board meetings.

3. Duties and Responsibilities also shall include scheduling and holding staff meetings.

4. Duties and Responsibilities shall include arranging or providing executive board training and building representative training.

5. A written report shall be made to the WTU Executive Board and the AFT at the end of 60, 180, and 365 day intervals, minimally, examining the existing conditions and the improvements made. All recommendations shall be made to the Executive Board and AFT.

The recommendations are self explanatory hence indicating where I believe the WTU could be assisted thereby yielding membership dividends. As presently constructed, the agreement contains no written reporting requirement. Under no circumstances should the AFT or WTU continue to support or condone additional special assistants to the President position at members' expense. This agreement is necessary, warranted, and must be strong for this union to survive! While WTU situation is one of peril, I could support this agreement with these changes. Thank you for your consideration in advance.

08 0715

**FILED**

APR 2 5 2008

**Clerk,** U.S. District and
Bankruptcy Courts

*Exhibit 5*
*20 PM*

**Clay White**

| | |
|---|---|
| **From:** | Al Squire, Regional Director, Organization & Field Services [ASQUIRE@aft.org] |
| **Sent:** | Saturday, March 08, 2008 9:10 AM |
| **To:** | gparker@wtulocal6.org |
| **Subject:** | Mtg |

George: Unable to reach Ed, he is probably traveling.
I would simply state for the record that "the agreement stands as presented, if it is passed by the WTU EX BD today, please advise and we will move forward; if not, this proposal is off the table" Hope all goes well.

08 0715

**FILED**

APR

**Clerk, U.S. District and
Bankruptcy Courts**

1



| From : | Candi Peterson <kepmclp@msn.com> |
|--------|----------------------------------|
| Sent : | Thursday, March 20, 2008 8:48 PM |
| To : | HaynesD@washpost.com |
| Subject : | Re: President George Parker & the WTU |

MIME-Version: 1.0
X-Originating-IP: [71.191.93.126]
X-Originating-Email: [kepmclp@msn.com]
X-Sender: kepmclp@msn.com
Received: from bay0-omc3-s25.bay0.hotmail.com ([65.54.246.225]) by bay0-imc3-s36.bay0.hotmail.com with Microsoft
SMTPSVC(6.0.3790.2444); Thu, 20 Mar 2008 18:48:06 -0700
Received: from hotmail.com ([64.4.61.45]) by bay0-omc3-s25.bay0.hotmail.com with Microsoft SMTPSVC(6.0.3790.3959); Thu,
20 Mar 2008 18:48:06 -0700
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC; Thu, 20 Mar 2008 18:48:06 -0700
Received: from 64.4.61.244 by by102fd.bay102.hotmail.msn.com with HTTP;Fri, 21 Mar 2008 01:48:04 GMT
X-Message-Info: JGTYoYF78jEHjJx36Oi8+Z3TmmkSEdPtYrlmWV6HfqB06n5FDDHMGAnhsFnI0s/Z6F8i1cibS3A=
X-OriginalArrivalTime: 21 Mar 2008 01:48:06.0787 (UTC) FILETIME=[9BEFE530:01C88AF5]
Return-Path: kepmclp@msn.com

View E-mail Message Source

Content-Type: text/html; format=flowed

3/20/08

Dear Dion: Hi. As you may be unaware I was present when you called Mr. George Parker, WTU President of the
Washington Teachers' Union tonight. I am a WTU Board of Trustee member. Mr. Parker inappropriately placed your call
on speaker phone at the conclusion of our WTU Exec. Board meeting for some WTU Board members to hear your
questions/comments.

I do believe that Mr. Parker is giving you half-truths as there was an attempt made in our WTU Executive Board meeting
for a motion that was made to silence our WTU Vice Preisent, Mr. Nathan Saunders. This motion failed to pass by our
WTU Exec. Board. Subsequent to this, Mr. Parker instituted the new media policy on his own accord . Unlike what Mr.
Parker said tonight- the WTU constitution requires him to represent teachers in the media. Unfortunately, many of our
WTU teacher members feel that Mr. Parker does not adequately represent them in the media as he should and they
often express gratitude that Mr. Nathan Saunders is more vocal and actively engaged in the issues that impact teachers.

I also don't hink it is coincidental that Chancellor Rhee attempted to silence me as well  around the same time Mr.
Pakers's new media polilcy came out. Could this be coincidental? Due to my aggressive representation as a WTU
Building representation for city-wide teachers and service providers as well as being politically active, the only employee
to testify before the city council and being actively engaged with the Coalition to Save our Neighborhood schools to
bring attention to school closures and school restructuring. I would like you to read an article that I was In the Mail
which referenced Chancellor Rhee's attempts to intimidate me as an DCPS employee and silence me as an active labor
representative. Mr. Saunders, WTU Vice President represented me in this regard and we both agree this was an unfair
labor practice as well as an act of intimidation/retaliation.

Please feel free to call me on 301-613-6092. I will forward you the other email.

Candi Peterson

WTU Board of Trustee member

WTU Building Representative/city wide teachers and service providers

CSONS member

08 0715

**FILED**

APR 25 2008

Clerk, U.S. District and
Bankruptcy Courts



Exhibit #22 1 p4

## Labor's Diss-Union

 Given that some teachers may lose their jobs as schools close and others are reorganized in Mayor Adrian M. Fenty's system takeover, it's not unreasonable to think the leaders of the 4,200-member Washington Teachers' Union might be focusing on unity in their current contract talks with Schools Chancellor Michelle Rhee (who just canned 98 workers at central headquarters).

And George Parker, union president, and Nathan Saunders, general vice president, certainly are choosing sides--- against each other.

"George and I are officially split on our philosophies of our approaches to solving problems," Saunders said.

"Nathan has his beliefs based on his experience -- or lack thereof," Parker countered. "Nathan doesn't have the history of unionism that some of us have. Some of his perceptions may not be as knowledge-based as ours."

Saunders says Parker is perceived by some as being too close to Rhee. "Members are completely demoralized and desirous of taking action and the union is stuck in the mud," he said.

The dispute boiled over several months ago when Parker notified media-types that official statements can only come from him. Saunders saw that as a move to silence him, and things just got worse, he said, when Parker filled two staff positions from outside the teacher ranks. "We represent teachers who should have the first opportunity to lead and be employed by their union," Saunders said.

Parker, who says he has the support of the board, didn't seem worried. "Teachers feel confident in my negotiating ability," he added.

Meanwhile, Saunders is making his own moves. He said he will join a community "teach-in" at Shaw Middle School in Northwest Washington on Wednesday evening to protest Rhee's plans to close 23 schools and restructure 27 failing ones.

### V. Dion Haynes

By Dion Haynes | March 25, 2008; 7:25 AM ET | Category: Dion Haynes , Education
Previous: Happy Birthday! Again and Again and Again... | Next: When Should the Public Testify on the School Budget?

.........................................................................................

### Comments                    Please email us to report offensive comments.

Parker is too close to Rhee, however, overall the union is still ineffective. Instead of fighting each other, they should be fighting for the rights of the few good teachers that the District may still have. As I see it, this is tantamount to

08 0715

## FILED

APR 2 5 2008

Clerk, U.S. District and Bankruptcy Courts

Case 1:08-cv-00715-RMC    Document 1-2    Filed 04/25/2008    Page 54 of 57

Exhibit
3 PG

**From:** "Levy, Michael (OGC)" <michael.levy@dc.gov>

**To:** "Nathan Saunders" <nsaunders@wtulocal6.org>

**Cc:** "George Parker" <gparker@wtulocal6.org>, "Clay White" <cwhite@wtulocal6.org>, "Tom Flood" <tflood@aft.org>

**Date:** 08/31/2007 09:20 AM

**Subject:** RE: Leave of Absence MOU issues - pay status of George Parker, Mary Collins, Clay White & Tamika Brown

Understood, Nathan.

I sent a detailed email to George Valentine yesterday outlining the issues and options and he in turn passed it along to Natasha Campbell at OLRCB for further action. Natasha is considering the matter now. I'll keep you posted.

Mike

Michael D. Levy, Esq.
Attorney Advisor
Office of the General Counsel
D.C. Public Schools
202/442-5157 (voice)
202/442-5098 (fax)


This electronic transmission contains information from the Office of the General Counsel for the District of Columbia Public Schools, which may be confidential or privileged. The information is intended for the use of the above addressee only. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you received this transmission in
error, please notify us by telephone, 202/442-5000, or by reply electronic mail to the sender.


-----Original Message-----
From: Nathan Saunders [mailto:nsaunders@wtulocal6.org]
Sent: Thursday, August 30, 2007 7:23 PM
To: Levy, Michael (OGC)
Cc: George Parker; Clay White; Tom Flood
Subject: Re: Leave of Absence MOU issues - pay status of George Parker, Mary Collins, Clay White & Tamika Brown

08 0715

Mike,

Thanks for following up. While I mentioned those previously stated in your email, this issue is applicable to Rachel Hicks and myself. We are impacted although we current have a leave of absence through a different method. Our leave status should also remain the same as well. Technically, WTU's attempt to develop consistent treatment to all similarily disposed employees does address the requirement to continue their leave to absence notice to District of Columbia Public Schools.

**FILED**

Please keep me informed on the progress.

**APR 2 5 2008**

**Clerk, U.S. District and Bankruptcy Courts**

7:17:08 PM
Thu, Aug 30, 2007

Nathan A. Saunders
General Vice President
Washington Teachers' Union
1717 K St. NW
Suite 902
Washington DC 20036
202.293.8613 office
202.293.8635 fax
202.213.7081 cell

Confidentiality Notice: This e-mail message, including any attachments, is intended
only for the person or entity to which it is addressed and contains information
which may be confidential, legally privileged, proprietary in nature, or otherwise
protected by law from disclosure. If you received this message in error, you are
hereby notified that reading, sharing, copying, or distributing this message, or
its contents, is prohibited. If you have received this message in error, please
telephone or reply to me immediately and delete all copies of the message.

Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: "Levy, Michael (OGC)" <michael.levy@dc.gov>

Date: Wed, 29 Aug 2007 10:08:35
To:"Nathan A. Saunders" <nsaunders@wtulocal6.org>
Subject: Leave of Absence MOU issues - pay status of George Parker, Mary Collins,
Clay White & Tamika Brown

Good morning, Nathan.

I have again communicated today with Priya Matthews, DCPS' Payroll
Manager, and she has confirmed to me that she will keep the captioned
individuals in pay status until we are able to work through the details
of this matter. We are working toward wrapping up these issues by the
end of the current fiscal year i.e. September 30, 2007.

I met with and discussed this matter in detail with our Interim General
Counsel, George A. Valentine on Friday and he told me that he intends to
engage Natasha Campbell, Director of the City's Office of Labor
Relations & Collective Bargaining (OLRCB) in the process of working
through this matter. Involving the OLRCB in handling these issues is
part of the impact of the transition that the entire school system is
undergoing.

I'll keep you posted on any new developments that I become aware of.

I hope that this helps!

Mike Levy

Michael D. Levy, Esq.

Case 1:08-cv-00715-RMC    Document 1-2    Filed 04/25/2008    Page 56 of 57

Attorney Advisor
Office of the General Counsel
D.C. Public Schools
202/442-5157 (voice)
202/442-5098 (fax)


This electronic transmission contains information from the Office of the
General Counsel for the District of Columbia Public Schools, which may
be confidential or privileged.  The information is intended for the use
of the above addressee only.  If you are not the intended recipient, be
aware that any disclosure, copying, distribution or use of the contents
of this information is prohibited.  If you received this transmission in
error, please notify us by telephone, 202/442-5000, or by reply
electronic mail to the sender.



**In The Mail – March 9, 2008**

**Political Activism Gets a Thumbs Down from Chancellor Rhee**
Candi Peterson, kepmclp@msn.com

On Thursday, March 6, as a DCPS employee, I was required to attend a mandatory meeting with Chancellor Rhee. Of course, as a Washington Teachers' Union Building Representative, I requested representation from our Washington Teachers' Union for obvious reasons.

I am clear that this meeting was called by Chancellor Michelle Rhee due to my political activism and aggressive representation of WTU citywide teachers and related service providers. The purpose of this mandatory meeting was to discuss my attendance at the January 2008 DC city council hearings in which I was the only DCPS employee to testify. The meeting also focused on my participation at the various protest rallies at which I have been actively involved. In addition, issues have been raised about my communication with my WTU constituents as a union representative — which is allowable under labor law and our WTU contract. Ms. Rhee did not question anything about my work performance, which I think is significant. I am sure that you will not be surprised that she failed to put anything addressing her concerns in writing, which is uncharacteristic of an executive leader. Of course it is important to note that most superintendents/chancellors fail to meet directly with someone at my level. I am very worried about the dismantling of our educational landscape by the Fenty/Rhee machine. In my opinion, Friday, March 7, represented Black Friday. One in which 116 workers in total were from DCPS. Whether you believe the staff at the central office were incompetent or not, most of us should support due process rights, which these workers were denied. I do believe that there will be more of this to come and I am concerned that next on the agenda will be for Fenty and Rhee to attempt to seek permission to fire unionized workers, including teachers and related school personnel, from the DC city council.

As a member of the Coalition to Save Our Neighborhood Schools (CSONS), I would like to invite you to our Town Hall Meeting event on Wednesday, March 26, beginning at 6:30 p.m. Please save the date. We will be discussing the dismantling of our education landscape. Topics will include the closing of our twenty-three DCPS schools, the restructuring of our twenty-seven schools that did not meet AYP, and the Chancellor's plan to privatize our schools as well as her efforts to develop private partners for some of our public schools with low student enrollment. The location of our town hall meeting will be announced. We encourage the participation of parents, DCPS teachers/related school personnel, community members, and members of the media.

08 0715

**FILED**

APR 2 5 2008

Clerk, U.S. District and
Bankruptcy Courts

## I (a) PLAINTIFFS

Nathan A. Saunders

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  11001
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

202 213 7081
3224 wheeler Rd SE
Washington D.C. 20032

## DEFENDANTS

George Parker, ET AL

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  88888
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

Case: 1:08-cv-00715
Assigned To : Collyer, Rosemary M.
Assign. Date : 4/25/2008
Description: Pro Se General Civil

JURY ACTION

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

☐ **A.** *Antitrust*

☐ 410 Antitrust

☐ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

☐ **E.** *General Civil (Other)* OR ☒ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Immigration**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus- Alien Detainee
☐ 465 Other Immigration Actions

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant

☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.

☐ 460 Deportation
☒ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)

| □ **G.** *Habeas Corpus/ 2255* | □ **H.** *Employment Discrimination* | □ **I.** *FOIA/PRIVACY ACT* | □ **J.** *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ⊗ **K.** *Labor/ERISA (non-employment)* | □ **L.** *Other Civil Rights (non-employment)* | □ **M.** *Contract* | □ **N.** *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>⊗ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☑ 1 Original Proceeding  □ 2 Removed from State Court  □ 3 Remanded from Appellate Court  □ 4 Reinstated or Reopened  □ 5 Transferred from another district (specify)  □ Multi district Litigation  □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

29 USCS § 411(2)(4)(B)(C) and (E)
Labor Management Dis. Act Freedom of Speech, Assembly and Assoc w/ Rico issues.

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23   DEMAND $ ____ Check YES only if demanded in complaint   JURY DEMAND: ☑ YES   □ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   No.   □ YES   ☑ NO   If yes, please complete related case form.

DATE 4/25/08   SIGNATURE OF ATTORNEY OF RECORD   *[signature]* Pro Se

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

J:\forms\js-44.wpd

U.S. DISTRICT COURT
NANCY MAYER WHITTINGTON, CLERK
APR 2 5 2008
RECEIVED