## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATHAN A. SAUNDERS

Plaintiff,

v.

GEORGE PARKER, *et al.,*

Defendants.

Civ. Action No. 1:08-cv-00715 (RMC)

## MOTION TO DISMISS
## BY DEFENDANTS AFT, EDWARD J. MCELROY AND AL SQUIRE

Pursuant to Fed. R. Civ. P. 12(b)(6) and Local Rule LCvR 7.1(a), Defendants American Federation of Teachers ("AFT"), Edward J. McElroy ("McElroy") and Al Squire ("Squire"), by and through their attorneys, submit this Motion to Dismiss on the grounds that Plaintiff's Complaint fails to state a claim upon which relief can be granted and Plaintiff does not have standing to bring his claims. The basis for the Defendants' Motion to Dismiss is set forth in the attached Statement of Specific Points of Law and Authority in Support of their Motion to Dismiss.

Respectfully submitted,

Date: July 3, 2008

_____/s/ Daniel J. McNeil_____
David J. Strom (D.C. Bar No. 376233)
Daniel J. McNeil (D.C. Bar No. (455712)

AMERICAN FEDERATION OF TEACHERS
555 New Jersey Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 393-7472
Facsimile:  (202) 393-6385

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATHAN A. SAUNDERS

      Plaintiff,

  v.

GEORGE PARKER, *et al.,*

      Defendants.

Civ. Action No. 1:08-cv-00715 (RMC)

**STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS
BY DEFENDANTS AFT, EDWARD J. MCELROY AND AL SQUIRE**

David J. Strom (D.C. Bar No. 376233)
Daniel J. McNeil (D.C. Bar No. (455712)
AMERICAN FEDERATION OF TEACHERS
555 New Jersey Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 393-7472
Facsimile:  (202) 393-6385

ATTORNEYS FOR AFT, EDWARD J. MCELROY AND
AL SQUIRE

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii-vi

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 3

RULE 12(B)(6) STANDARD FOR DISMISSAL .............................................................. 4

I.  PLAINTIFF'S DEMAND TO REVIEW AFT RECORDS IN COUNT III SHOULD BE
DISMISSED FOR SAUNDERS' FAILURE TO STATE A CLAIM AGAINST AFT AND
FAILURE TO  EXHAUST INTERNAL REMEDIES ....................................................... 8

     A.  Saunders has failed to allege sufficient facts to support a claim against AFT .................. 8

     B.  Saunders has not exhausted internal union remedies within WTU or AFT ...................... 9

II.  SAUNDERS' FIDUCIARY CLAIMS IN COUNT IV MUST BE DISMISSED UNDER
THE LMRDA FOR FAILURE TO STATE A CLAIM, LACK OF STANDING AND LACK
OF SUBJECT MATTER JURISDICTION .......................................................................... 10

     A.  The Court should dismiss Count IV of Saunders Complaint because it fails to
allege any facts that would support a claim under Section 501(a) of the LMRDA ................ 10

     B.  Section 501 claims cannot be brought against AFT and may be brought only
against individuals with fiduciary responsibilities .................................................................. 12

     C.  Plaintiff Saunders failed to satisfy the LMRDA prerequisites prior to filing suit
and does not have standing to bring Count IV against Defendants McElroy or Squire .......... 13

          1.  Saunders did not satisfy the requirements of Section 501(b) by failing to
request that AFT take corrective action ............................................................................... 13

          2.  Saunders does not have standing to bring his claim under § 501(b) because he
did not seek leave of the Court prior to filing the Complaint .............................................. 14

III.  THE PLAINTIFF'S BREACH OF CONTRACT CLAIMS IN COUNTS V and VI
MUST FAIL UNDER § 301 OF THE LMRA FOR FAILURE TO STATE A CLAIM UPON
WHICH RELIEF CAN BE GRANTED, LACK OF STANDING AND LACK OF SUBJECT
MATTER JURISDICTION .................................................................................................. 15

     A.  Plaintiff's claim that AFT breached its obligations to WTU members must be
dismissed because Plaintiff has failed to state a claim upon which relief may be
granted against Defendant Parker. ......................................................................................... 17

     B.  The AFT Constitution does not obligate AFT to intervene into local union affairs
or collective bargaining negotiations; therefore failure to act is not a breach of the

AFT Constitution ...................................................................................................................18

    C.  In the absence of a duty to act, AFT is not liable for mismanagement and
    ineffective leadership because AFT never ratified Parker's actions........................................20

    D.  Plaintiff's claim in Counts V and VI must fail under § 301 of the LMRA because
    Saunders' failed to exhaust administrative remedies..............................................................21

IV.  COUNT X MUST BE DISMISSED BECAUSE PLAINTIFF'S LMRDA TITLE I
RIGHTS HAVE NOT BEEN VIOLATED, THERE ARE NO FACTS TO SUPPORT THE
ALLEGATION OF A SCHEME TO SUPPRESS DISSENT, AND FAILURE TO
EXHAUST INTERNAL REMEDIES ................................................................................22

    A.  Count X does not present facts that establish that the free speech rights of WTU
    members have been restricted or infringed because Plaintiff's right to sue has not
    been restricted ........................................................................................................................23

    B.  Count X does not allege facts that establish a pattern of conduct by Defendants
    aimed at suppressing dissent within the Union.......................................................................28

        1.  Limiting Saunders to performance of constitutional duties does not infringe on
        his LMRDA Title I rights or suppress dissent within WTU.............................................29

        2.  Plaintiff's allegations regarding Squire's participation in a conspiracy does
        not establish tangible and identifiable retaliation that would suppress dissent or
        chill speech within WTU ..................................................................................................30

        3.  Saunders allegation that Defendant's actions will prevent him from being a
        candidate for office is speculative and does not demonstrate that he has been
        disciplined or retaliated against in violation of the LMRDA in an effort to chill
        speech within WTU. .........................................................................................................32

    C.  Count X claim should be dismissed for failure to exhausted internal union
    remedies as required by LRMDA Title I .................................................................................33

V.  COUNTS XI AND XII ALLEGING RICO VIOLATIONS AGAINST DEFENDANTS
MCELROY AND SQUIRE SHOULD BE DISMISSED FOR FAILURE TO STATE A
CLAIM UPON WHICH RELIEF MAY GRANTED ........................................................34

CONCLUSION.............................................................................................................................36

# TABLE OF AUTHORITIES

## CASES

1199 DC, National Union of Hospital and Health Care Employees v. National Union of Hospital and Health Care Employees, 533 F.2d 1205 (D.C. Cir. 1976)..............................................25

Adams-Lundy v. Association of Professional Flight Attendants, 731 F.2d 1154 (5th Cir. 1984) .........................................................................................................................................29

Airline Pilots v. O'Neill, 499 U.S. 65, 111 S.Ct. 1127 (1991) ...........................................18

Alexander v. Evans-Afflick, C.A. 92-2384 (TFH)(PJA), 1993 U.S. Dist. LEXIS 16425, *7 (D.D.C. Nov. 18, 1993)..........................................................................................................4

Alexis v. District of Columbia, 44 F. Supp. 2d 331 (D.D.C. 1999) ......................................5

Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985) ........................................................16

Amalgamated Clothing Workers of America Ranks and File Committee v. Amalgamated Clothing Workers of America, Philadelphia Joint Brotherhood, 473 F.2d 1303 (3d. Cir. 1973)..........................................................................................33

American Postal Workers Union, AFL-CIO, Headquarters Local 6885 v. American Postal Workers Union, AFL-CIO, 665 F.2d 1096 (D.C. Cir. 1981) .............................................11

Barton v. City of Bristol, 294 F.Supp.2d 184 (D.Conn. 2003)............................................18

Bates v. Northwestern Human Services, Inc., 466 F. Supp.2d 69 (D. D.C. 2006)..............36

Berkley v. Boncoraglio, 1994 WL 440751 (S.D.N.Y. 1994) ..............................................34

Bocchiere v. Biller, 1988 WL 163032 (D.D.C. 1988) .................................................. 12-15

Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283 (3rd Cir. 1991) ..............................................................................20, 21, 25

Buford v. Runyon, 160 F.3d 1199, 1202 (8th Cir. 1998) ...................................................18

Carbon Fuel v. United Mine Workers of America, 444 U.S. 212, 100 S. Ct. 410 (1979).............20, 21

Carr v. Learner, 547 F.2d 135, (1st Cir. 1976) ..................................................................11

Cefalo v. Moffett, 449 F.2d 1193 (D.C. Cir. 1971) ...........................................................11

Commer v. Keller, 64 F. Supp. 2d 266 (S.D.N.Y. 1999)....................................................25

Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99 (1957)............................................................4

E.E.O.C. v. St. Francis Xavier Parochial School, 117 F.3d 621 (D.C. Cir. 1997) ..............................19

Finnegan v. Leu, 456 U.S. 431, 102 S.Ct. 1867 (1982)......................................................22, 23, 33

Fisher v. Washington Teachers' Union, 350 F.Supp.2d 69 (D.D.C., 2004)........................................33

Franza v. International Brotherhood of Teamsters, Local 671, 869 F.2d 41 (2d. Cir. 1989) ........29, 33

George v. Local Union No. 639, 98 F.3d 1419 (1996).........................................................................14

Helton v. N.L.R.B., 656 F.2d 883 (D.C. Cir. 1981) ...........................................................................25

Jacobsen v. Oliver, 201 F. Supp. 2d 93 (D. DC. 2002) ......................................................................19

Johnson v. General Motors, 641 F.2d 1075 (2d Cir. 1981) ................................................................34

Kolinske v. Lubbers, 712 F.2d 471, 481 (D.C. Cir. 1983) ...........................................................17, 18

Kowal v. MCI Communications Corp., 16 F.3d 1271 (D.C. Cir. 1994) .................................................4

Laborers Union Local No. 324, v. N.L.R.B., 123 F.3d 1176 (9th Cir. 1997)......................................28

Laughon v. Int'l Alliance of Theatrical Stage Employees, Moving Picture Technicians,
Artists & Allied Crafts of the United States and Canada,
248 F.3d 931 (9th Cir. 2001) .......................................................................................................20, 21

Maljack Productions, Inc. v. Motion Picture Association of America, Inc.,
52 F.3d 373 (D.C. Cir. 1995)..........................................................................................................4, 5

Manax v. McNamara, 842 F.2d 808 (5th Cir. 1988) ..........................................................................36

Massey v. Inland Boatmen's Union of the Pacific, 886 F.2d 1188 (9th Cir. 1989) ........................25,28

Members for a Democratic Union v. Local 1101, Communications Workers of America,
AFL-CIO, 697 F. Supp. 771 (S.D.N.Y. 1988.)..................................................................................28

McBurnie v. Local 17, 1996 WL 432471 (S.D.N.Y., 1996) ...............................................................34

Murphy v. Int'l Union of Operating Engineers, Local 18, 774 F.2d 114 (6th Cir. 1985) ...................25

National Treasury Employees Union v. Federal Labor Relations Authority,
800 F.2d 1165 (D.C. Cir. 1986)........................................................................................................17

Newman v. Local 1101, Communications Workers, 570 F.2d 439 (2d Cir. 1978)...............23, 29, 33

N.L.R.B v. Indus. Union of Marine & Shipbuilding Workers,
391 U.S. 418, 88 S. Ct. 1717 (1968).................................................................................................10

N.L.R.B. v. McClatchy Newspapers, Inc. Publisher of The Sacramento Bee,

964 F.2d 1153, 1159 (D.C. Cir. 1992) ...........................................................................17

Noble v. U.S. Postal Service, 537 F.Supp.2d, 210 (D.D.C. 2008) ....................................18

O'Connor v. Freyman, 1985 WL 121 (D.D.C. 1985) .................................................. 13-15

Papasan v. Allain, 478 U.S. 265, 106 S.Ct. 2932 (1986)..................................................4

Petramale v. Local No. 17 of Laborers International Union of North America,
736 F.2d 13 (2d Cir. 1984)..............................................................................................25

Phelan v. Local 305 of United Ass'n of Journeymen, and Apprentices of Plumbing and
Pipefitting Industry of U.S. and Canada, 973 F.2d 1050 (2nd Cir. 1992) ..................20, 21

Pierce v. Bahr, No. 96-0680, 1996 U.S. Dist. LEXIS 6488 (D. D.C. 1996) ..................9, 10

Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S. Ct. 614 (1965)..............................22

Rumore v. Belk, 907 F. Supp. 487 (D.D.C. 1995)......................................... 22, 26, 29, 31-33

Saunders v. Hankerson, 312 F.Supp.2d 46 (D. D.C. 2004) ..................................... 12-14, 16

Scheck v. General Electric Corp., 1992 U.S. Dist. LEXIS 134 (D. D.C. Jan. 7, 1992) .....................36

Schonfeld v. Penza, 477 F.2d 899 (2d. Cir. 1973)...............................................................29

Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 105 S.Ct. 3292 (1985)................................35

Sheet Metal Workers International Association v. Lynn, 488 U.S. 347, 109 S.Ct. 639 (1989)....24, 29

Sheridan-Wyoming Coal Co. v. Krug, 83 U.S. App. D.C. 162, 168 F.2d 557, 559 (1948) ..............4, 5

Shimman v. Frank, 625 F.2d 80 (6th Cir. 1980)................................................................21

Shimman v. Miller, 995 F.2d 651 (6th Cir. 1993) .............................................................25

United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the
United States and Canada, AFL-CIO et al v. Local 334, United Ass'n of Journeymen and
Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada,
452 U.S. 615, 101 S. Ct. 2546 (1981)...............................................................................16

United Mine Workers of America v. Boyle, No. 3436-69, 1978 WL 1601 .......................12

United Steelworkers of America, AFL-CIO-CLC v. Sadlowski,
457 U.S. 102, 102 S.Ct. 2339 (1982)................................................................................28

Vaca v. Sipes, 386 U.S. 171, 87 S. Ct. 903 (1967)........................................................17, 22

W.C. & A.N. Miller Cos. v. United States, 963 F. Supp. 1231 (D.D.C. 1997).................4,5

Whitacre v. Davey, 890 F.2d 1168 (D.C. Cir.1985) ............................................................................5

Winter v. Local 639, Int'l Bhd. of Teamsters, 569 F.2d 146 (D.C. Cir. 1977) ............................10, 33

Wooddell v. International Brotherhood of Electrical Workers,
502 U.S. 93, 112 S. Ct. 494 (1991) ......................................................................................16

Yager v. Carey, 910 F. Supp. 704 (D. D.C. 1995) .................................................................... *passim*

Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,
913 F.2d 948 (D.C. Cir. 1990) .............................................................................................35

## FEDERAL STATUTES

18 U.S.C. §1956 .................................................................................................................35

18 U.S.C. §1957 .................................................................................................................35

18 U.S.C. § 1964(c) .........................................................................................................5, 35

29 U..S.C. § 185 ..............................................................................................................2, 16

29 U.S.C. § 411 .................................................................................................... *passim*

29 U.S.C. § 431(c) ...........................................................................................................8, 9

29 U.S.C. § 501 ....................................................................................................... 2, 6, 11-15

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(6)........................................................................................................4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATHAN A. SAUNDERS

　　　　　Plaintiff,

　　v.                                                  Civ. Action No. 1:08-cv-00715 (RMC)

GEORGE PARKER, *et al.,*

　　　　　Defendants.

**STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO DISMISS**
**BY DEFENDANTS AFT, EDWARD J. MCELROY AND AL SQUIRE**

　　　　Pursuant to Fed. R. Civ. P. 12(b)(6) and Local Rule LCvR 7.1(a), Defendants American Federation of Teachers ("AFT"), Edward J. McElroy ("McElroy") and Al Squire ("Squire"), by and through their attorneys, submit this Statement of Specific Points of Law and Authority in Support of their Motion to Dismiss the above-captioned case on the grounds that Plaintiff's Complaint fails to state a claim upon which relief can be granted.  The failure of the allegations of each of the Counts against these Defendants in the Complaint to state a claim upon which relief can be granted is discussed in turn below, and for the reasons discussed herein, we respectfully submit that the Court should dismiss the complaint in its entirety in accordance with Fed. R. Civ. P. 12(b)(6).

**PRELIMINARY STATEMENT**

　　　　The Plaintiff in this action, Nathan Saunders, is the general vice-president of the Washington Teachers Union ("WTU").  As the Plaintiff states in his Complaint, Nathan A. Saunders ("Saunders") was elected to this position while the WTU was under an "administratorship" imposed by the AFT following the embezzlement scandal that saw the former WTU president and several accomplices convicted of stealing several million dollars

from the WTU members.  After AFT conducted an election of officers in January 2005 and the

officers were installed, WTU was released from administratorship and reverted to its former

status as an autonomous local affiliated with AFT.  Defendant George Parker ("Parker") and

Plaintiff ran together as a team for WTU president and general vice president, in the 2005

election and again in 2007.  Both were re-elected to their respective positions in 2007.

The Defendants in this action include Parker, members of the WTU Executive Board,

AFT, McElroy, Squire, Michelle Rhee, the Chancellor of D.C. Public Schools, D.C. Mayor

Adrian Fenty, and three (3) unidentified "Jane Doe" defendants.

Plaintiff alleges that he has been "constructively removed" from his position as the

General Vice President of WTU through the "collusive" acts of the Defendants.  <u>See</u> Complaint

at pp. 5-6.  Plaintiff claims that the acts of the Defendants violated the Labor Management

Reporting and Disclosure Act, specifically the so-called "Union Member Bill of Rights," 29

U.S.C. § 411(a)(1), (2), and (4).  Plaintiff claims that the AFT Defendants' actions violated the

LMRDA by "trying to suppress dissent within the union and further their own, political,

economic and educational interest." <u>See</u> Complaint at p. 6.  In addition Plaintiff claims that the

AFT Defendants violated the union constitution in contravention of the Labor Management

Relations Act, 29 U.S.C. § 185 <i>et se</i>q., and breached their fiduciary obligations to WTU

members under 29 U.S.C. § 501.

Plaintiff claims that the Defendants retaliated against him because Saunders "opposed

Mayor Fenty's and Chancellor Rhee's At-Will legislation officially titled 'District of Columbia

Public Education Personnel Reform Amendment Act of 2007,' based on ethical, educational and

economic reasons." <u>See </u>Complaint at p. 10.  Plaintiff claims that Parker personally supported

the at-will legislation and "took only minor superficial actions against the legislation." <u>Id</u>. at p.

11. Saunders, on the other hand, claims that he "aggressively spoke out against the At-will legislation, participated in community meetings and town hall election forums – all aimed at speaking against the At-Will, per the directive of the Delegate Assembly." Id. at 12. Consequently, Saunders concludes that "[e]vidence will show that members in DCPS and the Washington Teachers' Union, who spoke out against the At-Will legislation were retaliated against and intimidated by Defendants Parker and Rhee." Id.

According to the Complaint, the AFT's and WTU Defendants' attempts to "suppress dissent within the union" in violation of the LMRDA are based on the following actions alleged by Plaintiff: introduction of "The Martel Resolution" at a WTU Executive Board meeting; the implementation of a new media policy; the alleged re-assignment of duties traditionally performed by the WTU General Vice President to other staff; and tampering with Plaintiff's personnel records and employment status.

In addition to the LMRDA violations alleged by Saunders, he also claims that Defendant Parker and other WTU Executive Board members and staff have breached the WTU Constitution and their fiduciary duties by engaging in certain financial transactions and colluding with DCPS managers, including Mayor Fenty and Chancellor Rhee.

## ARGUMENT

Plaintiff's Complaint essentially describes a political dispute between himself, the WTU President and members of the WTU Executive Board based upon a difference of opinion about reorganization of schools by Mayor Fenty and Chancellor Rhee.  There are union procedures available to Saunders to address his concerns about the WTU's leadership in relations to school reorganizations, including the WTU's political processes, governance structures, and collective bargaining proposals.  Importantly, the labor statutes and case law require Saunders to exhaust

these internal procedures before filing his claims in federal court, but Saunders has ignored these mandates.  Rather, Saunders has taken his disagreements with the WTU president to federal court with the hope of scoring a political victory.  The Court should reject Saunders' fatally flawed pleadings.  As explained more fully below, Saunders' Complaint fails to state a claim upon which relief may be granted, and thus, the Court should grant the motion to dismiss filed by AFT, McElroy and Squire.

## RULE 12(B)(6) STANDARD FOR DISMISSAL

In determining whether to grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court "must accept the factual allegations as true and draw all reasonable inferences therefrom in favor of the plaintiff."  W.C. & A.N. Miller Cos. v. United States, 963 F. Supp. 1231, 1235 (D.D.C. 1997), citing, Maljack Productions, Inc. v. Motion Picture Ass'n of Am., Inc., 52 F.3d 373, 375 (D.C. Cir. 1995); Sheridan-Wyoming Coal Co. v. Krug, 168 F.2d 557, 559 (1948).  "A claim must be dismissed if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief."  W.C. & A.N. Miller Cos, 963 F. Supp. at 1235, citing, Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 103-106 (1957).  When considering a motion to dismiss, however, "the Court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations."  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing, Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944 (1986)); see also Alexander v. Evans-Afflick, C.A. 92-2384 (TFH)(PJA), 1993 U.S. Dist. LEXIS 16425, *7 (D.D.C. Nov. 18, 1993) (conclusory allegations of required elements of claims that are not supported by alleged facts tending to prove those elements are insufficient.  Courts are not required to accept legal

conclusions as true in considering a motion to dismiss); <u>Whitacre v. Davey</u>, 890 F.2d 1168, 1168 n.1 (D.C. Cir. 1989); <u>Alexis v. District of Columbia</u>, 44 F. Supp. 2d 331, 337 (D.D.C. 1999). Indeed, "the Court must not accept inferences drawn by the plaintiff if they are unsupported by the facts, nor must the Court accept purely legal conclusions masked as factual allegations." <u>W.C. & A.N. Miller Cos.</u>, 963 F. Supp. at 1235, <u>citing</u>, <u>Maljack Productions, Inc. v. Motion Picture Ass'n of Am., Inc.</u>, 52 F.3d at 375.

Plaintiff's Complaint brings the following counts, either jointly or separately, against the AFT, AFT President Edward J. McElroy and AFT Regional Director Al Squire:

- Count III – Plaintiff's Right to Review Union Financial Records Against Defendant AFT;

- Count IV – Breach of Fiduciary Duty pursuant to the Labor Management Reporting and Disclosure Act Against AFT;

- Count V – Negligence Against Defendant AFT;

- Count VI – Breach of National Constitution pursuant to the Labor-Management Relations Act Against Defendant AFT;

- Count X – Civil Conspiracy against Defendants Parker, Squires (sic), Smith, Martel, Carrillo & Tatum;

- Count XI – Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1964(c) Against All Individual Defendants; and

- Count XII – Civil Rico Conspiracy Against All Individual Defendants

For the reasons that follow, Plaintiff's allegations in the Complaint, as described in the counts above, even taken as true, do not state any claims against AFT, McElroy or Squire.

Plaintiff's demand in Count III to review the WTU financial records in possession of the AFT records should be dismissed on for failure to state a claim against AFT and failure to exhaust available remedies. As Plaintiff acknowledges, WTU has not been in administratorship since 2005, and thus, AFT does not maintain WTU's financial records. Moreover, Saunders has

never approached either WTU or AFT seeking access to the WTU financial records, which is a statutory prerequisite before seeking relief in court. Consequently, Count III should be dismissed.

Count IV sets forth Plaintiff's allegations of breach of fiduciary duty under Section 501 of the Labor Management Reporting and Disclosure Act ("LMRDA"). 29 U.S.C. § 501. Count IV against the AFT should be dismissed for failure to state a claim because actions under Section 501 cannot be brought against labor organizations such as the AFT and can only be brought against union officers. Claims under Section 501 are only proper against individuals and Count IV fails to allege facts that support a claim for breach of fiduciary duty against McElroy or Squire. The Court also should dismiss Count IV for lack of subject matter jurisdiction and lack of standing because the Plaintiff failed to satisfy the statutory prerequisites necessary to bring a Section 501 action.

Count V alleges that "negligence" against AFT, which is a tort standard that fails to state a claim for which relief may be granted. Even if the Court were to favorably construe Plaintiff's allegations in Count V as something other than negligence, such as breach of fiduciary duty or breach of contract, Count V must be dismissed. As stated above, a breach of fiduciary duty claim under Section 501 of the LMRDA cannot be brought against AFT, and thus, should be dismissed.

If Count V is read as a breach of contract (i.e., the AFT Constitution), then Counts V and VI can be addressed together as they both allege that AFT failed to intervene on behalf of WTU members in violation of the AFT Constitution. As AFT will show, there has not been a breach of the AFT Constitution because it does not create a duty that requires AFT to intervene into the internal governance of WTU or to be responsible for servicing WTU's membership. In the

absence of a duty, AFT cannot be liable for the effectiveness of the WTU president or the working conditions and compensation of WTU members, because AFT did not ratify the WTU president's actions. For these reasons alone, Counts V and VI should be dismissed. A further ground for dismissal of Counts V and VI is Saunders' failure to exhaust his internal union remedies under the AFT Constitution before filing his lawsuit.

Count X, read in the light most favorable to the Plaintiff, alleges that certain individual defendants engaged in a conspiracy to violate Saunders' rights under Title I of the LMRDA to engage in free speech and assembly. Plaintiff's claim should be dismissed because he has failed to plead any facts indicating that his rights as a member to express his opinion have been restricted. Further, even if his duties as a union officer have been restricted, the LMRDA protects members' rights and the same standards do not apply to officers. Therefore, Plaintiff has failed to alleged sufficient facts to support an LMRDA Title I claim that Defendants have engaged in a scheme to suppress dissent or chill the speech of WTU members. Plaintiff's allegations that Defendant Squire's participated in a conspiracy to violate Saunders' Title I rights does not present tangible and identifiable retaliation sufficient to maintain this claim. Finally, Saunders did not exhaust available internal union remedies that are a prerequisite to bringing an LMRDA Title I claim.

Count XI alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Count XII alleges civil conspiracy against all individual Defendants (and presumably including McElroy and Squire). The Court should dismiss these insufficiently plead counts for failure to state a claim upon which relief may be granted. Plaintiffs' claims of RICO violations amount to nothing more than legal conclusions set forth as allegations without any underlying facts to support these claims. With respect to Defendants McElroy and Squire, there

are no factual allegations in the Complaint that would support their alleged involvement in any

racketeering activity.  Accordingly, the Court should dismiss Counts XI and XII for failure to

state a claim upon which relief may be granted.

I.      **PLAINTIFF'S DEMAND TO REVIEW AFT RECORDS IN COUNT III SHOULD
        BE DISMISSED FOR SAUNDERS' FAILURE TO STATE A CLAIM AGAINST
        AFT AND FAILURE TO  EXHAUST INTERNAL REMEDIES**

Plaintiff, in Count III, alleges that he is "entitled to review any books, records, and

accounts necessary to verify WTU's financial reports filed with the Department of Labor, which

are in the control of AFT."  See Complaint at p. 38.  This claim against AFT is clearly misplaced

as AFT has no recordkeeping responsibility with respect to WTU.  Saunders claim is also

confusing given the fact that he clearly has access to WTU's financial records as demonstrated

by the inclusion of WTU's "Financial Statements and Accountant's Report for FYE June 30,

2007 and June 30, 2006" as Exhibit 16 to his Complaint.

A further basis to dismiss Count III is Saunders failure to meet the statutory prerequisites

before filing suit insofar as he failed to exhaust internal union remedies or plead that such

exhaustion would be futile.

Plaintiff claims that he is entitled to review the records pursuant to 29 U.S.C. §431(c)

which provides,

> Every labor organization required to submit a report under this subchapter shall
> make available the information required to be contained in such report to all of its
> members, and every such labor organization and its officers shall be under a duty
> enforceable at the suit of any member of such organization in any State court of
> competent jurisdiction or in the district court of the United States for the district in
> which such labor organization maintains its principal office, to permit such
> member for just cause to examine any books, records, and accounts necessary to
> verify such report. The court in such action may, in its discretion, in addition to
> any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's
> fee to be paid by the defendant, and costs of the action.

**A.  Saunders has failed to allege sufficient facts to support a claim against AFT.**

Plaintiff's request for relief against AFT in Count III assumes that AFT is responsible for

maintaining the financial records of WTU.  As explained in more detail at Section III(B), *infra*,

local unions affiliated with AFT are autonomous and are responsible for the day-to-day administration of their locals.  The administrative responsibilities of local union require it to maintain its own financial accounts, adopt and implement financial recordkeeping procedures, and secure an independent audit of the local's finances. The AFT Bylaws, at Article IX, Section 1, requires each local to send a copy to AFT, but that is the limit of AFT's recordkeeping responsibility with respect to local union finances.[1]  The local, not the AFT, is responsible for causing the audit to occur and the local is the entity that has the exclusive control over the records that are necessary to perform the audit.  Therefore, Saunders should be seeking relief from WTU not AFT.[2]  To the extent that WTU is obligated to comply with LMRDA §431(c) and it has not, common law agency theory governs the AFT' liability for the unlawful actions of its local or their officers.  The legal authority discussed fully, *infra*, at Section III(C), precludes AFT's liability to Saunders for his LMRDA § 431(c) claim, because Plaintiff has not alleged any facts that would support his claim under an agency theory.  Accordingly, the Court should dismiss Count III against AFT.

**B.  Saunders has not exhausted internal union remedies within WTU or AFT.**

Under section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), a plaintiff has an obligation to exhaust reasonable union hearing procedures before litigating the issue in court. Pierce v. Bahr, No. 96-0680, 1996 U.S. Dist. Lexis 6488 (D. D.C. 1996).  The exhaustion requirement serves two functions: (1) it prevents unnecessary judicial intrusion into internal union affairs, and (2) it allows a court, once it becomes involved, to benefit from the union's

---

[1] In 2004, when WTU was being operated under an administratorship by AFT, WTU had a per capita delinquency amounting to several hundred thousand dollars.  WTU and AFT entered into a repayment agreement that required WTU to consult with AFT in the preparation of its operating budget for the years 2006-2007, 2007-2008 and 2008-2009.  However, that agreement did not require AFT to perform any financial recordkeeping for WTU.  A copy of that agreement is attached hereto as Exhibit 1.

[2] Plaintiff does not explain why he believes that WTU's records "are in the control of AFT." Unlike the period in 2003-2005 when AFT held WTU in administratorship and AFT controlled WTU's finances and financial records, WTU has been operating autonomously since 2005.

internal development of the issues.  Id.; Winter v. Local 639, Int'l  Bhd. of Teamsters, 569 F.2d
146, 149 (D.C. Cir. 1977).  Courts have traditionally enjoyed broad discretion to dismiss
LMRDA complaints filed by plaintiffs that have failed to exhaust available internal union
remedies.  Pierce v. Bahr citing N.L.R.B. v. Indus. Union of  Marine & Shipbuilding Workers,
391 U.S. 418, 426, 88 S. Ct. 1717, 1722 (1968).

        The Complaint fails to allege that Saunders has exhausted internal union procedures in an
attempt to review the books and records of the WTU.  In fact, Plaintiff fails to allege that to date
he has asked either the WTU or, assuming *arguendo* that AFT did have responsibility for WTU's
financial records, AFT to produce the WTU's financial records for his review.  Nor does
Saunders allege that either the WTU or the AFT has in any way constrained the Plaintiff's right
to inspect WTU records.  At a minimum, Saunders must give the WTU or the AFT on
opportunity to grant him appropriate relief prior to his going to court.  See Pierce v. Bahr, No.
96-0680, 1996 U.S. Dist. Lexis 6488 at *16 (stating that it is plainly impermissible for plaintiffs
to ignore intra-union avenues of resolution).  Consequently, the Court should dismiss Count III.

## II.    SAUNDERS' FIDUCIARY CLAIMS IN COUNT IV MUST BE DISMISSED UNDER THE LMRDA FOR FAILURE TO STATE A CLAIM, LACK OF STANDING AND LACK OF SUBJECT MATTER JURISDICTION

### A.  The Court should dismiss Count IV of Saunders Complaint because it fails to allege any facts that would support a claim under Section 501(a) of the LMRDA.

        In Count IV, Saunders asserts the legal conclusion that AFT and AFT President McElroy
breached its fiduciary duty to WTU members by "failing to monitor" one of its employees (Al
Squire) and his "deep involvement in a local political agenda to silence Plaintiff and other
members."  See Complaint at p. 38.  Plaintiff has not alleged sufficient facts to state a cause of
action for breach of fiduciary duty under the LMRDA, and consequently, Count IV must be
dismissed.

        Officers of labor organizations who have control over union funds are entrusted to use the
union's money for the exclusive benefit of the members, and thus, under Section 501(a) of the

LMRDA, there is a fiduciary duty between such officers and the labor organization members.  29 U.S.C. § 501(a).[3]  While some jurisdictions have held that Section 501(a) suits are available only to redress fiduciary violations concerning misuse of union funds or property, this jurisdiction has endorsed the majority view establishing the fiduciary obligations of union officials in all their functions.  American Postal Workers Union, AFL-CIO, Headquarters Local 6885 v. American Postal Workers Union, AFL-CIO, 665 F.2d 1096, 1108 (D.C. Cir. 1981); Cefalo v. Moffett, 449 F.2d 1193, 1198 & n.15 (D.C. Cir.1971).  Notwithstanding that a 501(a) suit may be brought for conduct not limited to the misuse of union funds or property, it is not a "catchall" provision and cannot support a claim that may be brought pursuant to other statutory provisions.  APWU, Headquarters Local 6885, 665 F.2d at 1108 (stating that Section 501 was not meant to apply a union's performance during collective bargaining, where other avenues of relief were available to challenge union's conduct) citing Carr v. Learner, 547 F.2d 135, 137-38 (1st Cir. 1976); Cefalo, 449 F.2d at 1198, n.15 (expressing "grave doubts" as to the jurisdiction of the district court to award relief where plaintiffs styled their allegation of a violation of their Title IV rights (election procedures) as a breach of fiduciary duties under Title V of the LMRDA).

---

[3] Section 501(a) of the LRMDA provides:

> The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy."

Section 501 is intended to protect union membership as a whole and was not designed as a weapon for the pursuit of individual grievances such as the one presented by Saunders. See Bocchiere v. Biller, 1988 WL 163032 at *3 (D.D.C.,1988) vacated on other grounds, 1990 WL 67713 (D.C. Cir. May 16, 1990)("it is clear that Bocchiere's alleged injuries are personal in nature and not appropriate for relief under section 501."). In this case, Saunders objects to conduct by the Defendants that allegedly infringed on his free speech as a union member. There are no facts indicating that any other members' speech has been has been similarly affected. Accordingly,  Saunders' claim is personal and should be addressed under applicable LMRDA Title I standards. Consequently, the Court should dismiss Plaintiff's breach of fiduciary claims enumerated in Count IV.

### B. Section 501 claims cannot be brought against AFT and may be brought only against individuals with fiduciary responsibilities.

Should the Court find that Saunders has stated a claim for fiduciary breach, Count IV against AFT, a labor organization, should be dismissed.

The LMRDA, at 29 U.S.C. §501(a), establishes the fiduciary duties of officers, agents, shop stewards and representatives of labor organizations, and confers fiduciary status on union officers who actually manage the property and funds of the local union. Yager v. Carey, 910 F. Supp. 704 (D. D.C. 1995); United Mine Workers of America v. Boyle, (No. 3436-69), 1978 WL 1601 (D. D.C. 1978). Importantly, Section 501(a) only imposes liability on individual union officers for breach of their fiduciary obligations, and does not impose the duty on the labor organization itself. Consequently, a plaintiff union member cannot bring a claim – and a court does not have jurisdiction to entertain claims – for fiduciary breach against a labor organization. Saunders v. Hankerson, 312 F.Supp.2d 46, 58 (D. D.C. 2004)(citing cases and dismissing Saunders' Section 501 claim against AFT). In this action, the Plaintiff alleges breach of fiduciary duty by the AFT. Because a Section 501 action cannot be maintained against AFT, Count IV of the Plaintiff's Compliant must be dismissed.

**C. Plaintiff Saunders failed to satisfy the LMRDA prerequisites prior to filing suit and does not have standing to bring Count IV against Defendants McElroy or Squire.**

Assuming for the sake of argument that Saunders has adequately plead a cause of action for fiduciary breach against President McElroy for failure to supervise Al Squire, Count IV must be dismissed because Saunders' did not ask AFT to take corrective action against its employee.

**1. Saunders did not satisfy the requirements of Section 501(b) by failing to request that AFT take corrective action.**

A union member seeking judicial enforcement of the remedial provisions under §501(b) must *first* meet the statutory prerequisites. 29 U.S.C. § 501(b)[4]; Saunders v. Hankerson, 312 F. Supp.2d 46, 60 (D. D.C. 2004); Yager, 910 F. Supp. 704. The member must request that the union or its governing officers bring legal action, secure an accounting or other appropriate relief. Saunders, 312 F.2d at 60. Upon failure by the union to act, the members must allege that the union refused or failed to bring an action. The plaintiff union member then must request leave of court to bring the action with a showing of good cause. Saunders, 312 F.Supp.2d at 60; Bocchiere v. Biller, 1988 WL 163032 at *3; O'Connor v. Freyman, 1985 WL 121 at *4 (D. D.C. 1985). The provision of Section 501(b) requiring a demand for the union to take corrective action is mandatory and its requirements cannot be met by anything short of an actual request. Saunders, 312 F.Supp.2d at 60; O'Connor, 1985 WL 121 at *2.

---

[4] 29 U.S.C. § 501(b) reads,

> When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation."

The condition precedent to the filing of a §501(b) suit, by an individual member or a group of members, requires proof that the union refused or failed to take corrective action upon a demand made by the union member. Saunders, 312 F.Supp.2d at 60. The union's failure to take corrective action on behalf of the members triggers the ability for the federal court to assert jurisdiction over §501(b) claims. Id. at 61. On the other hand, a court must dismiss a union member's claim when there is a failure to comply with the statutory prerequisites prior to filing suit because the court cannot assert jurisdiction over the claim. Bocchiere, 1988 WL 163032 at *1; O'Connor, 1985 WL 121 at *2. Saunders' failure to request that the AFT take corrective action against either President McElroy or Al Squire is fatal to his cause of action for breach of fiduciary duties under the LMRDA; therefore, Count IV must be dismissed.

### 2. Saunders does not have standing to bring his claim under § 501(b) because he did not seek leave of the Court prior to filing the Complaint

A union member may not seek redress from the federal court under the remedial provisions of §501(b) of the LMRDA without first filing for leave of the court. 29 U.S.C. § 501(b). A complaint alleging federal jurisdiction under § 501(b) may be filed only upon leave of the court obtained after the plaintiff has (a) filed a verified application, and (b) shown there is good cause for filing the complaint. The plain language of § 501 states that leave of the court is a mandatory condition precedent to acceptance of a complaint. Saunders, 312 F.Supp.2d at 65; George v. Local Union No. 639, 98 F.3d 1423 (1996); O'Connor v. Freyman, 1985 WL 121. Saunders did not obtain leave of court to file his fiduciary breach claim against AFT, he has not demonstrated good cause as shown earlier because AFT has performed an accounting and filed a restitution claim, and his complaint was not verified. Consequently, Saunders does not have standing to sue.

The purpose of the "good cause" requirement embodied in Section 501(b) is to "ensure that union officials will not be subjected to harassing law suits." Saunders, 312 F.Supp.2d at 65 quoting Bocchiere v. Biller, 1988 WL 163032 at *2; O'Connor v. Freyman, 1985 WL 121 at *3. In order to demonstrate "good cause", a plaintiff must show "a reasonable likelihood of success

and, with regard to any material facts he alleges, must have a reasonable ground for belief in their existence." Bocchiere v. Biller, 1988 WL 163032 at *3; see also O'Connor v. Freyman, 1985 WL 121 at *4 (noting that the policies underlying Section 501 and the requirement that a plaintiff make a showing of good cause "include the supervision of union officials in the exercise of their fiduciary obligations and the protection, through a preliminary screening mechanism, of the internal operation of unions against unjustified interference and harassment."). It follows then in the context of Section 501(b) that if the defendant can establish that the Plaintiff has failed to satisfy a condition precedent prior to filing suit, then the Plaintiff will not have satisfied the good cause standard.

In the present case, the Plaintiff failed to comply with the mandatory prerequisites of §501(b) of the LMRDA prior to filing suit. First, Saunders' Complaint makes no allegation that he requested the AFT to take corrective action; second, Plaintiff's Complaint was not brought "upon leave of the court obtained upon verified application and for good cause shown;" Accordingly, Count IV must be dismissed.

## III.  THE PLAINTIFF'S BREACH OF CONTRACT CLAIMS IN COUNTS V and VI MUST FAIL UNDER § 301 OF THE LMRA FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED, LACK OF STANDING AND LACK OF SUBJECT MATTER JURISDICTION

Count VI of the Complaint specifically alleges that AFT breached the "national constitution" by failing to "enforce its constitution against WTU." See Complaint at p. 39. While Saunders alleges in Count V that AFT "was negligent" in assisting the WTU membership, this claim is substantially similar to Count VI to the extent that the allegations imply that AFT had a duty to intervene into the Local's affairs on behalf of the WTU membership. This interpretation of Count V as a breach of contract claim affords the Plaintiff better treatment than would dismissal of his claim based on preemption based on Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a).[5] Regardless, Count V and VI must fail

---

[5] To the extent that Count V alleges common law negligence based on the AFT Constitution, it would be preempted by federal law and should be resolved applying the law developed under

because Plaintiff has failed to state a claim for which relief may be granted, the Plaintiff does not have standing to bring a Section 301 claim, and the Court lack's subject matter jurisdiction over Plaintiff's claims.

Plaintiff is asserting that an alleged breach of the AFT's Constitution violated the LMRA.[6] The Supreme Court has recognized that breach of an international union's constitution can form the basis for an action under Section 301 of the LMRA. United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO et al v. Local 334, United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, 452 U.S. 615, 101 S. Ct. 2546 (1981) (holding that individual member may bring a claim in federal court for breach of contract against his local union only if the alleged breach violates a contract between two labor organizations); Wooddell v. International Brotherhood of Electrical Workers, 502 U.S. 93, 112 S. Ct. 494 (1991) (holding that a member may bring suit against his local under § 301 when the breach of contract is based on the local's breach of the international's constitution). In this case, however, there is no cause of action because the AFT does not have an affirmative duty to intervene, *sua sponte*, into the affairs of a local union. As described more fully below, the Court must dismiss Counts V and VI against the Defendants because Plaintiff has failed to state a claim for which relief may be granted, the Plaintiff does not have standing to bring a Section 301 claim, and the Court lack's subject matter jurisdiction over Plaintiff's claims.[7]

---

Section 301 of the LMRA. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985); Saunders, 312 F.Supp.2d at 72 (dismissing common law breach of contract and negligence claims against AFT that were premised on violation of alleged duties under the AFT Constitution because preempted by LMRA § 301).

[6] Section 301 states that District Courts shall have jurisdiction in suits for violations of contracts between labor organizations. 29 U.S.C. § 185(a).

[7] For purposes of clarity, this section does not address the allegations in Count X that Defendant Squire participated in a conspiracy to "undermine union democracy, freedom of speech, association, and assembly" in violation of Title I of the LMRDA. AFT addresses these claims, *infra*, at Section IV(B)(2).

**A.  Plaintiff's claim that AFT breached its obligations to WTU members must be dismissed because Plaintiff has failed to state a claim upon which relief may be granted against Defendant Parker.**

Counts V and VI allege a breach of the AFT Constitution.  In order for the Court to find that Saunders has stated a claim against AFT, several factual and legal hurdles would have to be crossed.  For example, the Court would have to accept Saunders unsupported conclusions that "Parker was incapable of providing effective leadership," "WTU's members working conditions and compensation were damaged" and that "WTU is unable to adequately serve its membership."  Even if supported by facts, these allegations are not sufficient to maintain a claim against Parker under the applicable standards for breach of the duty of fair representation.

The duty of fair representation ordinarily applies to labor organizations by virtue of their status as exclusive bargaining representatives of individual workers.  Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910 (1967).  Collective bargaining necessarily subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit.  Id. at 182, 87 S.Ct. at 912; N.L.R.B. v. McClatchy Newspapers, Inc. Publisher of The Sacramento Bee, 964 F.2d 1153, 1159 (D.C. Cir. 1992); National Treasury Employees Union v. Federal Labor Relations Authority,  800 F.2d 1165, 1169 (D.C. Cir. 1986); Kolinske v. Lubbers, 712 F.2d 471, 481 (D.C. Cir. 1983).  In light of such subordination of the individual member's interests, the duty of fair representation serves as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." National Treasury Employees Union,  800 F.2d at 1169 quoting Vaca v. Sipes, 386 U.S. at 182, 87 S.Ct. at 912.  Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.  Vaca v. Sipes, 386 U.S. at 182, 87 S.Ct. at 912  The duty of fair representation applies to matters involving an employee's dealings with his employer, such as collective bargain and grievance representation.  Kolinske,  712 F.2d at 481. Because Saunders has alleged that Parker has been ineffective in governing the union and

17

protecting the employment rights of WTU members in collective bargaining, analysis under the standards for duty of representation is appropriate.

Saunders allegations that Parker has been ineffective and not able to adequately protect the interests of WTU members are not sufficient to maintain a claim against Parker for breach of the duty of fair representation.  See Air Line Pilots v. O'Neill, 499 U.S. 65, 111 S.Ct. 1127 (1991) (union's negotiation of a settlement agreement with the employer which proved to be a bad deal for the employees was insufficient to support a holding that the union breached its duty of fair representation to its members);  Buford v. Runyon, 160 F.3d 1199, 1202 (8th Cir.1998). ("Mere negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the duty of fair representation.");  Noble v. U.S. Postal Service, 537 F. Supp.2d 210, 216 (D. D.C. 2008)(mere negligence is insufficient to establish that the union acted arbitrarily);  Barton v. City of Bristol, 294 F. Supp. 2d 184 (D. Conn. 2003) (A union's tactical errors are insufficient to show a breach of the duty of fair representation).  Plaintiff's failure to state a cognizable claim of breach of the duty of fair representation against WTU precludes him from asserting thus that AFT breached its obligation to intervene on behalf of the WTU membership.  Before such a derivative claim may be leveled against AFT, Sunders must establish that there was a violation in the first instance against Parker and he plainly has failed to do so.  As a result, the Court should dismiss Counts V and VI against AFT.

### B. The AFT Constitution does not obligate AFT to intervene into local union affairs or collective bargaining negotiations; therefore failure to act is not a breach of the AFT Constitution.

Plaintiff's theory that AFT breached its constitution implies that AFT can intervene into the day-to-day operations of its local union affiliates and that it has a duty to do so.  There is no such authority in the AFT Constitution.  Because Plaintiff makes repeated reference to the AFT Constitution, a copy is attached as Exhibit 1.[8]  The AFT Constitution describes the relationship

---

[8] The Court may consider the AFT Constitution in this motion to dismiss because it has been incorporated and referenced in Plaintiff's First Amended Complaint. See, E.E.O.C. v. St. Francis Xavier Parochial School, 117 F.3d 621 (D.C. Cir. 1997) (stating that in deciding a motion to

between the parent and affiliated local unions at Article IV.  It is clear from the AFT Constitution

that AFT's control over the day-to-day affairs of chartered locals is extremely limited.  Locals

are free to set their own bylaws, set their own dues rates, collect dues from its members,

negotiate their own contracts, and vote for their own officers.  Moreover, the AFT is not the

certified exclusive representative, does not bargain collectively on behalf of the locals or approve

collective bargaining agreements before they are signed.

     As Saunders acknowledged in his Complaint, "The AFT's constitution requires local

union autonomy."  See Complaint at p. 39.  Consistent with the concept of local autonomy, the

AFT Constitution limits the authority of AFT to unilaterally intervene into the affairs of a local

union  to only the most serious circumstances.[9]  Alternatively, the AFT Executive Council *may*

authorize an investigation of a local upon a petition by the officers, executive board or thirty (30)

percent or more of the membership of that local.  See Article VI, Section 14(a) of the AFT

Constitution.  It is clear from the constitutional language that the AFT does not have a duty to

take any action based on vague allegations, and a court should not impose such a requirement

where it is not explicitly stated.  Brenner v. Local 514, United Bhd. of Carpenters, 927 F.2d 1283

(3rd Cir. 1991) (holding that retention of regulatory and supervisory powers by international

---

dismiss, court may consider facts alleged in complaint, any documents either attached to or
incorporated in complaint and matters of which court may take judicial notice); Jacobsen v.
Oliver, 201 F. Supp.2d 93 (D. D.C. 2002)(same).

[9] These circumstances are:

- Investigation by the AFT Executive Council, pursuant to Article VI, Section 14(c), for
  "failure of local unions and state federations to comply with provisions of the AFT
  constitution;"
- Administratorship Investigation, pursuant to Article VI, Section 15(a), "where an AFT
  state or local affiliate is incapable of taking adequate remedial measures on its own
  initiative…(i) where there has been a significant failure either in election procedures or
  representation required under the AFT or affiliate constitution(s) or (ii) correcting
  financial malpractice or misappropriation of funds;" and
- Emergency Administratorship, pursuant to Article VI, Section 15(c), "in situations
  requiring immediate action for the purpose of securing and safeguarding an affiliate's
  assets and vital records from immediate threat."

union in its constitution merely gives a discretionary right, as distinguished from a duty, to intervene in the affairs of a local union) citing Carbon Fuel v. United Mine Workers of America, 444 U.S. 212, 218-22, 100 S. Ct 410, 414-16, (1979). In the absence of a duty to act, AFT cannot have breached its obligations to WTU or its members.

The Plaintiff has masked purely legal conclusions as factual allegations in the Complaint. Specifically, the Plaintiff has concluded, based solely on the fact that WTU is affiliated with AFT that AFT was required to take "appropriate remedial actions" and concluded that there has been a breach of that duty. For the reasons described above, the Court should not accept these legal conclusions as true and should grant AFT's Motion to Dismiss with respect to Counts V and VI.

### C. In the absence of a duty to act, AFT is not liable for mismanagement and ineffective leadership because AFT never ratified Parker's actions.

Assuming *arguendo* that Parker's management of WTU and amounted to illegal conduct, common law agency theory governs an international union's liability for the unlawful actions of its local chapters or their officers. Carbon Fuel Co., 444 U.S. 212, 100 S.Ct. 410 (1979); Phelan v. Local 305 of United Ass'n of Journeymen, and Apprentices of Plumbing and Pipefitting Industry of U.S. and Canada, 973 F.2d 1050 (2d Cir. 1992); Brenner, 927 F.2d 1283. Accordingly, an international union cannot be held liable on agency theory, as a matter of law, absent evidence that either the international instigated, supported, ratified or encouraged the local's illegal activity, or that the local acted pursuant to agreement with the international. Carbon Fuel Co., 100 S. Ct. 410. An unbroken line of decisions establishes that Courts routinely reject claims against international unions where the complaining party fails to demonstrate that the international union participated in the alleged wrongful activity. Laughon v. In'l Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists & Allied Crafts of the United States and Canada, 248 F.3d 931 (9th Cir. 2001) (unsuccessful applicant for union membership who alleged her rejection was due to sex discrimination failed to establish liability of the international union, based on contention that the international had actual notice of local's

discriminatory activity, and that its failure to investigate was tacit ratification of the conduct); Phelan, 973 F. 2d 1050 (International union was not shown to have participated in, ratified or encouraged alleged scheme to suppress dissent, precluding imposition of liability of international); Shimman v. Frank, 625 F.2d 80 (6th Cir. 1980) (holding that an international that does not authorize, encourage or ratify violations of the LMRDA should not be held liable for them).

Similarly, an international union has no independent duty to intervene in the day-to-day affairs of its local chapters, even where the international has knowledge of the local's unlawful acts. Carbon Fuel, 100 S. Ct. 410; Phelan, 973 F.2d 1050; Laughon, 248 F. 3d 931; Brenner, 927 F.2d 1283. In Brenner, the Plaintiffs argued that the international union's failure to "step in" constituted instigation, support, ratification, or encouragement of the alleged discriminatory behavior, and alternatively, that the international union's constitution created a duty to intervene. The Third Circuit, citing Carbon Fuel, 100 S. Ct. 410 at 414-15, stated "'In the face of Congress' clear statement of the limits of an international union's legal responsibility for the acts of one of its local unions, it would be anomalous to hold that an international is nonetheless liable for its failure to take certain steps in response to actions of the local.'" Brenner, 927 F.2d at 1289.

Plaintiff has not alleged that the AFT participated in the mismanagement of WTU or ratified Parkers' bargaining concessions to DCPS and Chancellor Rhee. The AFT made no warranties or promises to WTU members that it would oversee the local or perform their collective bargaining, and there are no such allegations in the Amended Complaint. The AFT has no affirmative duty, created by its constitution, to intervene into the day-to-day management of a local. Consequently, the AFT did not breach its constitution and the Court must dismiss Counts IV and V for failure to state a claim upon which relief must be granted.

### D. Plaintiff's claim in Counts V and VI must fail under § 301 of the LMRA because Saunders' failed to exhaust administrative remedies.

The court does not have jurisdiction to address Plaintiff's Section 301 claim because Saunders has not satisfied the statutory prerequisite of exhausting union remedies. The

exhaustion of union remedies is a prerequisite to a § 301 action by an employee against an employer for breach of contract. <u>Vaca v. Sipes</u>, 386 U.S. 171, 87 S. Ct. 903. The Supreme Court has long held that prior to commencing an action for breach of labor contract, "employees wishing to assert contract grievances must attempt to use the contract grievance procedure agreed upon by the employer and the union as the mode of redress." <u>Republic Steel Corp. v. Maddox</u>, 379 U.S. 650, 85 S. Ct. 614 (1965). The Supreme Court in <u>Republic Steel</u> further explained that the employee must afford the union an opportunity to act on his behalf. <u>Id.</u> In this case, Saunders circumvented the internal procedures of WTU and AFT, and went directly to court; therefore, Counts V and VI must fail for failure to exhaust his internal union remedies.

IV.   **COUNT X MUST BE DISMISSED BECAUSE PLAINTIFF'S LMRDA TITLE I RIGHTS HAVE NOT BEEN VIOLATED, THERE ARE NO FACTS TO SUPPORT THE ALLEGATION OF A SCHEME TO SUPPRESS DISSENT, AND <u>FAILURE TO EXHAUST INTERNAL REMEDIES</u>**

Plaintiff's allegations in Count X that the Defendants engaged in a conspiracy to violate the LMRDA Title I rights of WTU members fails to state a claim upon which relief may be granted. As demonstrated below, Saunders' Title I rights as a union member have not been infringed, there are no facts to support a scheme to suppress dissent in the union, any restrictions on free speech were reasonable, and Plaintiff has not exhausted his internal remedies. Consequently, Count X against Defendants, including Al Squire, must be dismissed.

Congress enacted Title I of the LMRDA, 29 U.S.C. §§ 411-415, for the purpose of providing union members with a right to freedom of expression that would in turn help ensure that unions would be democratically governed. <u>Finnegan v. Leu</u>, 456 U.S. 431, 435-36, 102 S.Ct. 1867, 1870-71 (1982); <u>Rumore v. Belk</u>, 907 F. Supp. 487, 491 (D. D.C. 1995), <u>judgment aff'd without opinion</u>, 107 F.3d 923 (D.C. Cir. 1996). The LMRDA § 101(a)(2) states in relevant part that:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the

> meeting, subject to the organization's established and reasonable rules pertaining
> to the conduct of meetings

29 U.S.C. § 411(a)(2).  This section does not provide union members with an unfettered right to

free speech.  Rather, it permits unions "to adopt and enforce reasonable rules as to the

responsibility of every member toward the organization as an institution and to his refraining

from conduct that would interfere with its performance of its legal or contractual obligations."

Id.

On the issue of free speech, courts distinguish between the rights of a union member and

the rights of appointed or elected union officials under the LMRDA.  See Finnegan v. Leu, 456

U.S. 431, 102 S.Ct. 1867 (finding that Congress sought to protect the rank-and-file members, not

union officers, with the LMRDA).  Yager, 910 F. Supp. at 722.  Although a union member does

not surrender his right to free speech by accepting appointment or election to union office, a

union official has certain duties toward the organization and its leadership.  Id.  As the Yager

court noted,

> Although a person is free as a union member to criticize mercilessly his union's
> management and its policies, once he accepts a union position obligating him
> fairly to explain or carry out the union's policies or programs, he may not engage
> in conduct inconsistent with these duties without risking removal as an official or
> employee (but not as a union member) on the ground that his conduct precludes
> his effective representation of the union.

910 F. Supp. at 722 citing Newman v. Local 1101, Communications Wkrs., 570 F.2d 439, 445

(2d Cir. 1978).  While the union leadership may not use internal disciplinary proceedings as a

means to suppress the speech of union members, union officials may not avoid discipline when

they have engaged in conduct that violates union rules or policy by seeking refuge in the

LMRDA.  Id.

### A. Count X does not present facts that establish that the free speech rights of WTU members have been restricted or infringed.

Saunders alleges that the Defendants "entered into an agreement with each other to

undermine democracy, freedom of speech, association, and assembly."  See Complaint at p. 42.

In other sections of the Complaint, Saunders alleges that Defendants violated the LMRDA by "trying to suppress dissent within the union," Complaint at p. 6; that the certain WTU policies restrict "the public speech of the WTU General Vice President" and "restricts the speech of all members," Complaint at p. 14; and that Defendants Parker, Smith and Martel were "conspiring to and engaging in a scheme to undermine the free speech, assembly and association rights of WTU members," Complaint at p. 35. Saunders' bases his conclusory allegations that WTU members have had their Title I rights violated based on the following:

- a letter from Defendant Joseph M. Carrillo to Defendant Parker criticizing public statements made by Saunders. Id. at p. 13;

- a resolution introduced during an WTU executive board meeting that resolved to make the WTU president the "only spokesman of and for the WTU on all policy issues," Id. at pp. 13-14; and

- implementation of the WTU media policy.

As will be demonstrated, none of these alleged actions by the Defendants, and in particular Squire, have restricted the LMRDA Title I rights of WTU members.

The federal courts have thoroughly delineated between the type of conduct by unions that violates LRMDA § 101(a)(2) and that which does not infringe on members' rights. Compare Sheet Metal Workers' Intern. Ass'n v. Lynn, 488 U.S. 347, 109 S. Ct. 639 (1989) (LMRDA rights violated where officer was removed from his elected position in retaliation for opposition to dues increase proposed by union trustee); Shimman v. Miller, 995 F.2d 651 (6th Cir. 1993), reh'g denied, (July 27, 1993) (refusal to publish member's criticism of union leadership who was the subject of an earlier adverse article in the newsletter violated free speech rights); Murphy v. International Union of Operating Engineers, Local 18, 774 F.2d 114 (6th Cir. 1985), cert den 475 U.S. 1017, 106 S. Ct. 1201 (LMRDA rights violated where a union representative's physical intimidation and violence towards plaintiff prevented him from attending meetings); Petramale v.

Local No. 17 of Laborers Intern. Union of North America, 736 F.2d 13 (2d Cir. 1984), cert den

469 U.S. 1087, 105 S.Ct. 593 (1984) (fine and suspension imposed on union member were

unlawful where the charges did not differentiate between protected and unprotected activity);

Helton v. N.L.R.B., 656 F.2d 883 (D.C. Cir. 1981) (business manager's refusal to allow a

member to post material critical of the union on union bulletin board violated the free speech

provision of the LMRDA); 1199 DC, Nat. Union of Hospital and Health Care Emp. v. National

Union of Hospital and Health Care Emp., 533 F.2d 1205 (D.C. Cir. 1976)(union members stated

a claim under 29 U.S.C. § 411(a)(2) where they alleged they were prevented from attending

meetings, and from voting and convening on their own); with Brenner, 927 F.2d 1283

(allegations that ad hoc retaliation by an individual union official who allegedly manipulated

hiring hall procedures in a discriminatory manner did not establish that members were

"otherwise disciplined" by union in violation of LMRDA Title I); Massey v. Inland Boatmen's

Union of the Pacific, 886 F.2d 1188 (9th Cir. 1989) (member's statutory free speech rights were

not violated by enforcement of union's rule requiring union members to picket during labor

dispute); Commer v. Keller, 64 F. Supp. 2d 266 (S.D.N.Y. 1999)(Union president's use union

funds, without approval of executive board, to pay for literature criticizing other union officers

did not violate free speech provision of LMRDA where there was no allegation that officers were

denied access to media or ability to speak in their defense); Rumore, 907 F. Supp. 487 (e-mail

communication from international union executive to a local union officer criticizing his

organizing a seminar on trusteeships did not violate the free speech rights of the local official).

Similar to those cases where the courts found no violations of § 101(a)(2) of the

LMRDA, there are no facts to support Saunders' allegations that his rights have been infringed

or restricted.  The letter from Joseph Carillo, a WTU member who himself has a right to express

his views on the WTU leadership, asserts that Saunders' public statements were creating confusion about WTU's position on school closings and that Saunders' statements were outside of his duties as enumerated in the WTU Constitution.  See Plaintiff's Exhibit 4 to Complaint. The letter encourages the WTU President to limit Saunders' responsibilities to those enumerated in the WTU Constitution.  Similarly, the Martel Resolution explained that under the WTU Constitution, at Article VIII, Section 1(J), that the WTU President has the constitutional responsibility to "[r]epresent the organization before the public, community organizations and the news media."  The resolution went on to explain that statements by other officers "compromise the public image of the WTU, the WTU Executive Board and the WTU President, thereby undermining the educational mission and fiduciary responsibility of the WTU."  See Plaintiff's Exhibit 5 to Complaint.  Finally, it resolved that to "designate the WTU President as the only spokesman of and for WTU on all policy issues," directed all other WTU officers and Executive Board members "to refrain from making statements or commitments of a  policy nature;" and authorized the WTU President or his designee "to be the only spokespersons for the WTU on these issues."  Id.  This was clearly the type of reasonable rule that is authorized by § 101(a)(2) of LMRDA, insofar that it was consistent with the WTU Constitution and did not limit WTU members from speaking on issues that affect them so long as they did not represent their position as the official policy of WTU.  Regardless, according to Saunders allegations, the resolution failed to pass.[10]

The media policy to which that Saunders' objects also fails to indicate that the membership rights to engage in free speech under Title I of the LMRDA have been infringed.

---

[10] Contrary to Plaintiff's assertion that the WTU minutes were manipulated by Defendants Parker and Tatum to indicate that the motion passed, Plaintiff's Exhibit 7 clearly indicates that the minutes from the December 22, 2007 meeting were marked "DRAFT" and do not reflect WTU's approved version.

See Plaintiff Exhibit 6 to Complaint.  It is clear from the policy that it provides guidelines to the media rather than imposing any restrictions on individual WTU members.  The policy on its face does not prevent WTU officers from giving statements or interviews from the press.[11]  It specifically states that "[I]nterviews with the WTU President or any other WTU Officers must be arranged through the Director of Communications."  Id. (emphasis supplied).  It also states that if members of the media fail to follow the process outlined in the media policy, "statements or opinions received will not represent the official WTU position as it relates to your media topic."  Id. (emphasis in original).  Thus, it is clear that the policy does not forbid WTU officers or members from speaking to the media; rather it clarifies that statements that are obtained from WTU members outside of the media guidelines are personal opinions and not the official position of the union.  This is precisely the type of reasonable union rule that was contemplated by § 101(a)(2) that balances the legitimate interests of the union with the individual rights of union members.  See United Steelworkers of America v. Sadlowski, 457 U.S. 102, 102, 102 S.Ct. 2339, 2341 (1982) (union rule prohibiting non-members from contributing to campaigns for union offices upheld because it was rationally related to union interests); Laborers Union Local No. 324 v. N.L.R.B., 123 F.3d 1176 (9th Cir. 1997)(holding that a union rule barring solicitation or distribution during union office hours was not an unfair labor practice since the rule was unobjectionable on its face and there was no evidence that it was being enforced in a

---

[11] Indeed, Saunders continued to make statements in the press after the filing of this case:

- Parker "has got to be stopped; he's giving away the store," said Nathan Saunders, the union's general vice president.  "This will affect the union forever and a day."  V. Dion Haynes, *Rhee Gets Say Over Teacher Transfers*, Washington Post, April 29, 2008 at B1.
- Rhee's plans "are weighty decisions," and teachers have "not had any union training this year," Saunders said.  "That's a problem when you've got one of the most comprehensive paradigm changes [affecting teachers] in country."  V. Dion Haynes, *Turmoil Racks Teachers Union*, Washington Post, May 5, 2008 at B4.

way that impaired any overriding policy embedded in the labor laws); <u>Massey</u>, 886 F.2d at 1190

(holding union rule was reasonably related to the protection of the organization, but finding that

member stated a claim for violation of his Title I rights where union engaged in selective

prosecution against him because he spoke out at union meetings); <u>Members for a Democratic

Union v. Local 1101, Communications Workers of America, AFL-CIO</u>, 697 F. Supp. 771

(S.D.N.Y. 1988) (holding that union's editorial policy of not accepting paid advertisements and

the policy had been applied in even-handed manner did not violate members free speech rights).

Because WTU's media policy is reasonably related to the union's interest in conveying a

coherent message to the public, does not restrict WTU members from voicing their opinion, and

no WTU member has been disciplined for violating the policy, Saunders conclusion that the

media policy infringes on the free speech of WTU members must fail.

### B. Count X does not allege facts that establish a pattern of conduct by Defendants aimed at suppressing dissent within the Union.

Saunders has alleged that the Defendants named in Count X "entered into an agreement

with each other to undermine union democracy, freedom of speech, association and assembly…

pursuant to and in furtherance of a common scheme against the WTU."  <u>See</u> Complaint at p. 42.

In essence, Saunders maintains that the Defendants' actions were targeted at him as an elected

officer as part of a plan by defendants to suppress speech throughout WTU.  <u>Lynn</u>, 488 U.S. at

354, 109 S.Ct. at 644; <u>Adams-Lundy v. Association of Professional Flight Attendants</u>, 731 F.2d

1154, 1159 (5th Cir.1984), <u>rehr'g denied</u>, 736 F.2d 1526 (1984).  Plaintiff's claim must fail

because he has failed to present any factual allegations that he has been threatened or actually

retaliated against as a result of his speech.  <u>Lynn</u>, 488 U.S. at 354, 109 S.Ct. at 644; <u>Rumore</u>, 907

F. Supp. at 492.  In <u>Rumore</u>, the court described the requirement for conduct that would support

a scheme to suppress dissent:

> Courts proceeding under plaintiff's theory require a tangible and identifiable threat or retaliatory action to form the basis of the claim.  For example, the court in <u>Adams-Lundy</u> reached the question of whether defendants had engaged in a plan to suppress dissent only after finding that plaintiff had suffered tangible retaliation, that is, removal from the union governing board.  Similarly, in <u>Schonfeld v. Penza</u>, defendants removed Schonfeld from office and barred him from holding any office for five years.  This discipline raised "the question whether the sanctions on Schonfeld in the peculiar context of the history of union factionalism presented here impede[d] or infringe[d] upon the free speech and association rights of union members...."  In <u>Newman v. Local 1101</u>, the court found that the defendant union removed plaintiff from his position as shop steward in response to his speech.  This was tangible and identifiable retaliation.

907 F. Supp. at 492 (internal citations omitted).

Because Saunders cannot demonstrate that his LMRDA Title I rights have been infringed, Saunders' conspiracy claim must fail because he has failed to provide "clear and convincing evidence" that the Defendants' actions were "part of a deliberate attempt by union officials to suppress dissent within the union."  <u>Rumore</u>, 907 F. Supp at 492 <u>quoting</u> <u>Newman v. Local 1101, Communications Wkrs.</u>, 570 F.2d 439, 445-46 (2d Cir.1978); <u>Yager</u>, 910 F. Supp. at 723; <u>accord</u> <u>Schonfeld v. Penza</u>, 477 F.2d 899, 904 (2d Cir.1973); <u>Franza v. Int'l Bhd. of Teamsters, Local 671</u>, 869 F.2d 41, 45 (2d Cir.1989)("A litigant states a cognizable Title I claim when he demonstrates upon clear and convincing evidence that dismissal was part of a scheme to suppress dissent.").

Plaintiff's allegations about a suppression of dissent fall into two categories, the re-assignment of duties traditionally performed by the WTU general vice president and tampering with Saunders' personnel records.

> **1. Limiting Saunders to performance of constitutional duties does not infringe on his LMRDA Title I rights or suppress dissent within WTU.**

Saunders allegations that his duties have been reassigned "for punitive reasons" are devoid of any facts suggesting that his Title I rights have been restricted by Defendants.  As is

clear from the officer duties listed in the WTU Bylaws, the General Vice President's authority is limited and largely restricted to those duties that are delegated to him by either the President or the Executive Board. For example Article VIII, Section 2(A) states that the General Vice President will "[p]erform other duties **as delegated by the President or assigned by the Executive Board**." (Emphasis added). Similarly, the General Vice President has the authority to supervise field representatives and other WTU employees "as designated by the President." See Article VIII, Section 2(C). The only specific authority that is conferred on the General Vice President is to "[o]versee and assist the building representatives in their duties" and to "[c]onvene the Elections Committee." These are the two responsibilities that the General Vice President has by virtue of being elected to that position. There are no allegations that these two specific functions have been taken from Saunders as retaliation for engaging in free speech.

In the absence of constitutional authority that requires him to perform certain duties and in light of the broad delegation language, Saunders cannot claim that not serving as the presiding officer of delegate assembly meetings and not being appointed by the WTU President to the negotiation committee limits his ability to engage in free speech and association. Saunders, without any threat of retaliation, continues to hold his elected position as the General Vice President, is still a member of the WTU Executive Board, and continues to make public statements to the media about WTU issues. There is simply no evidence that Defendants have improperly disciplined Saunders or prevented him from exercising his Title I rights as part of a scheme to suppress dissent, and thus, Count X should be dismissed.

> **2. Plaintiff's allegations regarding Squire's participation in a conspiracy does not establish tangible and identifiable retaliation that would suppress dissent or chill speech within WTU.**

Saunders makes conclusory allegations that Defendants Parker and Squire have conspired with DCPS personnel to prevent him from obtaining a leave of absence. According to the

Complaint, Saunders overheard Parker inform "Squire that he could keep Plaintiff's leave of absence unsigned which would disallow him from being a WTU candidate in the future."  <u>See</u> Complaint at p. 25.  While Saunders does not alleged that Squire or AFT has taken any proactive action to affect his leave of absence or retaliate against him, Saunders alleges that Squire involved himself in local politics and has animosity towards the Plaintiff.  <u>See</u> Complaint at pp. 26-27.  Squire's "begrudging" comments to Saunders, which were devoid of any explicit or implicit threats of discipline or negative action by AFT, are insufficient to establish cannot sustain a claim of chilled free speech.  <u>Rumore</u>, 907 F. Supp. at 494; <u>Yager,</u> 910 F. Supp. at 723-724.

In <u>Rumore v. Belk</u>, the district court held that a letter from international union official to member of local union in which international union official expressed his support of trusteeships and stated that legal challenges to trusteeships were wasteful and voiced his reaction and opinion concerning subject of seminar on trusteeships to be sponsored by local union amounted to little more than expression of fundamentally different political ideology and did not constitute threats, express or implied, that would have chilled local union member's exercise of free speech in violation of the LMRDA. <u>Id</u>. at 493; <u>See also</u> <u>Yager,</u>  910 F. Supp. at 723-724 (holding that several statements by executive board, including that plaintiff was a "pain in its side," and a warning that the president of the international would not tolerate any violations of union constitution was not evidence of an existing plan by Carey and the General Executive Board to suppress free expression within the Teamsters).  Squire's comments to or about Saunders are similar to those in <u>Rumore</u> and <u>Yager</u> in that there was no threat of retaliation that would suppressed Saunders' speech or would chill the speech of WTU members.  The allegations in Count X regarding Squire's participation in a conspiracy to suppress dissent fail to meet the criteria for tangible and identifiable retaliation and therefore must be dismissed.

31

**3. Saunders allegation that Defendant's actions will prevent him from being a candidate for office is speculative and does not demonstrate that he has been disciplined or retaliated against in violation of the LMRDA in an effort to chill speech within WTU.**

Even if Saunders' leave of absence had not been approved at the time the Complaint was filed, Saunders claim that he will be ineligible to run for office is speculative, because the next WTU election will not be held until 2010. See Complaint at p. 7. Moreover, the allegations are baseless and not supported by the facts, including Plaintiff Exhibit 23.

Plaintiff Exhibit 23 conclusively demonstrates that Parker and Squire have no ability to impact Saunders' leave of absence. That correspondence between Saunders' and Mike Levy, Office of the General Counsel for D.C. Public Schools, indicates that the leave of absence for all WTU officers and employees was being processed by the DCPS Payroll Manager and the D.C. Office of Labor Relations & Collective Bargaining. There is simply no evidence to suggest that either Parker or Squire hold any influence over DCPS officials that are responsible for approving Saunders' leave of absence.

Even if Saunders leave of absence will not be approved, his allegation that Parker and Squire were conspiring to prevent him from running for office is baseless. Saunders has a leave of absence from DCPS schools because he is a WTU officer on full-time release from his teaching duties. If DCPS does not approve a leave of absence for Saunders, it would not impact his position as an officer and he would still be a WTU member if he resumed teaching. Unlike Harold Fisher who was not eligible to be a candidate for office because his position had be eliminated by DCPS and he was no longer a "member in good standing," Saunders would remain eligible to run for office so long as he was actively employed in the bargaining unit represented by WTU. Fisher v. Washington Teachers' Union, 350 F.Supp.2d 69 (D. D.C. 2004)(holding that WTU did not discriminate against candidate for election to union office in violation of LMRDA § 401(a)(1) where rejected candidate was separated from employment as result of reduction of force, and had no reinstatement rights). It follows, therefore, that Saunders' rights under Title I as a union member are not restricted if he has to return to the classroom. Finnegan, 456 U.S.

431, 102 S.Ct. 1867 (finding that Congress sought to protect the rank-and-file members, not employment status, with the LMRDA); Franza, 869 F.2d at 48 (holding that that there was a lack of a nexus between plaintiff's status as a union member and as an employee of the union fund, and thus, loss of employment was not an infringement of employee's LMRDA rights).  Saunders suggestion that he will not be eligible to run for office in 2010 is purely speculative and baseless; consequently, the Court should dismiss Count X.

### C.  Count X claim should be dismissed for failure to exhausted internal union remedies as required by LRMDA Title I.

Saunders failed to exhaust his internal union remedies, and thus, Count X should be dismissed.  "Union members cannot use the LMRDA as a mechanism to attack political opponents."  Rumore, 907 F. Supp. at 492.  The free speech rights of union members are not threatened or infringed upon every time that there is a political dispute in a union and dissident members interpret some action by union officials as a threat.  Id. citing  Newman, 570 F.2d at 445.  The exhaustion requirement, at 29 U.S.C. § 411(a)(4), obliging individual union members to pursue internal union remedies before instituting legal proceedings prevents courts from becoming unnecessarily involved in internal union affairs.  Winter, 569 F.2d at 148; See Amalgamated Clothing Workers of America Rank and File Committee v. Amalgamated Clothing Workers of America, Philadelphia Joint Bd., 473 F.2d 1303 (3d Cir. 1973) (dismissing plaintiffs' claims, in view of their failure to exhaust internal union remedies, in an action where union members alleged that certain rules governing the conduct of union elections violated 29 U.S.C.A. § 411(a)(2)).  While this exhaustion requirement is facially permissive, "generally the courts will require an exhaustion of intra-union remedies in the absence of a showing that it would be futile to do so or that the remedies are inadequate."  McBurnie v. Local 17, 1996 WL 432471 at * 2 (S.D.N.Y.,1996); See Berkley v. Boncoraglio, 1994 WL 440751, at *14 (S.D.N.Y. March 16,

1994) (where plaintiff conceded that she had not exhausted her intraunion remedies, her Title I action failed to state a claim).  To show the futility of intra-union remedies excusing exhaustion, Plaintiff must "allege that the union failed to apprise him of available remedies ... affirmatively misinformed him of his rights, and the ... provisions of the union's constitution] that may have afforded him relief were so ambiguous that he was denied any reasonable basis for relief." Johnson v. General Motors, 641 F.2d 1075, 1078 (2d Cir.1981).

Plaintiff has failed to pursue the remedies that are available to him under the WTU Constitution and instead requested the Court to intervene in a local union's political dispute.  The WTU Bylaws, at Article III, Section 4 specifically state that disciplinary action against a member can be appealed to the next representative assembly or membership meeting, where a "simple majority" vote of the membership is sufficient to overturn the discipline.  Saunders has failed to follow the procedures available to him and has not alleged that such remedies are futile. Similarly, Saunders has made no appeal to AFT with respect to his allegations about Defendant Squire.  Consequently, the Court should dismiss Count X.

## V.  COUNTS XI AND XII ALLEGING RICO VIOLATIONS AGAINST DEFENDANTS MCELROY AND SQUIRE SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY GRANTED

In Counts XI Plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), against "all Individual Defendants."  Count XII alleges a conspiracy to commit the acts in Count XI.  For purposes of this motion, AFT assumes that Saunders has included AFT President McElroy and AFT Regional Director Squire as being among the "individual defendants."  Saunders has failed to allege any facts that would support a RICO claim against McElroy and Squire, and thus, Counts XI and XII must be dismissed for failure to state a claim upon which relief may be granted because.

In <u>Sedima S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 105 S.Ct. 3292 (1985), the Supreme Court described the elements of a § 1962 violation as (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. A civil RICO plaintiff who claims a violation of § 1962(c) must allege and prove (1) an injury to his business or property by reason of the violation; (2) the existence of an enterprise; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the enterprise's affairs; and (5) that the participation was through a pattern of racketeering activity. <u>See Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639</u>, 913 F.2d 948, 950 (D.C.Cir.1990) (en banc), <u>cert. denied</u>, 501 U.S. 1222, 111 S.Ct. 2839 (1991). Plaintiff has not alleged a single element of a RICO claim against either McElroy or Squire.

Saunders states that "all of the Individual Defendants conducted or participated directly or indirectly in the conduct of the Enterprise's affairs through a patter of racketeering activity," including "embezzling union funds by an officer or employee of a union under 29 U.S.C. § 501(c); money laundering under 18 U.S.C. § 1956; and engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957." <u>See</u> Complaint at p. 43. The Complaint is entirely devoid of any factual allegations against either McElroy or Squire to support a claim that they engaged in racketeering activity. <u>See</u> <u>Bates v. Northwestern Human Services, Inc.</u>, 466 F. Supp.2d 69, 85 (D. D.C. 2006) (complaint dismissed where plaintiffs had neglected to distinguish between the defendants when describing the factual underpinning of the complaint, and specifically their RICO claims); <u>see also</u> <u>Scheck v. General Electric Corp.</u>, 1992 U.S. Dist. LEXIS 134, at *10 (D. D.C. Jan. 7, 1992)("Plaintiffs in a RICO claim must plead specific facts, not merely conclusory allegations, which establish the enterprise") <u>quoting Manax</u>

v. McNamara, 842 F.2d 808, 811 (5th Cir. 1988).  Consequently, Counts XI and XII must be

dismissed as to McElroy and Squire for failure to state a claim upon which relief may be granted.

### **CONCLUSION**

For the reasons stated above, the Court should dismiss Counts III, IV, V, VI, X, XI, and

XII against AFT, McElroy and Squire.

Respectfully submitted,


Date: July 3, 2008                              __/s/ Daniel J. McNeil_____
                                                David J. Strom (D.C. Bar No. 376233)
                                                Daniel J. McNeil (D.C. Bar No. (455712)
                                                American Federation of Teachers
                                                555 New Jersey Avenue, N.W.
                                                Washington, DC  20001
                                                Telephone:  (202) 393-7472
                                                Facsimile:  (202) 393-6385

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion to Dismiss and Statement of Points and Authorities In Support of Motion to Dismiss by Defendants AFT, Edward J. McElroy and Al Squire, was mailed, by first class mail, postage prepaid, this 3rd Day of July, 2008 to:

       Nathan A. Saunders, II
       3224 Wheeler Road, SE
       Washington, D.C. 20032

                    _____/s/ Daniel J. McNeil_____
                    Daniel J. McNeil
                    American Federation of Teachers

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATHAN A. SAUNDERS<br><br>                    Plaintiff,<br><br>        v.<br><br>GEORGE PARKER, *et al.,*<br><br>                    Defendants. | Civ. Action No. 1:08-cv-00715 (RMC) |

### **ORDER**

Upon consideration of the Motion to Dismiss submitted by Defendants American Federation of Teachers, Edward J. McElroy and Al Squire, Plaintiff's opposition and Defendants' reply thereto, and the Court having concluded that Plaintiff has failed to state a claim upon which relief may be granted, and does not have standing to bring his claims, it is by the Court, pursuant to Fed. R. Civ. P. 12(b)(6), this _____ day of _____, 2008, **ORDERED,**

1. that Defendants' Motion to Dismiss is hereby **GRANTED**; and

2. Counts III, IV, V, VI, X, XI and XII of Plaintiff's Complaint as to Defendants AFT, McElroy and Squire are hereby **DISMISSED.**


Date: _____          _____

                                            United States District Judge

SUPPLEMENTAL AGREEMENT

This Agreement between the American Federation of Teachers, AFL-CIO, and the Washington Teachers' Union, AFT, AFL-CIO, is entered into this 25ᵗʰ day of August 2005 for the purpose of clarifying WTU's financial obligations to AFT.

RECITALS

1.  The Washington Teachers' Union ("WTU") and the American Federation of Teachers ("AFT") executed an Agreement on December 13, 2004 ("2004 Agreement") that described the measures required for WTU to safeguard union democracy and ensure financial stability.

2.  The 2004 Agreement described WTU's obligation to reimburse AFT for the per capita delinquency that it owes AFT and included a 24 month repayment schedule.

3.  The per capita delinquency was created during the period when Barbara Bullock was president of WTU.

4.  Subsequent to executing the 2004 Agreement, WTU and AFT continued to discuss WTU's repayment obligations and its ability to pay in a timely manner. During these discussions, WTU brought to AFT's attention the following developments affecting WTU's financial condition:

    a.  That WTU made per capita payments to AFT on more individuals than were actual members, which occurred as a result of numerous layoffs and retirements. The overpayments began in January 2003 and continued through December 2004.

    b.  That the reduced membership numbers resulted in a reduction in revenue for WTU and adversely affected WTU's ability to repay its per capita obligations in accordance with the 24 month repayment schedule set forth in the 2004 Agreement.

5.  This Agreement recognizes the change in financial circumstances at WTU and the parties have agreed to clarify and modify the terms of the WTU's obligation to repay the per capita delinquency to AFT.

AGREEMENT

NOW THEREFORE, AFT and WTU agree as follows:

1.  In recognition of the overpayment to the AFT of per capita between January 2003 and December 2004, the per capita delinquency has been reduced by One Hundred Nine Thousand Five Hundred Thirty Six dollars and Forty-five cents ($109,536.45). The current per capita delinquency is Four Hundred Sixty-six Thousand Six Hundred Thirty-eight dollars and Eighteen cents ($466,638.18).

2.    The WTU will reimburse AFT for the per capita delinquency set forth in Paragraph 1 over a period not to exceed forty-eight (48) months, which shall begin on October 1, 2005, in accordance with the repayment schedule attached as Appendix A. The monthly amount due is Ten Thousand dollars ($10,000).

3.    To the extent that WTU has excess revenue or decreased costs compared to what is set forth in the WTU Budget for the year ending June 30, 2006, attached hereto as Appendix B, WTU will supplement the scheduled payments of its per capita delinquency based on a quarterly review of WTU revenue and expenses to be conducted by AFT. The following terms are applicable to this "recapture" arrangement:

    a.    "Revenue" means any funds from dues or other income received by the WTU, but does not include interest income, AFT Legal Defense Fund payments or AFT formulary assistance.

    b.    "Regular Expenses" means expenditures for employee salaries, employee benefits, taxes, travel expenses, office rent and other overhead expenses that occur on a regular and anticipated basis.

4.    If the quarterly review of Revenue and Regular Expenses demonstrates a surplus in WTU funds, WTU shall pay to AFT one-half of the surplus funds, subject to the limits described in Paragraph 5 below. The portion received by the AFT shall be applied to WTU's per capita obligation which shall be reduced by that amount.

5.    AFT will not be entitled to recapture more than Thirty Thousand dollars ($30,000.00) for each quarterly review.

6.    WTU will consult with AFT in the preparation of its operating budget for each of the following budget years: 2006-2007, 2007-2008 and 2008-2009. Any budgeted increase in Regular Expenses will use the collective bargaining agreement between WTU and DCPS as a benchmark. The procedures for identifying and recapturing surplus WTU funds, set forth in paragraphs 3-5 above, will be followed for the 2006-07, 2007-08 and 2008-09 budget years.

7.    Payments, pursuant to the schedule set forth in Appendix A, shall be due on the first of each month.

8.    In the event that WTU has not made the per capita delinquency payment within 30 days of the due date, WTU will have breached this Agreement and will be considered "in default." WTU shall then have 30 days to cure any default of this Agreement by making payment to AFT of all amounts due under the schedule of payments as of the deadline for the cure. Should WTU fail to cure the default within 30 days, interest will accrue on the amount in default from December 13, 2004, to be charged at the prime rate.

9.    WTU grants AFT a security interest in the monthly dues payments that are forwarded by the District of Columbia Public Schools ("DCPS") to WTU. If WTU does not cure a

default of this Agreement in accordance with paragraph 8, AFT shall be entitled to monthly dues payments from DCPS for the amount in default of this Agreement, and for $10,000.00 per month, plus interest, legal fees and costs until the full per capita delinquency set forth in Appendix A has been paid.

10. If legal action is required to enforce this Agreement, the prevailing party shall be entitled to legal fees and costs.

11. This Agreement will terminate upon full repayment of the per capita delinquency, or if AFT or WTU breaches or defaults on any covenant or agreement contained in the Agreement. However, in the event of a breach or default by WTU, AFT will have all rights to collection and enforcement set forth in paragraphs 8-10.

12. All of the terms and conditions of this Agreement have been freely bargained for, are all supported by reasonable and adequate consideration, and the provisions herein are material inducements for AFT entering into this Agreement.

13. The parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect to any claim or controversy between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to this Agreement including any renewals, extensions or modifications or any document related to this Agreement. This provision is a material inducement for the parties entering into this Agreement.

14. This Agreement shall be governed by the laws of the District of Columbia and enforceable in the courts for the District of Columbia.

15. The terms and conditions set forth in this Agreement are the product of joint draftsmanship by all parties, each being represented by counsel, and any ambiguities in this Agreement or any documentation prepared pursuant to or in connection with this Agreement shall not be construed against any of the parties because of the draftsmanship.

16. This Agreement is a modification of the 2004 Agreement between the parties. The terms of the 2004 Agreement are amended only to the extent described herein and the remaining terms are otherwise unaffected. This Agreement is the final agreement between the parties concerning the per capita delinquency and may not be contradicted by evidence of prior oral or written, contemporaneous or subsequent oral agreements among the parties. There are no unwritten oral agreements among the parties.

Signed this 25th day of August, 2005.

_____
WASHINGTON TEACHERS' UNION

_____
AMERICAN FEDERATION OF
TEACHERS





*A Union of Professionals*

# 2006 Constitution and Bylaws

**CORRECT AS OF JULY 2006**

---

# Table of Contents

---

# Constitution

| Article | | Page |
|---|---|---|
| I | Name | 1 |
| II | Objects | 1 |
| III | Membership | 2 |
| IV | Charters | 4 |
| V | Officers | 6 |
| VI | Executive Council | 7 |
| VII | Conventions | 11 |
| VIII | Representation | 11 |
| IX | Revenues | 14 |
| X | Amendments | 15 |
| XI | Affiliation | 15 |
| XII | Referenda | 16 |
| XIII | Parliamentary Authority | 17 |

---

# Bylaws

| I | Special Rules of Order for Conventions | 18 |
|---|---|---|
| II | Committee on Credentials | 19 |
| III | Convention Program | 19 |
| IV | General Convention Procedure | 20 |
| V | Convention Committees | 21 |
| VI | Nominations and Election Procedures | 21 |
| VII | Standing Committees | 22 |
| VIII | Per Capita, Budget and Audits | 22 |
| IX | Affiliate Audit and Financial Review Requirements | 24 |
| X | Good Standing | 25 |
| XI | Suspension of Rules and Amendment of Bylaws | 25 |

| | Table of Organization | 26 |
|---|---|---|
| | Index | 27 |
| | AFT Executive Council (2006-2008) | 32 |

# Constitution

## of the American Federation of Teachers, AFL-CIO

*NOTE: Underlined words indicate new language adopted at the 2006 convention. Strikethroughs indicate deleted language.*

## ARTICLE I
### Name

Name

This organization shall be known as the American Federation of Teachers, with divisions known as AFT Teachers, AFT Paraprofessionals and School-Related Personnel, AFT Healthcare, AFT Higher Education and AFT Public Employees.

## ARTICLE II
### Objects

Bargaining Rights

**Section 1.**  To obtain exclusive bargaining rights, including the right to strike, for teachers, paraprofessionals and school-related personnel, higher education faculty and professionals, state and local public employees, healthcare employees and other workers.

Mutual Assistance

**Section 2.**  To bring local and state federations of teachers and other workers into relations of mutual assistance and cooperation.

Worker Rights

**Section 3.**  To obtain for teachers and other workers all of the rights to which they are entitled in a free society.

Improve Professional Standards

**Section 4.**  To improve standards for teachers, paraprofessionals and school-related personnel, higher education faculty and professionals, state and local public employees, healthcare employees and other workers, by promoting better preparation, encouraging relevant in-service training and securing the working conditions essential to the best performance of professional service.

Improve Health Standards

**Section 5.**  To improve the standards for registered nurses, allied health professionals and other healthcare employees by advancing economic status, promoting better preparation in basic education programs, encouraging and promoting continuing education, securing working conditions essential to the best performance of services and the most effective delivery of healthcare.

Improve Public Employee Standards

**Section 6.**  To improve standards for public employees by working for the passage and strengthening of collective bargaining and civil service legislation in the states, promoting continuing education for state employees and securing working conditions conducive to the best performance and delivery of public service.

**Improve Education**

**Section 7.** To encourage the hiring and retention of competent teachers, paraprofessionals and school-related personnel, the maintenance of modern, well-equipped schools and the promotion of such educational programs and conditions in American schools as will enable their students to equip themselves better to take their places in the economic, social and political life of the community.

**Child Welfare**

**Section 8.** To promote the welfare of children by providing progressively better educational opportunities for all, regardless of race, color, creed, sex and social, political or economic status.

**Promote Welfare**

**Section 9.** To promote the welfare of the healthcare consumer by promoting progressively better access to and utilization of healthcare resources in this country.

**Oppose Bias**

**Section 10.** To fight all forms of bias due to race, creed, sex, social, political or economic status or national origin.

**Promote Democracy**

**Section 11.** To support and promote the ideals of democracy as envisioned in the Constitution of the United States of America, its Bill of Rights and other Amendments, to work for passage and retention of just laws that will improve the educational climate for students, teachers and other workers in education and to encourage them to exercise their proper rights and responsibilities under these laws.

**Organize Retirees**

**Section 12.** To encourage state federations and locals to organize retired members.

## ARTICLE III

## Membership

**Divisions**

**Section 1.** This organization shall consist of divisions of public and private school teachers, paraprofessionals and school-related personnel, higher education faculty and professionals, nurses, allied health professionals and other healthcare employees, state and local public employees and other workers organized in conformity with the provisions of this constitution. Other employees may be members of any local whose constitution so permits.

**Program and Policy Councils**

**Section 2.** A program and policy council shall be created to represent each division of membership. Members of program and policy councils and their chairpersons shall be appointed by the AFT executive council, upon recommendation by the AFT president. Recommendations from the program and policy councils will be presented to the AFT executive council for its consideration.

**Membership**

**Section 3.** Classroom teachers with supervisory authority may be admitted to membership by any local whose constitution so permits.

**Membership Outside Local Jurisdiction**

**Section 4.** Any employee residing outside of the jurisdiction of an established local who is otherwise eligible for membership under this article may be accepted as a member of the nearest local or as a member at large of the state federation. The state federation shall have full jurisdiction in the determination of a procedure for participation by these at-large members in all activities of the state federation.

**Charters**

**Section 5.** The executive council may exercise its discretion in the chartering of groups of teachers, paraprofessionals and school-related personnel, higher education faculty and professionals, nurses, allied health professionals, other healthcare employees, state and local public employees or other workers.

**Classes of Membership**

**Section 6.** Locals may establish the following special classes of membership:

(a) Employees who are eligible for membership whose salary is less than the beginning teacher's salary or employees whose salary is less than ~~$15,000~~ $18,000, whichever salary is higher: Such locals pay per capita tax for such members at one-half the regular rate.

(b) Employees earning under ~~$10,000~~ $12,000: Such locals pay per capita tax for such members at one-quarter the regular rate.

(c) Laid-off employees or employees on unpaid leave: Such locals shall pay per capita tax for such members at the rate of $1 per month.

(d) Locals that represent contingent employees, such as adjunct instructors, making less than ~~$10,000~~ $12,000 per year in circumstances where it can be demonstrated that the payment of one-quarter AFT per capita would be an actual hardship for both the employees and the local may apply for a reduction in per capita below the one-quarter rate. Applications for such reduction may be made on behalf of a bargaining unit or other clearly identified group within a local. The executive council shall adopt guidelines to govern the filing and consideration of such applications. Where appropriate, the executive council may grant to locals a reduction from the otherwise required per capita for a one-time, nonrenewable period ~~not to exceed two~~ of four years. Locals that qualify for the exemption shall pay per capita tax for the covered members at the rate of $1 per member per month.

Such members shall be entitled to receive full benefits of membership.

<div style="text-align: right"><strong>Student-Teacher Members</strong></div>

**Section 7.** Where a local of the American Federation of Teachers exists in or near a college or university having a department of education, that local may accept prospective teachers as student members. Annual dues of $5 per year shall be paid directly to the national office by the local for each student member. Student members shall have only visitors' privileges at the convention. A student teacher may also be accepted as a member at large of the state federation.

<div style="text-align: right"><strong>Membership of Individual College Teachers</strong></div>

**Section 8.** In jurisdictions where there are no college or university locals of the American Federation of Teachers, membership may be granted to individual college and university teachers by a local in that vicinity. Such membership may be maintained until there is chartered a college or university local in which such a member would be eligible for membership.

<div style="text-align: right"><strong>Associate Membership</strong></div>

**Section 9.** In jurisdictions where there is no local, employees may be admitted as associate AFT members without AFT voting rights but with rights to participate in the benefit programs otherwise available to the general membership. The dues for associate AFT members shall be determined by the AFT executive council.

<div style="text-align: right"><strong>Dues Determination</strong></div>

Former active members who are not eligible to continue their active membership may be admitted as associate members without voting rights but with the right to participate in benefit programs such as insurance, travel and discount buying services. The dues for this category of associate member shall be determined by the AFT executive council.

The AFT executive council is authorized to establish an organization(s) of associate AFT members without AFT voting rights. Associate AFT members in such organization(s) shall elect their chief executive officer.

<div style="text-align: right"><strong>Retiree Membership</strong></div>

**Section 10.** Effective September 1, 1990, an active member who retires from his/her present position shall be admitted as an AFT retiree member whose sole AFT voting rights are provided in Article VIII, Section 6, and with the right to participate in the benefit programs otherwise available to the general membership.

<div style="text-align: right"><strong>Anti-Discrimination</strong></div>

**Section 11.** No discrimination shall ever be shown toward individual members or applicants for membership because of race, creed, sex, sexual orientation, disability, social, political or economic status or national origin. Locals may establish procedures for admission of new members except that no discrimination shall ever be shown toward individual members or applicants for membership because of race, creed, sex, sexual orientation, disability, social, po-

litical or economic status or national origin.

**Section 12.** Nothing contained in this article shall permit this organization to admit into membership any organization of nonteaching persons who hold the position of principal or any higher position. This provision shall not be applicable to locals chartered prior to its adoption.

Nothing contained in this article shall permit locals to admit into or retain in membership any nonteaching person who holds the position of principal or any higher position. This provision shall not be applicable to holders of such positions who held membership in any local prior to the adoption of this article.

The executive council may permit locals to admit such persons into membership only where the exclusion of such persons from membership would legally bar a local from achieving exclusive representation for classroom teachers.

## ARTICLE IV
### Charters

**Section 1.** Ten or more teachers and/or other workers, upon application to the executive council and the payment of $25, may be granted a charter, and such locals shall establish and maintain at least a minimum dues of $50 per year unless, in the opinion of the executive council, special circumstances exist.

**Section 2.** Upon application to the executive council and the payment of a fee of $25, a charter may be issued to 10 or more teachers in educational institutions not supported by public funds.

**Section 3.** Charters may be granted by the executive council to state federations upon the payment of a charter fee of $10. A state federation shall consist of no fewer than three locals of the American Federation of Teachers, except when fewer than three locals represent jurisdictions embracing 50 percent of the teacher strength in the state. No dues shall be assessed on the state federations by the national organization except for the members at large as provided in the constitution.

**Section 4.** Charters may be granted by the AFT executive council to organizations of retired members upon payment of a charter fee of $5. Applications for such charters shall be made only by established local unions, state federations or regional councils.

The AFT executive council shall make such rules and regulations as are necessary for the administration of this section such as, but not limited to, the number of retirees required for issuing a charter and a definition of retiree.

The voting status of such organizations shall be as defined in Article VIII, Section 6, of this constitution.

**Section 5.** All locals and state federations shall submit three copies of their constitution and bylaws to the national organization within three months of receiving their charter or as of September 1, 1955, whichever is the later date, and they shall similarly submit all subsequent amendments to their constitution and bylaws. No such constitution or bylaws shall be in conflict with the constitution of the American Federation of Teachers. Effective September 1, 1994, and thereafter, the constitution and bylaws of each affiliated local and state federation shall provide for regular meetings of an executive body and regular meetings of the general membership or a representative body of the general membership. The conduct of elections shall be consistent with the standards for such elections developed under Title IV of the Labor-Management Reporting and Disclosure Act (LMRDA). Terms of office for officers shall not exceed four years, or fewer if required by applicable state or federal laws.

Supervisory Membership

Local Charters

Nonpublic Charters

State Charters

Retiree Organizations

Constitutions

Locals' Meetings and Elections

**Pass-Through**

**Section 6.** Each affiliated local shall increase the local dues to equal any increase in per capita payments that are required to be made to the American Federation of Teachers and any increase to either the state federation or the regional council with which the local is affiliated.

**Minimum Membership**

**Section 7.** The charter granted to any local shall not be revoked or suspended because it has a membership of fewer than 10 but not fewer than seven.

**Suspension of Charter**

**Section 8.** A charter issued to any local or state federation may be suspended or revoked by the executive council when the existence of such local or state federation is detrimental to the development of democracy in education. However, except for the nonpayment of dues to this organization, no local or state federation shall have its charter suspended or revoked until the executive council has (a) served the local or state federation with written specific charges, (b) provided the local or state federation a reasonable time to prepare its defense and (c) afforded a full and fair hearing within the jurisdictions of the local or state federation.

**Suspension Appeal**

Except for nonpayment of dues, such suspension or revocation may be appealed to the next national convention. The appeal shall be the first order of convention business. The local may present its own case without the right to vote. A two-thirds vote of the convention shall be required to sustain such suspension or revocation.

**Disbanding of Local**

**Section 9.** In the event a local or state federation disbands, the balance in the treasury shall be forwarded to the Defense Fund of the American Federation of Teachers.[1]

**Anti-Discrimination**

**Section 10.** No charter of the American Federation of Teachers that defines or recognizes jurisdiction on a basis of race, creed, sex, sexual orientation, social, political or economic status or national origin or permits the practice of such jurisdiction shall be recognized as valid, and the practice of any local in limiting its membership on account of race, creed, sex, sexual orientation, social, political or economic status or national origin shall render its charter void.

**Student Charters**

**Section 11.** A student federation of teachers may be chartered in any college or university. There must be a minimum of 10 members. Per capita for each member to the national organization shall be $5, payable annually.

A student federation of teachers may be chartered in any high school upon an application of the sponsoring local and payment of not less than $10 per year for such organization of at least 10 members. Locals may establish reasonable dues for members of the student federation.

The executive council shall make such rules and regulations as are necessary for the administration of this section.

Such student-teacher members shall have no voting status in either the national or state federations.

**Section 12.**

**A. Jurisdiction of Locals**

**Executive Council Allocation of Jurisdiction**

The executive council shall have power to allocate and define and, from time to time, redefine and reallocate the jurisdictions within which locals may exercise their jurisdictions. In doing so, the executive council shall be guided by the primary purpose of the American Federation of Teachers, which is to organize teachers and other workers into strong, effective unions for the purpose of achieving and engaging in collective bargaining.

**B. Rules for Defining and Allocating Jurisdiction**

**Geographic Jurisdiction**

(1) In the exercise of this power, the executive council shall give preference

---

[1] IRS regulations prohibit the assets of defunct, nonprofit organizations from accruing to the personal benefit of former officers or members of the organization.

to a local operating within a specific geographic area whose members shall constitute a bargaining unit of employees of a single employer or employees of two or more employers within a geographic area. Where a statute, regulation or decision by a court or other regulatory agency defines a bargaining unit on some other basis, exceptions may be made to conform thereto.

**Multi-Employer Jurisdiction**

(2) It will not be considered an infraction of this principle if there are several employers of teachers and other workers within the same general geographic area and the employees of each such employer are organized separately.

(3) No teacher or other worker who is a member of the bargaining unit of a local in a defined jurisdictional area may be a member at large of a state federation or be a member of a local having a general jurisdiction.

**Member-at-Large Restriction**

(4) A teacher or other worker who is a member at large of a state federation or a local having a general jurisdiction and is employed within the jurisdiction of another local now or hereafter chartered shall terminate such membership within 30 days.

**State Jurisdiction**

(5) No local shall have or maintain jurisdiction in an area that crosses state lines or has jurisdiction in more than one state without the specific approval of the executive council.

**Duplicate Membership**

(6) Nothing in this section shall prohibit a local from representing educational workers employed by labor organizations (other than the AFT) in worker education or by other private employers or government agencies or in places where no AFT local is chartered, but any person so employed shall cease to be a member of the first-mentioned local within 30 days after the chartering of a local that has jurisdiction of the employees of the employer of any such person.

**Charter of Other Educational Workers**

(7) Nothing in this section shall prohibit the existence or chartering of locals of educational workers other than teachers (such as clerks, truant officers, nurses, librarians and the like) where such local is otherwise in conformity with this section; nor shall anything in this section prohibit locals of nonpublic teachers and other educational workers in the same or overlapping geographic area as another local.

**Rules**

(8) The executive council may make rules to carry out any of the provisions of this section and shall determine all questions arising hereunder.

**Appeal**

(9) All decisions of the executive council that the executive council makes in the exercise of the powers defined in Article IV, Section 11, of this constitution may be appealed to the next national convention.

## ARTICLE V
### Officers

**Executive Council**

**Section 1.** The elected officers of the AFT shall be a president, secretary-treasurer, executive vice president, and 39 vice presidents. All divisions must be represented among the 39 vice presidents. These 42 shall constitute the executive council. They shall be elected in the even years by the convention for the term of two years. Vacancies shall be filled as provided in Article VI of this constitution.

**President**

**Section 2.** The president shall be the chief executive officer of the federation and administer all of the affairs of the federation and execute policies of the federation as determined by the convention and the executive council. The president shall employ, supervise, direct, promote, discipline and discharge staff and retain counsel, accountants and other professional personnel. Initial employment, promotion and compensation of such persons, to the extent that such is not determined pursuant to collective bargaining agreements, shall be

subject to the approval of the executive council.

**Duties of the Secretary-Treasurer**

**Section 3.** The secretary-treasurer shall be the financial officer of the federation. His or her duties shall include:

(a) the collection of all monies, properties, files and effects of the federation;

(b) the payment of all monies properly authorized by the council or the president through the adopted budget of the federation;

(c) to arrange from time to time but no less than annually for the audit of all books, accounts, records and financial transactions of the federation by an independent auditing firm. Such audit to be provided to the officers of the federation;

(d) to issue the Call for the convention and cause the proceedings of the convention to be recorded; and

(e) to work under the direction of the president in the performance of all other responsibilities as may be given him or her by the president or the executive council.

**Executive Vice President**

**Section 4.** The executive vice president shall assist the president in performing the duties of the chief executive officer of the federation and shall carry out those additional functions and responsibilities assigned by the president.

**Officer Requirement**

**Section 5.** No one shall be elected an officer of the federation unless he/she is a member of an affiliated local or a state federation.

**Vice President Employment**

**Section 6.** No vice president, except the executive vice president, shall be a full-time salaried employee of the American Federation of Teachers.

**AFL-CIO Delegates**

**Section 7.** The delegates to the convention of the American Federation of Labor and Congress of Industrial Organizations shall be the president, the secretary-treasurer, the executive vice president and other delegates elected by the biennial convention.

## ARTICLE VI
## Executive Council

**Section 1.** It shall be the duty of the executive council to obey the instructions of national conventions, except that any action by the convention involving expenditure of funds shall be referred to the executive council with power to revise in conformity with the budget.

**Convention Mandates**

**Section 2.** Employees not covered by collective bargaining agreements shall be employed by individual contracts with provision for orderly dismissal with the right of hearing and representation by counsel in accordance with a procedure recommended by the president and approved by the executive council.

**Staffing**

Other employees may be employed by union contract, and procedures shall be established in all such contracts for orderly dismissal with the right of hearing and representation by counsel unless otherwise provided in a union contract. The provisions of this section shall not apply to officers of the federation.

**Section 3.** The executive council shall have the power to designate one of the officers of the federation to act in place of the president in the event of a temporary or permanent vacancy of the office during his/her term.

**Acting President**

**Section 4.** The executive council, upon recommendation of the president, shall fill a temporary or permanent vacancy in the office of the secretary-treasurer.

**Acting Secretary-Treasurer**

**Section 5.** The executive council, upon recommendation of the president, shall fill a temporary or permanent vacancy in the office of the executive vice president.

**Executive Vice President's Vacancy**

**Section 6.** The executive council shall set the salaries of the president, the secretary-treasurer and the executive vice president. Such salaries shall not be diminished during their terms in office.

**Salary of President, Secretary-Treasurer and Executive Vice President**

**Council Vacancies**

**Section 7.** The executive council shall have the power to fill vacancies in its membership until the next regular convention.

**Additional Representation**

**Section 8.** When a significant need for additional representation on the council arises between conventions, the president, with the approval of a two-thirds vote of the executive council, may add a temporary seat(s) to the executive council until the next convention.

**Duties**

**Section 9.** The executive council shall have the authority to assign duties and areas of responsibility for each vice president.

**Interpretation and Enforcement of Constitution**

**Section 10.** The executive council shall have the power to interpret and enforce this constitution and to make rules not in conflict with this constitution and shall report such rules to the succeeding convention for approval or rejection. Any interpretation of the constitution by the executive council may be appealed at any subsequent convention.

**Appeal**

**Committees**

**Section 11.** The executive council shall appoint such committees as it deems necessary, not inconsistent with the constitution.

**Council Meetings**

**Section 12.** The executive council shall meet at its discretion during the period between conventions. The expenses of executive council meetings shall be paid by the American Federation of Teachers, each member of the executive council submitting an expense account to the national office.

**Expenses**

**Council Authority**

**Section 13.** The executive council shall have authority to deal with all of the affairs of the federation in the period between the conventions.

**Investigation of a Local**

**Section 14.** (a) The executive council may authorize the president to appoint a committee of the executive council to conduct an investigation of a local:

(i) upon the appeal of the officers or of the executive board or 30 percent or more of the membership of that local;

**Appeal**

(ii) upon the appeal by a two-thirds vote of the officers and executive board of a state federation or by state convention action or by 30 percent of the locals affiliated with a state federation; or

(iii) upon the appeal of locals representing 30 percent of the membership of the American Federation of Teachers within the state.

**Investigation of a State Federation**

The executive council may authorize a similar investigation of a state federation or of disputes between a local or locals and a state federation upon the appeal of one or more locals of that state.

**Report**

In any of these situations, the committee shall conduct an investigation and make a full report with recommendations to the executive council, which shall have full power to take appropriate action to resolve the matter. One-third of the cost of the investigation shall be borne by the national office. The executive council shall require the initiating party to advance $250 before proceeding, but may, in its final decision, assess up to two-thirds of the cost against the parties in such manner as it deems just. At its discretion, the executive council may return the $250, or any portion of it, advanced by the initiating party.

**Assessment**

**Investigations of a Local or State Federation**

**Section 14.** (b) The executive council may, by a two-thirds vote, authorize the president to appoint a committee to investigate a local or state federation where an election appears to have been conducted in violation of the local or state federation constitution, the AFT constitution or applicable federal law or a local whose conduct is not in harmony with the principles of the AFT and tends to bring the AFT into disrepute or a local that fails to maintain affiliation mandated in Article XI, Sections 2 and 3. The local or state federation shall be given an opportunity to present its position to the committee. The committee shall submit its findings and recommendations to the council, which shall have the power to take action to resolve the matter, including the imposition of the penalty contained in Article XI, Section 3, of this

constitution and/or other appropriate penalties. The action of the council in such cases shall be final. The cost of such an investigation shall be borne by the national office.

**Section 14.** (c) The executive council may authorize the president to investigate the alleged failure of local unions and state federations to comply with provisions of the AFT constitution. Such an investigation shall determine whether or not a violation exists, and if so, what steps must be taken by the state federation or local to comply with the AFT constitution as well as what assistance may be offered by the national union to help the state federation or local to address circumstances that may have led or contributed to the violation. If such an investigation, or assistance provided as a result of such an investigation, fails to bring the state federation or local union into compliance with the AFT constitution, then the president shall submit findings and recommendations to the council, which shall have the power to take action to resolve the matter, including but not limited to the following, plus any other measures enforceable through legal action or any other means:

(i) the ordering and enforcement of compliance;

(ii) communication to the members of the state federation or local that informs them about the violation and how it affects their status as AFT members;

(iii) the withholding of any AFT services or assistance provided to the state federation or local;

(iv) the denial of access to the AFT Militancy Fund and/or the AFT Defense Fund;

(v) the denial of delegate representation to the AFT convention;

(vi) suspension or revocation of charter as provided for in Article IV, Section 8, of this constitution; and

(vii) in the case of delinquent per capita to the national union or a state federation, interest levied on the amount in arrears and/or suspension as provided for in Article IX, Section 5, of this constitution.

**Section 15.** (a) **Grounds.** In exceptional and unusual circumstances where an AFT state or local affiliate is incapable of taking adequate remedial measures on its own initiative, the AFT may establish an administratorship for the purpose of:

(i) restoring the rights of members in situations where there has been a significant failure either in election procedures or representation required under the AFT or affiliate constitution(s); or

(ii) correcting financial malpractice or misappropriation or loss of funds.

**Section 15.** (b) **Process for Approval of an Administratorship.** Where the executive council has reason to believe that the grounds set forth in paragraph (a) above exist to consider an administratorship, the president shall be authorized to appoint a committee of the council to investigate and conduct a hearing. That hearing shall be scheduled within 30 days, at which time the affected parties will be able to appear and present evidence, witnesses and arguments. Notice of such hearing and a written statement of the grounds for the proposed administratorship will be provided to the affected local or state federation before the hearing. The committee shall submit its findings and recommendations to the council for final approval. Thereafter, the executive council, by a two-thirds vote, shall have the power to authorize the president to establish an administratorship and appoint an administrator. In situations where an administratorship has been approved, the members of the affected AFT affiliate will be notified of the reasons for such decision, including an explanation of the administrator's duties and functions.

**Section 15.** (c) **Emergency Administratorship.** Under grounds pursuant to Article VI, Section 15(a), the AFT president, upon the unanimous decision of the AFT president, secretary-treasurer and executive vice president, is authorized to invoke an emergency administratorship in situations requiring immediate action for the purpose of securing and safeguarding an affiliate's assets and vital records from immediate threat, provided that the executive council by a two-thirds vote approves such emergency action within five business days of its having been invoked. Within 24 hours thereafter, the president shall appoint a committee of the council, in keeping with Article VI, Section 15(b) of the AFT constitution, to investigate and conduct a hearing; and the normal processes, timetables, hearing rights and approval requirements under Article VI, Section 15(b) of this constitution shall apply.

**Section 15.** (d) **Powers of the Administrator.** The administrator will report to the president or his or her designee and will be authorized to take full charge of the affairs of the local or state affiliate and to take such actions as are necessary to protect the interests of the membership. Where required, such authority shall include:

(i) supervising the local or state affiliate's employees and other representatives;

(ii) taking possession of the books, records, funds and other assets of the state or local federation; and

(iii) suspending officers and staff of the local or state federation for the duration of the administratorship.

**Section 15.** (e) **Termination of Administratorship.** The executive council shall terminate an administratorship as soon as the cause for its establishment has been remedied. Where officer positions have been vacated as a result of the administratorship, then, prior to the termination of an administratorship, an administrator shall conduct an election in accordance with the applicable provisions of the governing documents of the affected local or state federation and the AFT constitution to fill such positions. Such officers will take office as of the date of the termination of the administratorship. At such time, an administrator shall also return control of the books, records, funds and other assets to the local or state federation.

**Section 15.** (f) **Limitation of Liability.** No financial obligation or liability of the local or state federation that may exist at the time an administratorship is established or that may be incurred during administratorship shall be assumed by or become an obligation of the American Federation of Teachers.

**Section 16.** The executive council shall have power to accept gifts and devises to the American Federation of Teachers if the conditions or purposes of any such gift or devise are not inconsistent with this constitution. The executive council may establish trusts or other agencies to hold and administer any such gift or devise and provide for appointment of trustees or managers thereof, upon such conditions as it may determine, subject to ratification at the next regular convention.

**Section 17.** The executive council shall have the power to carry on all the business affairs of the American Federation of Teachers, including, without limitation, the power to do on its behalf any or all of the following:

(a) to sue and be sued, complain and defend on behalf of and for the use of the federation;

(b) to adopt an official seal, which may be altered at pleasure, and to use the same by causing it or a facsimile thereof to be impressed or affixed or in any manner reproduced;

(c) to purchase, take, receive, lease as lessee, take any gift, devise or bequest or otherwise acquire and to own, hold, use,

*Side notes:*
Emergency Administratorship

Powers

Termination of Administratorship

Financial Liability

Gifts

Council Power

To Sue

Adopt a Seal

Acquire Property

deal in or with any real or personal property or any interest therein;

**Sell Property**

(d) to sell, convey, mortgage, pledge, lease as lessor and otherwise dispose of all or any part of its property and assets;

**To Purchase**

(e) to purchase, take, receive or otherwise acquire, own, hold, vote and use shares or other interests in or obligations of domestic or foreign corporations, associations, partnerships or individuals and to sell, mortgage, loan, pledge or otherwise dispose of such shares, interests or obligations;

**To Contract**

(f) to make contracts and incur liabilities that may be appropriate to enable it to accomplish any or all of its purposes; to borrow money for federation purposes at such rates of interest and terms and conditions as they may determine; to issue notes, bonds and other obligations; and to secure any of its obligations by mortgage, pledge or deed of trust of all or any of its property and income;

**To Invest**

(g) to invest the funds of the federation from time to time in any real or personal property and to take and hold real and personal property as security for the security of funds so invested or loaned; and

(h) to do anything it deems necessary or appropriate to the exercise of the foregoing power or any other power granted to the executive council in this constitution.

**Regional Councils**

**Section 18.** (a) The executive council may establish and/or revise regional councils to facilitate organization, professional growth, political and legislative activities and other purposes for the good of the union.

**Membership Eligibility**

**Section 18.** (b) The executive council may provide for the affiliation of locals to a regional council in lieu of the requirement of Article XI, Section 2, of this constitution and that these locals shall not be comprised of employees of local education agencies, colleges or universities or locals affiliated with existing state federations on July 1, 1981.

**Additional Per Capita**

**Section 18.** (c) The executive council shall establish and the AFT shall collect additional per capita from such locals to provide services to the regional councils with the approval of the executive council.

---

# ARTICLE VII
## Conventions

**Time and Place**

**Section 1.** Effective in 1984, conventions of this organization shall be held biennially in even-numbered years at such time and in such place as the previous convention or the executive council may determine.

**Special Convention**

**Section 2.** A special convention may be called in odd-numbered years by a two-thirds vote of the executive council or upon request from at least 30 locals representing a minimum of 30 percent of the AFT membership then in good standing from at least five states.

**Executive Council Delegates**

**Section 3.** The members of the executive council who are not delegates from their local or state federation shall be exofficio delegates at the convention and shall have one vote at the convention.

---

# ARTICLE VIII
## Representation

**Election of Delegates**

**Section 1.** (a) Delegates and/or alternates to the convention from a local or retiree organization shall be elected by secret ballot. Members of each local must be given suitable opportunity to nominate candidates for the office of delegate and alternate. Notice of the right to make nominations must be sent to each member or given a prominent place in the local publication and on bulletin boards. Notice of the right to

make nominations and notice of the election may be combined in one notice. Written notice announcing the time and place of election of delegates must be mailed to each member at least 15 days prior to the election. The results of the election must be published and the ballots kept for one year.

**Councils of Locals**

**Section 1.** (b) Locals with fewer than 100 members each, but in the aggregate fewer than 300 members from a contiguous geographic area, may form councils of locals for the exclusive purpose of electing a common delegate to the convention. Locals that form such a council under this section: (1) shall adopt a common resolution to establish the council in a regular meeting of such local no later than four months prior to the convention; (2) shall nominate at the same meeting of each local a member or members, if any, for the council's delegate to the convention; (3) shall elect at a meeting of each such local or by mail ballot agreed to by all locals in the council and in conformity with federal law no later than three months prior to the convention a delegate and alternate, if any, by a secret ballot common to each local in the council listing all nominees and their local numbers, the nominee receiving the highest number of votes totaled among all locals in the council to be the delegate, and the second highest, if any, the alternate; (4) shall forward properly signed credentials from each local in the council for the duly elected delegate and alternate, if any, of the council in time to reach the national office no later than two months prior to the convention; and (5) the executive council shall approve procedures consistent with the requirements of this section for the election of the council delegate. The secretary-treasurer shall forward such procedures to all locals reporting fewer than 100 members in per capita and to all state federations seven months prior to the convention. No local participating in the council shall have any other delegates seated in the convention. The voting strength of the council's delegate shall be based on the aggregate of the members in the locals that credential the council's delegate.

This section shall also authorize the executive council to recognize a council of locals organized for the convenience of doing business with one employer common to all of the council's locals for the purpose of electing delegates to the convention. Nomination procedures shall be established by such council to permit all such locals to nominate from their respective memberships at least 30 days in advance of the election, which shall be conducted by mail ballot in conformity with federal law. The election of such council's delegates shall be further subject to the provisions of Article VIII, Section 2, of this constitution, provided that no other delegates shall be seated in the convention from any individual local of the council unless such local has notified the national office three months prior to convention that it is not participating in such council for the purposes of electing delegates to the convention. The voting strength of such council shall be based upon the aggregate membership of all such locals that individually credential all delegates common to the council.

**Councils**

**Section 1.** (c) Delegates and alternates of state federations shall be elected according to its constitution, provided that the delegates to the state convention are themselves elected by secret ballot as herein provided, subject to applicable federal and state laws and rules and regulations promulgated pursuant thereto.

**State Federation Delegates**

**Section 1.** (d) Each local, state federation or retiree organization must send by registered or certified mail or any other reliable means, including electronic transmission, that provides proof of receipt to the national office a certified list of all elected delegates and alternates not later than 15 30 days prior to the opening date of the convention. Only delegates and alternates on this certified list shall be registered and seated at the convention.

**Delegate Lists**

**Seating of Delegates**

**Section 1.** (e) In the event of non-delivery to the national office of the certified list of the elected delegates and alternates, the executive council may recommend the seating of the delegates and alternates only upon the submission by the president, secretary or ranking delegate of the local, state federation or retiree organization of a statement certifying the list of elected delegates and alternates accompanied by the duly authorized duplicate credentials and receipts showing that the originals were sent to the national office by registered or certified mail, or any other form of mail service providing a return receipt, postmarked no later than 15 days prior to the opening date of the convention.

**Per Capita Qualifications**

**Section 1.** (f) To be entitled to representation at the convention, the full per capita tax of the local and all other monies due the American Federation of Teachers shall be paid through the two months immediately preceding the convention date, such payment to be made to the national office no later than the last day of the second month prior to the opening date of the convention.

**Delegate Allocation**

**Section 2.** One delegate to the convention may be elected by each affiliated local having a membership of 25 or fewer. (For each 100 members or major fraction thereof, one additional delegate may be elected.)

**Determining Average Membership**

**Section 3.** Effective July 1, 1986, for the purpose of this article, membership shall mean the average number on which the per capita tax has been paid for the first 24 months of the 26-month period immediately preceding the month in which the convention meets, provided:

**Local Eligibility**

(a) that no local in arrears for more than two months at the time of the convention shall be entitled to representation; and

(b) that, in the case of locals that have been chartered during the two years preceding the convention, the average shall be computed on the basis of the number of months of affiliation, the minimum for such computation to be two.

**Delegate Strength— Agency Fees**

**Section 4.** That, in the case of locals that receive fees from nonmembers for representing them under an agency shop agreement, the average number on which the per capita tax has been paid shall be increased by including, as if it were per capita tax, the sum equal to the per capita tax paid as required by Article VIII, Section 1, of the bylaws.

**State Federation Delegates**

**Section 5.** State federations, upon compliance with Article VIII, Section 1, of this constitution shall have the right to send delegates to the conventions of the American Federation of Teachers. Each state federation may elect one delegate to the convention, regardless of its at-large membership. Additional delegates may be elected by the state federations, according to their at-large membership, by applying the formula established for locals as set forth in Section 2 of this article.

All such delegates shall be either members of the state federation or its affiliated locals, provided such locals are in full compliance with Section 1 of this article. All state delegates shall be members of the convention, with all privileges, and shall be entitled to cast votes for their state federation pursuant to Section 6 of this article.

**Retiree Convention Delegates**

**Section 6.** Each chartered organization of retired members may elect one delegate to the AFT convention in the manner prescribed by Sections 1(a) and 1(d) of this article and shall be entitled to one vote at the convention. Such delegates shall be entitled to all rights and privileges of a delegate except that such delegate shall not be entitled to nominate any candidate for federation office or cast a vote in the election of federation officers unless such delegate has been elected to that position by secret-ballot vote.

**Full-Time Staff Restrictions**

**Section 7.** Locals entitled to two delegates may not elect more than one who is a full-time paid elected official of the local. Locals entitled to more than two delegates may not elect more than one-third who are full-time paid elected officials of the local.

**Roll-Call Voting Strength**

**Section 8.** On all roll calls at the convention, each local represented shall be entitled to a number of votes equal to the average membership as defined in Section 3 of this article.

**Distribution of Votes**

The votes of a local shall be distributed as evenly as possible among the delegates present at the time of the voting, but votes shall not be fractioned. All additional votes shall be assigned by lot or by an objective formula that has been previously reported to the secretary-treasurer of the American Federation of Teachers with no delegate getting more than one of the additional votes. In the election of officers and delegates to the AFL-CIO convention, all voting shall be by roll-call vote and each local represented shall be entitled to the average membership as defined in Section 3 of this article.

**Alternates**

**Section 9.** When a delegate leaves the convention, his/her place in the convention may be taken by an alternate, if any has been certified as provided in Article VIII, Section 1, of this constitution and in the order as listed. No other transfer or substitution of voting rights shall be allowed.

# ARTICLE IX
## Revenues

**Militancy/ Defense Fund**

**Section 1.** Twenty-seven cents of each member's per capita shall be set aside for a joint AFT Militancy/Defense Fund. The executive council shall establish clear guidelines and procedures that guarantee that the benefits available through the fund shall be distributed on an equitable basis. Strike benefits shall not be provided unless the strike action is in conformity with the AFT strike policy. An annual financial report of the Militancy/Defense Fund shall be made to the AFT executive council and to the convention, the purpose of which shall be in part to ensure that there is an adequate reserve to pay anticipated strike benefits.

**Publications**

**Section 2.** The payment of the per-capita tax shall entitle each active member to a subscription to the official periodicals of the American Federation of Teachers.

**Members at Large**

**Section 3.** State federations shall pay to the national office, for each member at large, the prevailing per capita tax required for each member of a chartered local.

**Per Capita Reports**

**Section 4.** Effective September 1, 1990, the treasurer of each affiliated local shall fill out and forward to the national office, on or before the 15th day of each month, the report of active members in good standing and retiree members who have retired since the last reporting period. Members in good standing of chartered retiree organizations shall be reported to the national office on or before the 15th day of each month together with mailing addresses, on the first day of that month, together with all taxes and assessments due the American Federation of Teachers. Locals that have once submitted names and addresses of the members shall revise and correct the membership list with each per capita payment. The report shall be subject to an audit by the secretary-treasurer's office.

**Audit**

**Per Capita Delinquency**

**Section 5.** Any affiliated local not paying its per capita tax on or before the 15th of each month shall be notified of the fact by the national office. A local that is more than three months in arrears shall pay interest on all monies owed in excess of three months' per capita. The rate of interest shall be at the rate then paid or payable for borrowed funds by the AFT, unless the executive council by a two-thirds vote shall decide to waive the inter-

**Interest on Arrearage**

<div style="float:left">Appeal</div>

est provision where there is substantial justification. The local shall become suspended from membership and can be reinstated only by a majority vote of the executive council upon payment of arrearages in full. A local that the executive council refuses to reinstate shall have the right to appeal to the next convention.

<div style="float:left">Treasurer's Certification of Membership</div>

**Section 6.** The treasurer of each affiliated local shall report monthly to the national office on forms furnished by the latter for that purpose and shall certify that the report is for the full number of members in good standing in the local.

<div style="float:left">Executive Council's Audit Powers</div>

**Section 7.** The executive council shall have power to employ an auditor to examine the books of any affiliated local or state federation upon the direction of a majority vote of the executive council.

## ARTICLE X
## Amendments

<div style="float:left">Procedure</div>

**Section 1.** Proposed amendments to the constitution may be submitted to the convention either by request of the executive council or the convention or executive council of any state federation or by request of a local. All amendments shall bear the signature of at least two elected officers of the federation introducing the amendment. The officers signing the amendment shall certify that the amendment was approved for submission to the convention by the executive board or membership of the local or by the executive board or convention of the state federation or by the executive council of the AFT.

<div style="float:left">Referendum Vote</div>

**Section 2.** Proposed amendments may be submitted to a referendum vote under the procedure set up in Article XII of this constitution.

<div style="float:left">Time Limitations</div>

**Section 3.** If a proposed amendment is to be submitted to a national convention, it must reach the national office by

March 15 and must be sent by the national office to the locals by April 15.

<div style="float:right">Two-Thirds Vote Requirement</div>

**Section 4.** The constitution shall be amended at the convention by two-thirds (majority) of the votes cast.

## ARTICLE XI
## Affiliation

<div style="float:right">AFL-CIO</div>

**Section 1.** This organization shall immediately affiliate with the American Federation of Labor and Congress of Industrial Organizations and shall permanently maintain that affiliation.

<div style="float:right">State Federation Requirements</div>

**Section 2.** Effective September 1, 1968, each local union of this organization shall maintain affiliation with its state federation, and delegate representation of each local in the state federation shall be no less than the formula delineated in Article VIII, Section 2, of this constitution. Each state federation shall, in its convention, follow all voting procedures as delineated in Article VIII, Section 8, of this constitution.

<div style="float:right">Local and State AFL-CIO Labor Councils</div>

**Section 3.** Effective September 1, 1969, each local union of this organization shall maintain affiliation with its AFL-CIO state labor council and its local AFL-CIO labor council(s) if such council(s) exist. Failure of any local union to maintain the affiliations as required in Sections 2 and 3 of this article shall be grounds for denial of delegate representation at any state or national convention of this organization or other appropriate penalties set by the executive council, except that the executive council may, by a two-thirds vote, waive these requirements for good and sufficient reasons.

<div style="float:right">Per Capita Tax</div>

**Section 4.** The AFT executive council, by majority vote, may require each affiliated local to pay for each member the per capita tax levied by its respective AFL-CIO state central labor body to the AFT on the regular AFT per capita forms. The AFT shall submit payment to each

state AFL-CIO central labor body in accordance with the AFL-CIO constitution.

# ARTICLE XII
## Referenda

**Initiation**

**Section 1.** Proposed actions, including actions of the convention and amendment to the constitution and the bylaws, shall be submitted to a referendum vote by order of the convention or of the executive council or by request of 15 or more locals representing not less than 15 percent of the members then in good standing or by petition signed by not less than 10 percent of the members, except that the executive council shall not order a convention action to be submitted to referendum; provided, however, that in no case shall a referendum be held whose termination date is between June 1 and November 1; and provided that actions taken by the executive council concerning:

(a) actions of the convention involving expenditure of funds;

(b) the employment, re-employment or dismissal of officers, organizers, office employees and other general employees who are appointed and whose salaries or other remuneration are fixed by the executive council;

**Limitations**

(c) the power to interpret and enforce the constitution and to make rules and bylaws not in conflict with the constitution subject to report to succeeding convention for approval, rejection or modification;

(d) the power to appoint committees not inconsistent with the constitution;

(e) the time and place for the meetings of the executive council and the expenses involved therein;

(f) the power to fill vacancies on the executive council; and

(g) the power to investigate locals shall not be the subject of referendum; and further provided, that action taken by the convention under authority of the bylaws, Article VI, governing Nominations and Elections Procedures, shall not be the subject of referendum.

**Time Limit**

**Section 2.** After receipt of order or request for referendum, it shall be the duty of the AFT president to transmit the question to be voted on to the locals within two weeks of its receipt by him/her. Following this, there shall be a period of six weeks during which the proponents and opponents shall be given opportunity to debate the issue through the regular channels of the union, at the end of which time the president shall send to the individual members of all locals in good standing ballots upon which the members shall cast their votes and shall also send to the members at large of the state federations, ballots upon which the members at large of the state federations shall cast their votes.

**Ballot-Counting Procedure**

**Section 3.** The president of the AFT shall rent a postal deposit box. The individual members will mail the ballots to this postal box. The closing date of the referendum shall be 30 days from the date ballots are mailed from the national office. At the end of 30 days, the president, or the president's representative, accompanied by at least two representatives of each side of the issue on the ballot, shall remove the ballots and cause them to be counted. Ballots received after the opening of the postal box will not be counted. In the alternative, the president, with the consent of the executive council, may engage an independent agency to conduct the balloting and to count the votes. In such event, the agency shall count only those ballots received during the 30-day period following the mailing of the ballots to the members.

Ballot
Verification

**Section 4.** The number of the local shall appear on the ballot, and only those ballots of members of locals or of state federations in good standing shall be counted. These votes shall not exceed in number the number of members and members at large for which per capita was last paid prior to the date on which ballots were sent from the national office. Should the number of ballots cast by any local or state federation exceed the number to which that local or state federation is entitled, the "ayes" and "nays" shall be reduced proportionately to come within the required number.

**Section 5.** The president shall notify the locals of the results of the referendum as soon as possible but no later than two weeks following receipt of the count. The president shall also publish the results in the official publications of the American Federation of Teachers.

Referendum
Duration

**Section 6.** AFT policy adopted by referendum shall not be considered by the first convention following the referendum.

## ARTICLE XIII

# Parliamentary Authority

Robert's
Rules

The rules contained in *Robert's Rules of Order Revised* shall govern this federation in all cases to which they are applicable and in which they are not inconsistent with rules regularly adopted by the federation.

# Bylaws

*NOTE: Underlined words indicate new language adopted at the 2006 convention. Strikethroughs indicate deleted language.*

## ARTICLE I

## Special Rules of Order for Conventions

**Program**

**Section 1.** The convention shall be called to order and conducted according to the printed program as prepared by the convention committee and approved by the executive council subject to such modification as the convention may make from time to time.

**Adjournment**

**Section 2.** The convention shall adjourn when the business of the convention has been finished.

**Speech Time Limitations**

**Section 3.** Limitations of speeches in debate shall be three minutes instead of 10 minutes as provided in *Robert's Rules of Order Revised* unless time is extended by majority vote of the convention.

**Roll-Call Vote**

**Section 4.** A motion calling for a roll-call vote shall require a one-fourth vote for adoption. When a roll-call vote has been ordered, the presiding officer shall at once call for the next item on the agenda, action on the pending motion being automatically postponed pending the tabulation of the results of the roll-call vote. No debate, amendment or other motion affecting the question on which the roll-call vote was ordered may be made after a roll call has been ordered. The ballots shall be distributed to the ranking delegates of each delegation under the direction of the presiding officer of the credentials committee. (These ballots shall be prepared in advance by the president.) Each delegate voting shall enter on his/her ballot the number of the roll call, the number of his/her local, his/her full name, the number of votes he/she is casting, how he/she is voting. This record shall be included in the convention proceedings. The ranking delegate shall tabulate the votes of the delegation on a summary sheet and submit the sheet along with the ballots to the credentials committee. If a delegate's ballot is not collected promptly, he/she may deliver his/her ballot directly to the committee on credentials. No vote shall be accepted later than one hour following the ordering of a roll-call vote. The results of the roll-call vote shall be tabulated by the committee on credentials and reported to the convention immediately upon completion of the tabulation according to the following procedure:

(a) the total vote shall be read;

**Vote Challenge**

(b) if any delegate challenges the vote of his/her local, the roll of delegates from that local shall be read, and each delegate shall rise as his/her name is called, announce his/her vote and state the number of votes he/she is casting;

(c) the report on the roll-call vote shall then be revised to agree with the oral vote just taken; and

(d) a copy of the roll-call vote shall be posted showing the vote of each delegate and shall remain posted until the end of the convention.

**Delegate Seating**

**Section 5.** Delegates shall be seated upon acceptance by the convention of the report of the credentials committee, and the list of delegates shall be made available to the members of the convention. The right of any delegate to be seated as a member of the convention shall be subject to challenge within a 24-hour period after he/she has been declared seated by the convention. Delegates may vote unless or until successfully challenged but, in the event of a roll-call vote, a successful challenge invalidates the individual's vote.

**Vote Distribution**

**Section 6.** In the case of locals represented by fewer delegates than the number of votes to which they are entitled, the votes shall be distributed in accordance with the constitutional provision (Article VIII, Section 8), and any remaining votes shall be distributed as determined by the delegation.

**Order of Business**

**Section 7.** The order of business for business sessions of the convention shall be as follows:

(a) report of committee on credentials (credentials committee shall make supplemental reports at the beginning of each business session of the convention);

(b) action on minutes of the previous convention as summarized in the delegate's reports prepared by the convention reporter;

(c) reports of officers and executive employees;

(d) report of executive council;

(e) reports of convention committees;

(f) reports of special committees; and

(g) installation of officers.

**Section 8.** Reports of officers and executive employees given before the seating of delegates shall be referred without debate and without action of the convention to the appropriate committees.

**Quorum**

**Section 9.** A quorum for the conduct of business at a convention shall be 25 percent of the delegates who have been seated.

## ARTICLE II
## Committee on Credentials

**Registration of delegates and visitors.**

**Appointment**

**Section 1.** The committee on credentials shall be appointed by the executive council and shall be notified of their appointment at least two weeks prior to the convention. The committee shall consist of at least five members and shall be responsible for registration of delegates, council members and visitors.

**Registration Procedure**

**Section 2.** Registration of delegates, members of the executive council and visitors shall begin at 1 p.m. on the day preceding the convention. Before the time for registration, the president shall furnish the committee on credentials with copies of the lists of delegations and the duplicates of credentials as reported to him/her by the various locals. Each delegate, member of the executive council and visitor shall be furnished with an appropriate official badge to be worn at the convention.

**Badges**

## ARTICLE III
## Convention Program

**Program Committee**

**Section 1.** The committee on convention program shall be appointed by the executive council. This committee shall prepare the tentative program of the next convention and shall submit it to the president. The president shall send a copy of the tentative program to each delegate as soon thereafter as possible.

**Reports**

**Section 2.** The convention program shall provide for business sessions, including one for nominations.

# ARTICLE IV

## General Convention Procedure

**Time and Place**

**Section 1.** The convention shall convene during the months of July and/or August at the time and place determined by the executive council.

**Speech Duplication**

**Section 2.** In case any motion is passed that any convention address be reproduced, the maker and seconder of the motion shall constitute a committee to secure the address in printable form and to submit it to the president.

**Convention Floor Admission**

**Section 3.** Only credentialed delegates and members of the executive council shall be admitted to the convention floor except invited guests participating in the program of the convention. All visitors shall secure a pass from the credentials committee and shall be seated only in a special section reserved for them.

**Resolution Procedure**

**Section 4.** Resolutions to the convention may be introduced by locals, state federations or the executive council of the American Federation of Teachers. No resolution shall be introduced later than six weeks prior to the opening of the convention except by two-thirds vote of the convention. All resolutions shall bear the signature of at least two elected officers of the federation introducing the resolution. The officers signing the resolution shall certify that the resolution was approved for submission to the convention by the executive board or membership of the local or by the executive board or convention of the state federation or by the executive council of the American Federation of Teachers. The resolution shall contain the title and shall be submitted to the president of the American Federation of Teachers in typewritten form, in quadruplicate. Resolutions so submitted shall be mailed from the AFT national office to locals and state federations prior to the convention.

**Sergeants at Arms**

**Section 5.** The president or presiding officer of the convention shall appoint an appropriate number of ushers whose duty it shall be to see that only persons entitled to admission shall be admitted to the convention hall. The ushers shall see that visitors are seated in the section assigned to them. They shall assist the presiding officer in such other ways as may be directed.

**Priority of Constitutional Amendments Committee**

**Section 6.** The constitutional amendments committee shall be heard in full prior to other committee reports. The constitutional amendments committee shall report only the proposed amendments that it recommends for adoption, with or without amendments. At the conclusion or immediately after the conclusion of the committee's full report, any delegate may move adoption of a proposed amendment not recommended by the committee. The chair shall allow one statement for the proposed amendment and one statement against the proposed amendment. The chair shall then immediately put the question of whether the convention desires to debate the proposed amendment. If this motion prevails by a one-third vote, the proposed amendment shall be before the convention.

**Debate**

**Section 7.** Each other committee shall select the three resolutions or items of business it considers most important for its initial report. When these have been acted upon or at the end of an hour, of each committee's partial report, whichever comes first, debate shall be closed and all pending questions shall be put to a vote immediately unless the time of debate is extended by majority vote of the convention. After all committees have had an opportunity to make their first reports, additional committee reports may be made in the order selected by the president.

**Committee Reporting**

**Section 8.** Resolutions upon which no action has been taken shall die when the convention adjourns.

**Section 9.** A copy of the rules should be provided for delegates and visitors upon convention registration and should be voted on at the opening session on the first day of the convention.

## ARTICLE V

## Convention Committees

**Section 1.** Convention committees shall be appointed by the executive council. In appointing such committees, the council shall give consideration to the expressed choices of delegates as indicated on the committee choice cards, which shall be sent by the president to each delegate promptly upon receipt of credentials. However, the council shall not be bound by the choice cards but shall give equal weight and consideration to service on standing committees and to the proper balancing of committees. Members of standing committees who are delegates shall be appointed to the corresponding convention committees so far as feasible in order to coordinate the work of convention and standing committees.

**Section 2.** A delegate interested in a specific problem of a resolution shall have an opportunity to present his/her viewpoint to the appropriate committee at a time designated by the committee chair.

**Section 3.** Changes in assignments of delegates to committees shall be made only by a committee of the executive council upon application. Such application shall include a written statement of the reason for desiring the change. No change shall be made after 5 p.m. on the first day of the convention.

**Section 4.** Reports of convention committees shall be received at the time designated in the printed program or as designated by the convention. Reports shall be made in the order assigned by the chair of the convention committee and the president who shall make such assignments upon application by the chair of committees except as the convention may desire to receive reports in a different order.

**Section 5.** Debate in committees may be limited by a two-thirds vote of the committee.

## ARTICLE VI

## Nominations and Election Procedures

**Section 1.** All nominations of officers shall be by petition signed by at least 50 delegates and presented to the secretary-treasurer no later than 8 a.m. on the third day of the convention. Declination of nominations shall be made prior to 8:30 a.m. on the same day. Candidates shall be introduced to the convention between 8:30 a.m. and 10 a.m. on the same day with the option of making a two-minute speech of acceptance. Candidates for president, secretary-treasurer and executive vice president shall be allotted five minutes for their acceptance speeches and remaining time allotted equally among vice-presidential candidates with the option of pooling their time. Nominations of delegates to the AFL-CIO convention will be made at the AFT convention that immediately precedes the AFL-CIO convention; nominations shall be by petition signed by at least 50 delegates and presented to the secretary-treasurer no later than 8 a.m. on the third day of the convention. Declination of nominations for delegate shall be made prior to 8:30 a.m. on the same day. Furthermore, candidates for delegate to the AFL-CIO convention shall be allotted two minutes for their speech with the option of pooling their time. No other business shall be conducted during this time.

**Section 2.**  Balloting for election of officers shall take place from 4:30 p.m. until 7:30 p.m. of the third day of the convention under the supervision of the elections committee.  No other official business of the convention shall be conducted during balloting.  Only delegates who are seated by 5 p.m. of the second day of the convention may vote in the election.

**Section 3.**  A majority of the votes cast for the offices of the president, the secretary-treasurer and the executive vice president shall be required to elect the president, the secretary-treasurer and the executive vice president.  In the event that no candidates for the positions of president, the secretary-treasurer or executive vice president receive a majority, a runoff election between the two candidates receiving the highest number of votes shall be conducted by roll-call vote.

**Section 4.**  Vice presidential candidates receiving the highest number of votes corresponding to the number of positions to be filled shall be declared elected subject to the provision of Article V, Section 1, of this constitution.  In the event that there is a tie for the final positions, a runoff election for that position between the tied candidates shall be conducted by roll-call vote.

## ARTICLE VII

### Standing Committees

**Section 1.**  The standing committees shall be established and appointed by the executive council not later than the midyear meeting of the council each year.  The presiding officer and as many members of standing committees as possible shall be appointed at the postconvention meeting of the council.

**Section 2.**  As a matter of policy, the executive council shall endeavor to maintain continuity of personnel of standing committees.

**Section 3.**  Each standing committee shall make a written report for submission to the appropriate convention committee.

**Section 4.**  In addition to the standing committees established and appointed by the executive council, there shall be a standing committee on civil and human rights.  The executive council shall appoint the chair and other members of the committee, which shall perform the following functions:

(a) recommend strategies for encouraging and coordinating local and regional conferences on civil and human rights in education, and work with locals to help establish effective local committees on civil and human rights;

(b) identify resource materials on African-Americans and other minorities and recommend the development of such materials for use by educators;

(c) recommend strategies for identifying, supporting, actively recruiting and retaining minority teachers and other employees; and

(d) conduct a national conference on civil and human rights.

The committee shall submit a report on its activities to the convention, and a copy shall be sent to each local.

## ARTICLE VIII

### Per Capita, Budget and Audits

**Section 1.** (a)  Effective September 1, ~~2004~~ 2006, each local shall pay a per-capita tax of ~~$12.75~~ $13.95 per month.  Effective September 1, ~~2005~~ 2007, each local shall pay a per capita tax of ~~$13.20~~ $14.70 per month.  The national office

---

**President, Secretary-Treasurer & Executive Vice President Vote Requirement**

**Vice-Presidential Vote Requirement**

**Appointment**

**Continuity**

**Written Reports**

**Committee on Civil and Human Rights**

**Recommend Strategies**

**Identify Resources**

**Retain Minority Teachers and Other Employees**

**Per Capita Tax**

shall pay back to the office of each state federation for each member of the state a per capita of 20 cents per month.

Agency Fees

**Section 1.** (b) Where a local receives fees from nonmembers for representing them under an agency shop agreement, it shall pay to the national office a sum equal to the per capita tax for all such nonmembers and shall also pay to the state federation of teachers a sum equal to the per capita of the state federation for all such nonmembers. Effective September 1, 1977, each affiliated local that has members within a unit where the bargaining rights have been won by another organization and where the other organization has obtained an agency shop or fair-share clause in the contract, the local shall pay per capita tax at one-fourth the regular rate on those members required to pay agency or fair-share fees to another organization. Representation at the American Federation of Teachers or the state convention shall also be computed at one-fourth the constitutional formula for apportionment of delegate and voting strength. Locals whose members pay agency or fair-share fees to another organization may elect to pay full per capita for such members and receive full representation.

State Rebate

Procedure for Objections to Agency Fees

**Section 1.** (c) Any local that receives service or fair-share payments in lieu of dues from employee(s) represented by the local shall adopt procedures for such employee(s) to object during a specific time period each year to the expenditure of his/her portion of such payments for certain purposes. Such procedures shall provide that employee(s) may object to expenditure of his/her portion of such payments for activities or causes of a political nature only incidentally related to collective bargaining. Employee(s) may object to the expenditure of his/her portion of such payments for activities or causes involving controversial issues of public importance only incidentally related to collective bargaining. Employee(s) may not object to expenditures of his/her portion of such payments used for collective bargaining in-

cluding, but not limited to, negotiating, organizing, servicing, educational research and union administration. That portion of such fees spent by the union, local, state and national level for the above-described purposes will be determined in each fiscal year by the respective chief fiscal policymaking body, and rebate of a prorated portion of his/her service or fair-share fees corresponding to such proration shall be made to each individual who has filed a timely notice of objection each year.

**Section 1.** (d) The procedures adopted shall provide for the right to object during a specific time by registered/certified mail and for the determination of appropriate portions of money spent for purposes described in Section 1(b) and (c). The employee(s) shall have rights of appeal internally and, if not satisfied, shall have the right to appeal to an independent, outside review panel whose decision shall be final and binding.

Time Limitations

Appeal

In the event that service or fair-share fees are established through procedures of state law in such a way as to meet the above objections, then Section 1(c) and 1(d) shall not apply.

State Laws

**Section 2.** The budget shall be prepared and adopted annually by the executive council and shall be subject to subsequent revision when needed.

Budget

**Section 3.** It shall be the responsibility of the executive council to cause the auditing of the financial records of the organization annually and to submit said audits to each convention.

Audit

**Section 4.** Ten cents of each member's per capita tax shall be set aside each month in a building fund to finance the purchase of an AFT building. The fund shall continue until such time as the purchase has been completed and any additional financial costs of the building not covered by income from the building have been met.

Building Fund

Per Capita
Tax Changes

**Section 5.** Proposed changes in per capita must be sent to the national office by March 15 and must be sent by the national office to the locals by April 15.

Funding for
Albert
Shanker
Institute

**Section 6.** Five cents of each member's per capita tax shall be set aside each month for the Albert Shanker Institute, a tax-exempt organization recognized under §501(c)(3) of the Internal Revenue Service Code.

Solidarity
Fund

**Section 7.** Effective September 1, 2006, ~~Sixty-seven~~ 80 cents and effective September 1, 2007, $1 of each member's per capita tax shall be set aside each month in a special fund that will function to assist the AFT and its affiliates in participating in legislative and political activities with significant potential impact on members of the AFT and the institutions where they work. Such assistance shall be collected and utilized in accordance with the provisions of applicable state and federal law. The executive council will adopt guidelines to implement this provision, including the development of criteria and an application for assistance. Where a state affiliate has a fund that is approved by the AFT and similar to the Solidarity Fund, in that it functions to assist the affiliate in participating in legislative and political activities with significant potential impact on the members and the institutions where they work, then the AFT will pay ~~25 cents~~ effective September 1, 2006, 30 cents and effective September 1, 2007, the AFT will pay 40 cents per member per month to be deposited in such similar state fund.

## ARTICLE IX
## Affiliate Audit and Financial Review Requirements

Affiliate
Audits

**Section 1.** Effective January 1, 2005, AFT affiliates with 1,000 or more members, excluding retirees, are required to submit to the AFT annually, and within six months of the close of the affiliate's fiscal year, an audit of its financial statements—in accordance with generally accepted auditing standards—by an independent CPA whose firm does not have responsibility for the affiliate's regular bookkeeping or for preparation of its routine financial statements. The audit must be prepared in accordance with generally accepted accounting principles. Appended to the audit submission must be a letter signed by the affiliate's principal officer and the auditor certifying that the audit has been presented at a specified regular or special meeting of the affiliate's governing body and published and made available to the members.

Audit
Guidelines

**Section 2.** Effective January 1, 2005, AFT affiliates with fewer than 1,000 members, excluding retirees, are required to submit to the AFT annually, and within six months of the close of the affiliate's fiscal year, an audit of its financial statements by an independent CPA in accordance with generally accepted auditing standards, or a financial review of the affiliate's financial statements conducted by an internal audit committee in accordance with AFT guidelines for audit committees. Appended to the audit or financial review must be a signed certification by the affiliate's principal officer that the current audit or financial review has been presented at a specified regular or special meeting of the affiliate's governing body and published and made available to the members.

Late
Audits

**Section 3.** Where a required audit or financial review has not been performed and received by the AFT within six months of the close of an affiliate's fiscal year, the AFT president is authorized to have the applicable audit or financial review, pursuant to Section 1 or 2 of this Article, conducted at the affiliate's expense. Such a review will include an examination of the financial records and a reporting of the results to the membership of the affiliate and to the AFT executive council.

# ARTICLE X

## Good Standing

Requirements for Good Standing

**Section 1.** To be in good standing in the AFT, affiliates must meet the following requirements:

(a) payment of per capita to the AFT on all members, with arrears not to exceed two months, and to the applicable state federation consistent with its constitution;

(b) current in submission of the affiliate's annual audit or financial review in keeping with Sections 1 and 2 of Article IX of the AFT bylaws;

(c) current in submission to the AFT of names and addresses for the principal executive and financial officers;

(d) current in submission to the AFT of the names and addresses of current members of the affiliate's executive board;

(e) current in submission of a membership roster; and

(f) current in submission of a copy of the affiliate's up-to-date constitution.

**Section 2.** Only affiliates in good standing shall be eligible for:

(a) representation at the AFT convention;. In order to satisfy such good-standing requirements and in addition to the deadlines otherwise set forth in the AFT constitution and bylaws, each affiliate must provide the AFT with the information required in paragraphs 1(b)-(f) above no later than 30 days prior to the opening date of the convention.

(b) participation in the AFT Occupational Liability program;

(c) coverage under the AFT Militancy/Defense Fund; and

(d) participation in programs that include staff and financial assistance from the AFT.

# ARTICLE XI

## Suspension of Rules and Amendment of Bylaws

Suspension of Bylaws

**Section 1.** The special rules of order contained in Article I of these bylaws may be suspended by a two-thirds vote in the same manner as provided by *Robert's Rules of Order Revised* for the suspension of all regular rules of order.

Amendment of Bylaws

**Section 2.** The bylaws may be amended by the same procedure as in Article X, Sections 1 through 3, of the constitution. All such amendments shall require a majority vote for their adoption, except those relating to bylaws, which themselves require more than a majority vote, in which case the same vote shall be required to adopt the amendment as required by the bylaws to be amended.

# AMERICAN FEDERATION OF TEACHERS
## TABLE OF ORGANIZATION



# INDEX

*NOTE: Bylaw articles are indicated by (B) directly following article number.*

| | Article | Section | Page |
|---|---|---|---|
| **ACTING PRESIDENT** | VI | 3 | 7 |
| **ADJOURNMENT,** | | | |
| OF CONVENTION | I(B) | 2 | 18 |
| **ADMINISTRATORSHIP** | VI | 15 | 9 |
| Emergency | VI | 15 | 10 |
| Process | VI | 15 | 9 |
| **AFFILIATION** | XI | | 15 |
| With AFL-CIO | XI | 1 | 15 |
| With state federations | XI | 2 | 15 |
| With AFL-CIO local and state labor councils | XI | 3 | 15 |
| **AFL-CIO** | | | |
| Affiliation with | XI | 1 | 15 |
| Convention, delegates to | V | 7 | 7 |
| Local and state labor councils | XI | 3 | 15 |
| **AFT HEALTHCARE** | I | | 1 |
| | II | 1,4,5 | 1 |
| | III | 1,5 | 2 |
| **AFT HIGHER EDUCATION** | I | | 1 |
| | II | 1,4 | 1 |
| | III | 1,5 | 2 |
| **AFT PARAPROFESSIONALS** | I | | 1 |
| | II | 1,4,7 | 1,2 |
| | III | 1,5 | 2 |
| **AFT PUBLIC EMPLOYEES** | I | | 1 |
| | II | 1,4,6 | 1 |
| **AGENCY FEES** | VIII(B) | 1(b) | 23 |
| Delegate strength | VIII | 4 | 13 |
| Internal appeals | VIII(B) | 1(d) | 23 |
| Procedure for objections to | VIII(B) | 1(c) | 23 |
| **ALTERNATES** | VIII | 1(c) | 12 |
| | VIII | 9 | 14 |
| **AMENDMENTS** | X | | 15 |
| Submission of | X | 1 | 15 |
| Time limitations | X | 3 | 15 |
| To bylaws | XI(B) | 2 | 25 |
| Vote requirements | X | 4 | 15 |
| **ANTI-DISCRIMINATION,** | | | |
| MEMBERSHIP | III | 11 | 3 |
| Bias, opposition to | II | 10 | 2 |
| In charters | IV | 10 | 5 |
| Standing committee on civil and human rights | VII(B) | 4 | 22 |
| **APPEALS** | | | |
| Of agency fees | VIII(B) | 1(d) | 23 |
| Of decisions of executive council | IV | 12B(9) | 6 |
| | VI | 10 | 8 |
| | VI | 14(a)(i) | 8 |
| Of refusal to reinstate local | IX | 5 | 15 |
| Of suspensions | IV | 8 | 8 |
| **ASSOCIATE** | | | |
| MEMBERSHIP | III | 9 | 3 |
| **AT-LARGE** | | | |
| MEMBERSHIP | III | 4 | 2 |
| Per capita payments for | IX | 3 | 14 |
| **AUDIT** | | | |
| Affiliate audits | IX(B) | 1 | 24 |
| Audit guidelines | IX(B) | 2 | 24 |
| Late audits | IX(B) | 3 | 24 |
| Responsibility for | VIII(B) | 3 | 23 |
| **AUDITORS, HIRING OF** | IX | 7 | 15 |
| **BADGES, CONVENTION** | II(B) | 2 | 19 |
| **BALLOTS (FOR ELECTIONS)** | VI(B) | 2 | 22 |
| **BALLOTS (FOR REFERENDUM)** | XII | 2 | 16 |
| Counting procedure | XII | 3 | 16 |
| Verification | XII | 4 | 17 |
| **BARGAINING RIGHTS** | II | 1 | 1 |
| **BENEFITS, STRIKE** | IX | 1 | 14 |
| **BIAS, OPPOSITION TO** | II | 10 | 2 |
| | III | 11 | 3 |
| **BUILDING FUND** | VIII(B) | 4 | 23 |
| **BUSINESS SESSIONS,** | | | |
| CONVENTION | III(B) | 2 | 20 |
| **BYLAWS** | | | 18 |
| Amendment to | XI(B) | 2 | 25 |
| Suspension of | XI(B) | 1 | 25 |
| **CERTIFICATION OF MEMBERSHIP,** | | | |
| TREASURER'S | IX | 6 | 15 |
| **CHALLENGE, OF ROLL-** | | | |
| CALL VOTE | I(B) | 4(b) | 18 |
| **CHARTERS,** | | | |
| ELIGIBILITY | III | 5 | 2 |
| Anti-discrimination | IV | 10 | 5 |
| Education workers | IV | 12B(7) | 6 |
| Emergency administratorship | VI | 15(c) | 10 |
| Healthcare employees | III | 5 | 2 |
| Local | IV | 1 | 4 |
| Nonpublic | IV | 2 | 4 |
| State | IV | 3 | 4 |
| Suspension of | IV | 8 | 5 |
| **CLASS OF MEMBERSHIP** | III | 6 | 2 |

|  | Article | Section | Page |
|---|---|---|---|
| **COLLEGE TEACHERS, INDIVIDUAL** | | | |
| MEMBERSHIP | III | 8 | 3 |
| **COMMITTEE ON CIVIL AND** | | | |
| HUMAN RIGHTS | VII(B) | 4 | 22 |
| **COMMITTEES,** | | | |
| CONVENTION | V(B) | | 21 |
| Appointment of | V(B) | 1 | 21 |
| Assignment changes | V(B) | 3 | 21 |
| Choice of | V(B) | 2 | 21 |
| Credentials | II(B) | | 19 |
| Program | III(B) | 1 | 19 |
| Reporting procedure | IV(B) | 7 | 20 |
| Reports from | V(B) | 4 | 21 |
| **COMMITTEES,** | | | |
| STANDING | VII(B) | | 22 |
| Appointment | VII(B) | 1 | 22 |
| Civil and Human Rights | VII(B) | 4 | 22 |
| Continuity | VII(B) | 2 | 22 |
| Reports | VII(B) | 3 | 22 |
| **CONSTITUTIONAL AMENDMENTS** | | | |
| COMMITTEE | IV(B) | 6 | 20 |
| **CONSTITUTION, ENFORCEMENT** | | | |
| **AND INTERPRETATION OF** | | | |
| | VI | 10 | 8 |
| **CONSTITUTIONS,** | | | |
| STATE AND LOCAL | IV | 5 | 4 |
| **CONVENTION, AFL-CIO** | V | 7 | 7 |
| **CONVENTION, AFT** | | | |
| Adjournment | I(B) | 2 | 18 |
| Appeals to | IX | 5 | 15 |
| Badges | II(B) | 2 | 19 |
| Biennial | VII | 1 | 11 |
| Business sessions | III(B) | 2 | 20 |
| Committee reporting | IV(B) | 7 | 20 |
| Committees | V(B) | | 21 |
| Constitutional | | | |
| amendments priority | IV(B) | 6 | 20 |
| Delegate seating | I(B) | 5 | 19 |
| Executive council, | | | |
| delegates to | VII | 3 | 11 |
| Floor admission | IV(B) | 3 | 20 |
| General procedure | IV(B) | | 20 |
| Mandates of | VI | 1 | 7 |
| Nominations and | | | |
| Election Procedures | VI(B) | | 21 |
| Order of business | I(B) | 7 | 19 |
| Program | I(B) | 1 | 18 |
| Quorum | I(B) | 9 | 19 |
| Reports to | I(B) | 8 | 19 |
| Resolutions duration | IV(B) | 8 | 21 |
| Retirees | VIII | 6 | 13 |
| Roll-call votes | I(B) | 4 | 18 |
| Rules adoption | IV(B) | 9 | 21 |
| Sergeants-at-arms | IV(B) | 5 | 20 |
| Special conventions | VII | 2 | 11 |
| Special rules of | | | |
| order for | I(B) | | 18 |
| Speech time limitations | I(B) | 3 | 18 |
| Time and place | VII | 1 | 11 |
| **COUNCILS, PROGRAM** | | | |
| **AND POLICY** | III | 2 | 2 |
| **COUNCILS OF LOCALS** | VIII | 1(b) | 12 |
| Regional | VI | 18(a) | 11 |
| **CREDENTIALS COMMITTEE** | II(B) | | 19 |
| Appointment | II(B) | 1 | 19 |
| Registration Procedures | II(B) | 2 | 19 |
| **DEBATE, CONVENTION** | V(B) | 5 | 21 |
| | IV(B) | 6 | 20 |
| **DEFENSE FUND** | IX | 1 | 14 |
| **DELEGATE STRENGTH** | VIII | 4 | 13 |
| Agency fees | VIII | 4 | 13 |
| **DELEGATES** | | | |
| Allocation of | VIII | 2 | 13 |
| Councils of locals | VIII | 1(b) | 12 |
| Election of | VIII | 1(a) | 11 |
| From state federations | VIII | 1(c) | 12 |
| | VIII | 5 | 13 |
| Lists of | VIII | 1(d) | 12 |
| Registration of | II(B) | 2 | 19 |
| Retiree | VIII | 6 | 13 |
| Seating of | VIII | 1(e) | 13 |
| | I(B) | 5 | 19 |
| **DELINQUENCY,** | | | |
| **PER CAPITA** | IX | 5 | 14 |
| **DEMOCRACY,** | | | |
| **SUPPORT OF** | II | 11 | 2 |
| **DEMOCRATIC RIGHTS OF MEMBERS,** | | | |
| **RESTORING THE** | VI | 15(a)(i) | 9 |
| Administrator power | VI | 15(d) | 10 |
| Administratorship Process | VI | 15(b) | 9 |
| Grounds | VI | 15(a) | 9 |
| Limitation of Liability | VI | 15(f) | 10 |
| Termination of | | | |
| Administratorship | VI | 15(e) | 10 |
| Emergency | | | |
| Administratorship | VI | 15(c) | 10 |
| **DISABILITY** | III | 11 | 3 |
| **DISBANDING OF LOCAL** | IV | 9 | 5 |
| **DIVISIONS** | III | 1 | 2 |
| **DUES** | | | |
| Dues determination | III | 9 | 3 |
| Interest on arrearage | IX | 5 | 14 |
| Pass-through | IV | 6 | 5 |
| **DUPLICATE** | | | |
| **MEMBERSHIP** | IV | 12B(6) | 6 |
| **EDUCATIONAL WORKERS,** | | | |
| **CHARTER OF** | IV | 12B(7) | 6 |
| **ELECTIONS** | VI(B) | | 21 |
| Time | VI(B) | 2 | 22 |
| Of local/retiree delegates | VIII | 1(a) | 11 |
| Of state federation | | | |
| delegates | VIII | 1(c) | 12 |
| Of officers | V | 1 | 6 |
| | VI(B) | 2 | 22 |
| Of locals | IV | 5 | 4 |
| **EQUAL EDUCATIONAL OPPORTUNITY** | | | |
| **(PROMOTION OF)** | II | 8 | 2 |
| **EXECUTIVE COUNCIL** | V | 1 | 6 |
| Acceptance of gifts | VI | 16 | 10 |
| Additional representation | VI | 8 | 8 |

| | Article | Section | Page |
|---|---|---|---|
| Appointment of convention committees | V(B) | 1 | 21 |
| Appointment of credentials committee | II(B) | 1 | 19 |
| Audit powers | IX | 7 | 15 |
| Authority | VI | 13 | 8 |
| Committees | VI | 11 | 8 |
| Duties of | VI | 1,2,6,7,9 | 7,8 |
| Meetings | VI | 12 | 8 |
| Powers | VI | | 7 |
| Restoring democratic rights | VI | 15(a)(i) | 9 |
| Rulings of | IV | 12B(8) | 6 |
| Staffing | VI | 4,5,7 | 7,8 |

**EXECUTIVE VICE PRESIDENT**

| | Article | Section | Page |
|---|---|---|---|
| | V | 1,4 | 6,7 |
| | VI(B) | 3 | 22 |
| | VI | 5,6 | 7 |

| | Article | Section | Page |
|---|---|---|---|
| **FAIR-SHARE FEES** | VIII(B) | 1(b) | 23 |
| Delegate strength | VIII | 4 | 13 |
| Procedure for objections to | VIII(B) | 1(c) | 23 |
| Internal appeals | VIII(B) | 1(d) | 23 |

| | Article | Section | Page |
|---|---|---|---|
| **FINANCIAL STATEMENT, LOCAL** | IX | 4 | 14 |

| | Article | Section | Page |
|---|---|---|---|
| **FULL-TIME STAFF RESTRICTIONS** | VIII | 7 | 14 |

| | Article | Section | Page |
|---|---|---|---|
| **FUND, MILITANCY/DEFENSE** | IX | 1 | 14 |

| | Article | Section | Page |
|---|---|---|---|
| **GEOGRAPHIC JURISDICTION** | IV | 12B | 5 |

| | Article | Section | Page |
|---|---|---|---|
| **GOOD STANDING** | X | | 25 |

| | Article | Section | Page |
|---|---|---|---|
| **GIFTS** | VI | 16 | 10 |

| | Article | Section | Page |
|---|---|---|---|
| **HEALTHCARE RESOURCES** | II | 9 | 2 |

| | Article | Section | Page |
|---|---|---|---|
| **HEALTH PROFESSIONALS** | II | 5 | 1 |
| | III | 5 | 2 |

| | Article | Section | Page |
|---|---|---|---|
| **HEALTHCARE, AFT** | I | | 1 |

| | Article | Section | Page |
|---|---|---|---|
| **HIGHER EDUCATION, AFT** | II | 1,4 | 1 |
| | III | 1,5 | 2 |

| | Article | Section | Page |
|---|---|---|---|
| **IN-SERVICE TRAINING** | II | 4 | 1 |

| | Article | Section | Page |
|---|---|---|---|
| **INVESTIGATIONS, STATE AND LOCAL** | VI | 14(a,b) | 8 |
| Determination | VI | 14(c) | 9 |
| Grounds | VI | 15(a) | 9 |

| | Article | Section | Page |
|---|---|---|---|
| **JURISDICTION** | III | 1,4 | 2 |
| Geographic | IV | 12B | 5 |
| Multi-employer | IV | 12B(2) | 6 |
| Of locals | IV | 12A | 5 |
| Rules for | IV | 12B | 5 |

| | Article | Section | Page |
|---|---|---|---|
| **LAID-OFF EMPLOYEES, MEMBERSHIP CLASS** | III | 6(c) | 3 |

| | Article | Section | Page |
|---|---|---|---|
| **LOCAL, CHARTERS** | IV | 1 | 4 |
| Disbanding | IV | 9 | 5 |
| Financial statement of | IX | 3 | 13 |
| Geographic jurisdiction | IV | 12B | 5 |
| Investigation of | VI | 14(a) | 8 |

| | Article | Section | Page |
|---|---|---|---|
| **MEETINGS, EXECUTIVE COUNCIL** | VI | 12 | 8 |

| | Article | Section | Page |
|---|---|---|---|
| **MEETINGS, LOCAL** | IV | 5 | 4 |

| | Article | Section | Page |
|---|---|---|---|
| **MEMBER AT LARGE** | III | 4 | 2 |
| Per capita payments for | IX | 3 | 13 |
| Restrictions | IV | 12B(4) | 6 |

| | Article | Section | Page |
|---|---|---|---|
| **MEMBERSHIP, QUALIFICATIONS** | III | 3,4 | 2 |
| Classes of | III | 6 | 2 |
| Determining average | VIII | 3 | 13 |
| Eligibility | III | 4 | 2 |
| Healthcare employees | III | 1 | 2 |
| Individual college teachers | III | 8 | 3 |
| Minimum number | IV | 7 | 5 |
| Student-Teachers | III | 7 | 3 |
| Supervisors | III | 12 | 4 |
| Treasurer's certification of | IX | 6 | 15 |

| | Article | Section | Page |
|---|---|---|---|
| **MILITANCY/DEFENSE FUND** | IX | 1 | 14 |

| | Article | Section | Page |
|---|---|---|---|
| **NAME (OFFICIAL)** | I | | 1 |

| | Article | Section | Page |
|---|---|---|---|
| **NOMINATIONS, CONVENTION** | III(B) | 2 | 20 |
| Procedures | VI(B) | 1 | 20 |
| Speech limitation | VI(B) | 1 | 20 |

| | Article | Section | Page |
|---|---|---|---|
| **NONPAYMENT, PER CAPITA** | IX | 5 | 14 |

| | Article | Section | Page |
|---|---|---|---|
| **NONPUBLIC CHARTERS** | IV | 2 | 4 |

| | Article | Section | Page |
|---|---|---|---|
| **NURSES** | II | 5 | 1 |
| | III | 5 | 2 |

| | Article | Section | Page |
|---|---|---|---|
| **OFFICERS** | V | | 6 |
| Eligibility | V | 5 | 7 |

| | Article | Section | Page |
|---|---|---|---|
| **ORDER OF BUSINESS, CONVENTION** | I(B) | 7 | 19 |

| | Article | Section | Page |
|---|---|---|---|
| **PARAPROFESSIONALS, AFT** | I | | 1 |
| | II | 1,4,7 | 1,2 |
| | III | 1,5 | 2 |

| | Article | Section | Page |
|---|---|---|---|
| **PARLIAMENTARY AUTHORITY** | XIII | | 17 |

| | Article | Section | Page |
|---|---|---|---|
| **PASS-THROUGH** | IV | 6 | 5 |

| | Article | Section | Page |
|---|---|---|---|
| **PER CAPITA** | VIII(B) | | 22 |
| Agency fees | VIII(B) | 1(b) | 23 |
| Changes in | VIII(B) | 5 | 24 |
| Defense fund | IX | 1 | 14 |
| Delinquency | IX | 5 | 14 |
| Entitlements | IX | 2 | 14 |
| Militancy/Defense fund | IX | 1 | 14 |
| Qualifications for representation | VIII | 1(f) | 13 |
| Reports | IX | 4 | 14 |

| | Article | Section | Page |
|---|---|---|---|
| **POLICY COUNCILS, PROGRAM AND** | III | 2 | 2 |

| | Article | Section | Page |
|---|---|---|---|
| **POSTING ROLL-CALL VOTE** | I(B) | 4(d) | 19 |

|  | Article | Section | Page |
|---|---|---|---|
| **POWERS OF EXECUTIVE** | | | |
| **COUNCIL** ..........................VI | | | 7 |
| **PRESIDENT, AFT** | | | |
| Duties.................................V | 2 | | 6 |
| Election of.........................V | 1 | | 6 |
| Vacancy of ........................VI | 3 | | 7 |
| Salary of .............................VI | 6 | | 7 |
| **PRESIDENT, EXECUTIVE VICE PRESIDENT** | | | |
| **AND SECRETARY-TREASURER** | | | |
| **VOTE REQUIREMENT...... VI(B)** | 3 | | 22 |
| **PROFESSIONAL** | | | |
| **SERVICE** ..............................II | 4 | | 1 |
| **PROFESSIONAL STANDARDS,** | | | |
| **IMPROVEMENT OF** .......... II | 4 | | 1 |
| **PROGRAM,** | | | |
| **CONVENTION**.................... I(B) | 1 | | 18 |
| Program Committee .........III(B) | 1 | | 19 |
| **PROGRAM AND** | | | |
| **POLICY COUNCILS** .......... III | 2 | | 2 |
| **PUBLICATIONS,** | | | |
| **RIGHT TO**..........................IX | 2 | | 14 |
| **PUBLIC EMPLOYEES, AFT**....... I | | | 1 |
| | II | 1,4,6 | 1 |
| **QUORUM, AT** | | | |
| **CONVENTION**.................... I(B) | 9 | | 19 |
| **REFERENDA**..............................XII | | | 16 |
| Ballot-counting | | | |
| procedure .........................XII | 3 | | 16 |
| Ballot verification...............XII | 4 | | 17 |
| Duration ............................XII | 6 | | 17 |
| Initiation ...........................XII | 1 | | 16 |
| Limitations ........................XII | 1(c-g) | | 16 |
| Notification of results........XII | 5 | | 17 |
| Time limit ..........................XII | 2 | | 16 |
| **REGIONAL COUNCIL**................ VI | 18(a) | | 11 |
| **REGISTRATION OF** | | | |
| **DELEGATES** ....................... II(B) | 2 | | 19 |
| **REGISTRATION OF** | | | |
| **VISITORS**.............................II(B) | 2 | | 19 |
| **REINSTATEMENT OF** | | | |
| **LOCALS**................................IX | 5 | | 15 |
| **RELATIONSHIP, LOCAL** | | | |
| **AND STATE** ........................ II | 2 | | 1 |
| **REPORTS, PER CAPITA** ........... IX | 4 | | 14 |
| **REPORTS, OF OFFICERS AND EXECUTIVE** | | | |
| **EMPLOYEES** ........................ I(B) | 8 | | 19 |
| **REPRESENTATION** .................. VIII | | | 11 |
| Local eligibility....................VIII | 3(a) | | 13 |
| Per capita qualifications.... VIII | 1(f) | | 13 |
| **RESOLUTIONS,** | | | |
| **CONVENTION**....................IV(B) | 4 | | 20 |
| Duration of .........................IV(B) | 8 | | 21 |

| | Article | Section | Page |
|---|---|---|---|
| Time limit for | | | |
| submission.........................IV(B) | 4 | | 20 |
| **RETIREES, ORGANIZE** ..............II | 12 | | 2 |
| Dues determination............III | 9 | | 3 |
| Membership, class of.........III | 10 | | 3 |
| **REVENUES**................................IX | | | 14 |
| Per capita ...........................VIII(B) | 1(a) | | 22 |
| **RIGHTS, TEACHER AND OTHER** | | | |
| **WORKERS**............................II | 3 | | 1 |
| **ROBERT'S RULES OF ORDER—** | | | |
| **REVISED** ............................XIII | | | 17 |
| | XI(B) | 1 | 25 |
| **ROLL-CALL VOTE** .....................I(B) | 4 | | 18 |
| Challenge ...........................I(B) | 4(b) | | 18 |
| Posting................................I(B) | 4(d) | | 19 |
| Tabulation ..........................I(B) | 4 | | 18 |
| **ROLL-CALL** | | | |
| **VOTING STRENGTH** .........VIII | 8 | | 14 |
| **RULES OF ORDER FOR** | | | |
| **CONVENTIONS**..................I(B) | | | 18 |
| **SCHOOL-RELATED** | | | |
| **PERSONNEL**......................I | | | 1 |
| | II | 1,4,7 | 1,2 |
| | III | 1,5 | 2 |
| **SEATING OF** | | | |
| **DELEGATES** .......................VIII | 1(e) | | 13 |
| **SECRETARY-TREASURER,** | | | |
| **AFT** ......................................V | 1 | | 6 |
| Acting .................................VI | 4 | | 7 |
| Election of ..........................V | 1 | | 6 |
| Duties ..................................V | 3 | | 7 |
| **SERGEANTS AT ARMS**...............IV(B) | 5 | | 20 |
| **SEXUAL ORIENTATION** ............III | 11 | | 3 |
| | IV | 10 | 5 |
| **SHANKER, ALBERT INSTITUTE** | | | |
| | VIII(B) | 6 | 24 |
| **SPEECH LIMITATIONS, AT** | | | |
| **CONVENTION**....................I(B) | 3 | | 18 |
| Speech duplications...........IV(B) | 2 | | 20 |
| **STANDING** | | | |
| **COMMITTEES**....................VII(B) | | | 22 |
| **STANDARDS,** | | | |
| **IMPROVEMENT OF**...........II | 4,5,6 | | 1 |
| **STATE CHARTERS** .....................IV | 3 | | 4 |
| **STATE FEDERATIONS** | | | |
| Affiliation with.....................XI | 2 | | 15 |
| Delegates from ...................VIII | 1(c) | | 12 |
| Requirements .....................VIII | 5 | | 13 |
| Restrictions ........................VIII | 7 | | 14 |
| **STRIKE, RIGHT TO** ....................II | 1 | | 1 |
| Militancy/Defense fund ....IX | 1 | | 14 |
| **STUDENT-TEACHER** | | | |
| **MEMBERSHIP**....................III | 7 | | 3 |

|  | Article | Section | Page |
|---|---|---|---|
| Charters .............................. IV | | 11 | 5 |
| Voting status........................ IV | | 11 | 5 |
| **SUBSCRIPTIONS TO OFFICIAL** | | | |
| **PERIODICALS** ................... IX | | 2 | 14 |
| **SUPERVISORS,** | | | |
| **MEMBERSHIP OF** ............. III | | 3 | 2 |
| **SUSPENSION OF** | | | |
| **BYLAWS**............................. XI(B) | | 1 | 25 |
| **SUSPENSION OF** | | | |
| **CHARTERS** ........................ IV | | 8 | 5 |
| **TABULATION OF ROLL-** | | | |
| **CALL VOTE**......................... I(B) | | 4 | 18 |
| **TIME LIMITATIONS FOR** | | | |
| **PROPOSED** | | | |
| **AMENDMENTS**.................. X | | 3 | 15 |
| **TRANSFER OF VOTING** | | | |
| **RIGHTS**............................. VIII | | 9 | 14 |
| **TREASURER'S CERTIFICATION OF** | | | |
| **MEMBERSHIP** .................. IX | | 6 | 15 |
| **USHERS, CONVENTION**........... IV(B) | | 5 | 20 |
| **VACANCIES ON EXECUTIVE** | | | |
| **COUNCIL** ........................... VI | | 7 | 8 |
| In presidency...................... VI | | 3 | 7 |
| Of secretary-treasurer ....... VI | | 4 | 7 |
| Of executive vice president VI | | 5 | 7 |
| Of vice presidents ............. VI | | 7 | 8 |

|  | Article | Section | Page |
|---|---|---|---|
| **VICE PRESIDENTS, AFT**............ V | | 1 | 6 |
| Employment of.................... V | | 6 | 7 |
| Executive Vice President ... V | | 1 | 6 |
| | V | 4 | 7 |
| | VI | 5,6 | 7 |
| | VI(B) | 3 | 22 |
| **VICE PRESIDENTIAL VOTE** | | | |
| **REQUIREMENT** ................. VI(B) | | 4 | 22 |
| **VISITOR TO CONVENTION,** | | | |
| **REGISTRATION OF** .......... II(B) | | 2 | 19 |
| **VOTE DISTRIBUTION**............... VIII | | 8 | 14 |
| **VOTE REQUIREMENT,** | | | |
| **AMENDMENTS** ................... X | | 4 | 15 |
| President, executive | | | |
| vice president and secretary- | | | |
| treasurer.............................. VI(B) | | 3 | 22 |
| Vice presidential................. VI(B) | | 4 | 22 |
| **VOTING IN** | | | |
| **REFERENDUM**................... XII | | 1 | 16 |
| **VOTING RIGHTS,** | | | |
| **TRANSFER OF** .................... VIII | | 9 | 14 |
| **VOTING STATUS, STUDENT-TEACHER** | | | |
| **MEMBERS** ......................... IV | | 11 | 5 |
| **WORKING CONDITIONS,** | | | |
| **IMPROVEMENT OF**.......... II | | 4,5,6 | 1 |

# AFT EXECUTIVE COUNCIL

**Edward J. McElroy**
PRESIDENT

**Nat LaCour**
SECRETARY-TREASURER

**Antonia Cortese**
EXECUTIVE VICE PRESIDENT

**VICE PRESIDENTS**

Shelvy Y. Abrams
Mary Bergan
Michelle Bodden
Barbara Bowen
Linda Bridges
Kenneth Brynien
Stacey Caruso-Sharpe
Kathy Chavez
Lee Cutler
Edward Doherty
Kathleen M. Donahue
James F. Dougherty
Eric Feaver
Andy Ford
Janna K. Garrison
David Gray
Judy Hale
David Hecker
Richard Iannuzzi
Sandra C. Irons
Lorretta Johnson
Ted Kirsch
Alan Lubin
Louis Malfaro
Tom Mooney
Maria Neira
Ruby Newbold
Candice Owley
Marcia B. Reback
Laura K. Rico
Pat Santeramo
Judy Schaubach
William Scheuerman
Sandra Schroeder
Marilyn Stewart
Ivan Tiger
Ann Twomey
Adam Urbanski
Randi Weingarten

Affiliated with
**American Federation of Labor and Congress of Industrial Organizations
Department for Professional Employees, AFL-CIO
Education International
Public Services International
Transportation Trades Department, AFL-CIO
Union Label and Service Trades Department, AFL-CIO**



*A Union of Professionals*

American Federation of Teachers, AFL-CIO
555 New Jersey Ave. N.W.
Washington, DC 20001
202/879-4400
www.aft.org
Single copies $1.00 / Ask for item no. 42-0007

